| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY; WESTLANDS WATER DISTRICT, | 1:09-CV-00407 OWW DLB |
| | MEMORANDUM DECISION AND |
| Plaintiffs, | ORDER RE EVIDENTIARY OBJECTIONS RE PLAINTIFFS' MOTION FOR PRELIMINARY |
| v. | INJUNCTION |
| KENNETH LEE SALAZAR, as Secretary of the Interior, *et al.*, | |
| Defendants, | |
| NATURAL RESOURCES DEFENSE COUNCIL and THE BAY INSTITUTE, | |
| Defendant-Intervenors. | |

## I.  INTRODUCTION

This case concerns the United States Fish and Wildlife Service's ("FWS") December 15, 2008 biological opinion ("BiOp" or "2008 BiOp") concerning the impact of coordinated operations of the Central Valley Project ("CVP") and State Water Project ("SWP") on the threatened delta smelt.  San Luis & Delta-Mendota Water Authority ("Authority") and Westlands Water District ("Westlands") (collectively "Plaintiffs") moved for a preliminary injunction to enjoin the application of Component 2 of the

1

Reasonable and Prudent Alternative ("RPA") in the BiOp, which imposes certain flow restrictions on CVP operations in the Old and Middle Rivers ("OMR") of the Sacramento-San Joaquin Delta. Doc. 31, filed April. 24, 2009 (Notice of Mot.); Doc. 32 (Mem. in Sup. of Mot.). The motion was heard May 22, 2009.

Plaintiffs' underlying complaint and motion for preliminary injunction raise claims against FWS based on the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"). Plaintiffs have filed numerous supporting declarations. Docs. 34-47, 71, 73-76, 78. Federal Defendants oppose the imposition of an injunction, and filed several declarations. Doc. 56. Environmental Intervenors, Natural Resources Defense Council ("NRDC") and The Bay Institute, also oppose injunctive relief and filed an opposing declaration. Doc. 58. Before the court for decision are various evidentiary objections raised by the parties in connection with the motion for preliminary injunction.


## II.  ANALYSIS

### A.  Objections to Evidence of Economic Harm.

Environmental Intervenors object to the following declarations, or portions thereof, on the ground that they discuss alleged economic costs, including water export and delivery reductions, that might result from implementation of the challenged flow restrictions:  Todd Diedrich; Shawn Coburn; Todd Allen; John Harris; Joan Maher, ¶¶ 5-21, 23-26; Russ Freeman, ¶¶ 3-24, and Exhibit A; Daniel Nelson, ¶¶ 3-13; James Snow, ¶¶ 9-10, 15-19; Dana Wilkie, ¶ 7; Robert Silva, ¶¶ 3-4; Marcia Sablan, ¶¶

3-7; and Baldomero Hernandez, ¶¶ 2, 6.

The Ninth Circuit has restricted the type of evidence that may be considered in deciding motions for injunctive relief in ESA cases. *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 793-94 (9th Cir. 2005) (*NWF v. NMFS I*) ("The traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA."); *Pac. Coast Fed'n of Fisherman's Ass'ns v. Gutierrez*, --- F. Supp. 2d ---, 2008 WL 2851568, *6-*7 (E.D. Cal. 2008).

> "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." [*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994).] As the Supreme Court has noted, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 194 (1978). Accordingly, courts "may not use equity's scales to strike a different balance." *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996) ("Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species.").

*NWF v. NMFS I*, 422 F.3d at 793-94 (parallel citations omitted); *see also TVA*, 437 U.S. at 187-88 (concluding that Congress determined in the ESA that the value of endangered species is "incalculable" and prohibiting the balancing of economic harms against the Congressionally determined public interest in preserving endangered species); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2537 (2007) (reaffirming holding from *TVA* that economic burden of enforcing the ESA cannot be considered by the courts, concluding that "the ESA's no-jeopardy mandate applies to every discretionary agency

action-regardless of the expense or burden its application might impose"); *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510-11 (9th Cir. 1994) ("In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests."); *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987) (courts "may not use equity's scales to strike a different balance"); *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996) ("Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species.").

Plaintiffs suggest that *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365 (2008)*,* overrules this long line of precedent, by holding that "[i]n <u>each case</u>, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" 129 S. Ct. at 376 (citing *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987))(emphasis added).[1] It is not

[1]  *Winter* is arguably inapplicable to a claim brought under the ESA.  Although the plaintiffs in *Winter* originally brought claims under both the ESA and NEPA, *Winter*, 129 S. Ct. at 372, the district court entered a preliminary injunction against the Navy based upon showing a likelihood of success on the NEPA claim, not the ESA claims.  *Id*. at 374, n. 4.  The Ninth Circuit and Supreme Court opinions explained and recognized that the subject sonar testing had significant adverse effects on individual members of ESA-listed species.  *See, e.g., NRDC v. Winter*, 518 F.3d 658, 691-692 (9th Cir. 2008); *Winter*, 129 S. Ct. at 374.  But, these passing references to the ESA status of the species affected by the sonar testing do not alter the fact that the district, appellate, and Supreme Court opinions analyzed <u>only</u> the NEPA claims.

4

necessary to resolve the impact of *Winter* on the Ninth Circuit's ESA injunctive relief jurisprudence at this stage of the litigation, because Plaintiffs have demonstrated a likelihood of success on their NEPA claim.  It is undisputed that evidence of economic harm is admissible in the context of a request for injunctive relief under NEPA.

Environmental Intervenors objection to the admission of economic harm evidence is OVERRULED for purposes of the NEPA claim.

### B.   Environmental Intervenors' Objection to Evidence of Potential Environmental Harm.

Environmental Intervenors further object to Plaintiffs' "attempt to characterize some of these irrelevant economic costs as alleged 'environmental harms' by, for example, discussing the potential impact of increased groundwater pumping conducted to make up for reduced CVP deliveries."  Doc. 60 at 4. Environmental Intervenors argue that any such increased groundwater pumping or related actions "would be voluntary actions taken by Plaintiffs or its constituents to mitigate for alleged economic costs of reduced CVP water deliveries."  *Id*.

The only legal support Environmental Intervenors offer for this position is a quote from *NRDC v. Kempthorne*, 2008 WL 5054115, *18 (E.D. Cal. Nov. 19, 2008), where the district court considered environmental plaintiffs' argument that the Bureau was unlawfully making "contractual promises of excessive water deliveries that the Bureau cannot meet," and that "[o]nly a more realistic allocation of CVP water in the contracts following a

5

valid ESA consultation can cure this problem."  The district court rejected this argument, reasoning:

> These are political, not legal arguments. Whether and to what extent water users take actions based upon contractual promises to provide water service that historically have rarely, if ever, been met in full is not cognizable under the ESA, which deliberately prohibits the federal courts from considering the economic impacts of actions taken to protect listed species

*Id.*  This discussion has nothing to do with whether environmental harms purportedly triggered by federal agency action requiring land fallowing may be considered in the balance of the harms when reviewing a request for injunctive relief in a NEPA case.  NEPA requires consideration of such indirect environmental impacts, along with any indirect "aesthetic, historic, cultural, economic, social, or health" impacts, so long as they are "reasonably foreseeable."  40 C.F.R. § 1508.8.[2]  Environmental Intervenors' objection is without merit and is OVERRULED.

C.  Objections to Fact Witness Declarations.

Environmental Intervenors also object to the following fact witness declarations under Federal Rules of Evidence 602 and 701 on the ground that they offer improper expert opinions and lack foundation:  Dana Wilkie, ¶ 7; Robert Silva, ¶¶ 3-4; Marcia Sablan, ¶¶ 3-7; Baldomero Hernandez, ¶¶ 2, 6.  None of these witnesses have been designated or accepted as experts.

---

[2]  Environmental Intervenors have not argued that the environmental impacts raised in Plaintiffs' declarations are not the reasonably foreseeable result of the challenged agency action.  Even if such an argument had been made, it would go to the weight, not the admissibility of any such evidence.

6

Federal Rule of Evidence 602 limits lay witness testimony to factual matters of which the witness has personal knowledge. Federal Rule of Evidence 701 limits opinion testimony by lay witnesses to "opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [Testimony by Experts]." "The admissibility of lay opinion testimony under Rule 701 is committed to the sound discretion of the trial judge...." *Nationwide Transp. Fin. v. Cass Info. Sys. Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting *United States v. Yazzie*, 976 F.2d 1252, 1255 (9th Cir. 1992)).

Environmental Intervenors argue that each of the objected-to declarants "opines on complex subjects such as the alleged cause of unemployment in the San Joaquin Valley, increasing demand at local food banks, declining police protection, or increasing crime rates, attributing all of these social ills to reduced water deliveries caused by implementation of the 2008 [BiOp]. However, none of these witnesses demonstrates the specialized knowledge required to opine on these matters."[3]  Doc. 60 at 6. Environmental Intervenors further argue that the identified

---

[3]    Environmental Intervenors further argue that the opinions of the objected-to declarants "are contradicted by both the facts, as reflected in current state and federal data regarding unemployment in the Valley, and expert opinions regarding the primary cause of that unemployment and related effects" citing the Declaration of Jeffrey A. Michael, Ph.D. But, this goes to the weight, not the admissibility, of these declarations.

paragraphs in each declaration are inadmissible because they are
(1) not based on facts of which the witness has personal
knowledge, and (2) the opinions offered therein are not
rationally based on the witness's own perception, or helpful to
the Court's determination of facts at issue.  *Id*. at 7.
Plaintiffs rejoin, generally, that the declarations properly
contain only simple observations and logical inferences based on
those observations.  Doc. 69 at 7.

As to Ms. Wilkie, Environmental Intervenors object to the
following paragraph:

> I believe that the increase in the number of hungry
> people in out southern San Joaquin counties is directly
> related to the restrictions on the availability of
> water to the farms in our area.  My belief is based on
> the fact that the need for assistance began to increase
> at approximately the same time the zero water
> allocations for our irrigation districts were
> announced, and the farmers started to lay off their
> employees, which significantly increased unemployment
> in our area.

Doc. 47 at ¶7.  Plaintiffs point out that, as the CEO of a large
community food bank that serves Fresno, Madera, and Kings
Counties, *id*. at ¶1, she is familiar with and knowledgeable of
the demands of the food bank and the individuals that it serves.
Doc. 69 at 9.  It is reasonable to infer that she is familiar
with the reasons why the individuals served by the food bank are
unemployed and/or undermployed.  Her opinion that the increased
demand for food services is caused, at least in part, by low
water allocation is based upon her personal observations and
knowledge, not any impermissible scientific, technical, or other
specialized knowledge.  This lay opinion evidence is admissible.
Environmental Intervenors' objection is OVERRULED as to paragraph

**8**

1    7 of the Wilkie declaration.

2        Mr. Silva is the mayor of Mendota and has been involved in

3    city government, education, and commerce for 20 years.  Doc. 45,

4    Silva Decl. at ¶1.  Environmental Intervenors object to the

5    following paragraphs from his declaration:

6              3.    The hydrologic and regulatory drought has
             resulted in a zero water allocation from the Bureau of
7            Reclamation ("Reclamation") to Westlands Water
             District, our region's primary supplier of water.  The
8            complete lack of irrigation water has caused the
             majority of the farmers in and around Mendota to leave
9            their fields fallow.  As a result, there have been
             significant layoffs from farms and agriculture support
10           industries, and/or practically no hiring of seasonal
             labor.  The current unemployment rate in Mendota is
11           40%.  This unemployment rate represents more than a 10%
             increase since November 2008.  Mendota's current rate
12           of unemployment is one of the highest in California and
             in the nation.

13
             4.    The City of Mendota contracts with the Fresno
14           County Sheriff for police protection services.  The
             Sheriff has recently notified the city that there has
15           been an increase in the crime rate in the city.  In
             2008, there was an 11% increase in the crime rate as
16           compared to 2007.  The percent increase in certain
             crimes, like aggravated assault, almost doubled in
17           2008.  The city does not have crime statistics for
             2009.  Since the effects of the water restrictions were
18           already beginning to impact the farm economy last year,
             I believe that this increase in the crime rate can
19           largely be attributed to the significant increase in
             unemployment during the same time period.  The city has
20           plans to start its own police department in an effort
             to increase the safety of our community.  However,
21           since the water restrictions have depressed the farm
             economy in our region, the availability of funding for
22           needed city polic[e] protection is uncertain.

23   *Id*.  As a local government official, Mr. Silva is familiar with

24   water supply, economic, employment, and community safety issues,

25   including availability of funding for police services, affecting

26   the City and residents he represents.  This lay opinion evidence,

27   which is not scientific or technical in nature, is admissible.

28   Environmental Intervenors' objection is OVERRULED as to the Silva

                                  9

Declaration.

Ms. Sablan, is the mayor of Firebaugh and has been involved in the community for 30 years. Doc. 44 at ¶1. Environmental Intervenors object to the following paragraphs of her declaration:

> 3. The drought and the regulatory pumping restrictions on the operation of the Central Valley Project ("CVP") have already significantly impacted the community of Firebaugh. The lack of water is causing agricultural workers in Firebaugh and the surrounding communities to lose their jobs, resulting in a loss of livelihood and inability to provide for their families, and increases in negative social and economic impacts on the communities that depend on them.

> 4. In response to the significant pumping restrictions, many farmers have been unable to plant large portions of the areas surrounding Firebaugh, and many of the areas planted in permanent crops are barely being sustained. The direct and indirect impact of the loss of farming has resulted in a rise in unemployment. The current unemployment rate in Firebaugh is 40%.

> 5. As a result of the unemployment resulting from hydrologic conditions and regulatory drought, many people in Firebaugh are hungry. In an effort to address the crisis, the City of Firebaugh has undertaken several food drives. Once a month for the last three months, the City of Firebaugh has provided, with the assistance of corporate sponsorships and large farmers, an average of 1,000 meal boxes to people in the community. As the spring and summer progress, the number of hungry people in Firebaugh could potentially increase. While the City of Firebaugh is working to provide assistance, our efforts are not likely to be enough to avoid the significant impacts of hunger, particularly if unemployment continues to increase.

> 6. The significant agricultural land fallowing in and around Firebaugh is a direct result of the CVP delivery restrictions. As a result of the loss of agricultural production, there has been a significant reduction in local sales tax revenue.... These losses ... have caused the City of Firebaugh to lay off three of its key upper level staff. As the size of the City of Firebaugh's staff has always been small as compared to other city governments, these layoffs are significant and will greatly impact city services. If the City of Firebaugh's tax revenue continues to decrease, it is possible that fire and police protection services will

10

1    be faced with substantial cuts....

2           7.    School enrollment ... has also been affected.    The
           Schools in the rural areas around Firebaugh have
3          experienced declining enrollment because the
           significant farm layoffs have resulted in dislocation
4          of employees that had lived in on-farm housing.   Many
           of these families with children have moved in with
5          family or friends in town, often increasing the number
           of people living in a home in Firebaugh to include two
6          or three families.   The standard of living of the
           families with children moving into our City of
7          Firebaugh schools has therefore declined significantly,
           and the crowding and stressful home life may be
8          impacting the children's academic performance.   At the
           same time, the schools in the rural areas around
9          Firebaugh are losing significant state funding as every
           child that leaves results in a $5,000 loss in annual
10         income to the schools....

11   Doc. 44.   Like Mr. Silva, as an elected official of the City of

12   Firebaugh, Ms. Sablan has a duty to be familiar with the

13   economic, education, and water supply conditions impacting the

14   residents of the City.   Her statements are admissible lay opinion

15   evidence based on personal knowledge.   Environmental Intervenors'

16   objections to Ms. Sablan's declaration are OVERRULED.

17         Finally, Environmental Intervenors object to paragraphs 2

18   and 6 of the declaration of Baldomero Hernandez, the principal of

19   Westside Elementary School, located approximately 45 miles

20   southwest of Fresno.   Doc. 45 at ¶1.   Paragraphs 2 and 6 provide:

21         2.    The community that surrounds Westside is rural and
           heavily reliant on farming.   The farmers in our area
22         are fallowing their fields because they do not have
           enough water to sustain their crops.   As a result, many
23         people are losing their jobs.   The parents of our
           students are among those most affected by the layoffs.
24         Many of the parents of our students are leaving the
           area to find work.
25
           6.    The families of our students are struggling.
26         Since the farm layoffs started, I have received many
           requests for assistance from families.   Many are
27         hungry.   There also appears to be a large number of
           parents separating.
28

                                    11

Doc. 41.  Plaintiffs are correct that, as the principal of a grade school, it is normal for Mr. Hernandez to be reasonably familiar with the academic and personal issues facing the students and families that his school serves.  Nothing in his declaration is scientific or technical in nature.  Rather, his statements and opinions are based his own personal observations and knowledge.  Environmental Intervenors' objections to the Hernandez declaration are OVERRULED.

### D.    Plaintiffs' Objection to the Declaration fo Jeffrey A. Michael.

Plaintiffs object to the Declaration of Jeffrey A. Michael, Doc. 58-2, on the grounds that his testimony violates Federal Rules of Evidence 702, 402 and 403.  Federal Rule of Evidence 702 only allows expert testimony in the form of an opinion or otherwise if:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 402.

The test for reliability "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).  In reviewing proffered expert testimony, the court serves as a gatekeeper and has considerable discretion in determining its reliability and the methods and factors to consider in making that determination. *United States. v. Hankey*, 203 F.3d 1160, 1167-1168 (9th Cir. 2000).  "[I]n discharging its gatekeeping obligation," a court may consider "1) whether a theory or

12

technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *Id*. at 1168.

Expert testimony must not only be reliable, it must also be relevant. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) ("'Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful.'") (quoting 3 Weinstein & Berger 702[02], p. 702-18); *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002) ("Whether testimony is helpful within the meaning of Rule 702 is in essence a relevancy inquiry."). Federal Rule of Evidence 402 states that "[e]vidence which is not relevant is not admissible." Federal Rule of Evidence 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of ... confusion of the issues."

Plaintiffs first argue that Dr. Michael's methods and opinions "cannot be reliably applied to the facts of this motion." Doc. 68 at 3. Specifically, Plaintiffs object that Dr. Michael relied upon "employment data collected on region-wide scales such as Metropolitan Statistical Areas and County levels," and that this is "too coarse a grain of analysis for the issues in this motion," because this data "does nothing to illuminate or expound on the individual hardships caused by potential water shortages to specific people and the smaller geographic areas such as the water districts, water users, and the smaller hamlets on the Westside of the San Joaquin Valley...." *Id*. Plaintiffs

13

point out that Dr. Michael admits that the data he employs does not account for farm layoffs on the Westside of the San Joaquin Valley because "[t]he State does not release current payroll data at the sub-county level." Michael Decl. at ¶8. Plaintiffs also emphasize that while he maintains that agricultural employment is rising, Dr. Michael also admits that "[b]ecause some fields have been fallowed in response to reduced water deliveries, there will be fewer farm workers required during the harvest season." *Id*. at ¶13. These objections go to the weight, not the admissibility of Dr. Michael's opinions, which are marginally relevant at a "macro" level.

In response to Dr. Michael's declaration, Plaintiffs offer the testimony of Dr. Richard Howitt of the University of California at Davis, an agricultural economics professor, who confirms these shortcomings. Howitt Decl. at ¶ 9. Dr. Howitt opines that the above-described flaws render the Michael Declaration's data and methods "largely irrelevant to the question of measuring the incremental loss in employment due to water reductions to the Westside of the San Joaquin valley." *Id*.

Alternatively, Plaintiffs argue that the Michael Declaration is irrelevant and risks confusing the issues in this case:

> By offering the Michael Declaration, Proposed Intervenors apparently attack the straw man proposition that all current economic ills in the San Joaquin Valley are a result of pumping restrictions. However, the Plaintiffs have never made this claim, and under Federal Rule of Evidence 402, this issue is irrelevant to the current preliminary injunction motion. Also, as explained above in Section II.A, the Michael Declaration uses inappropriate data that is inapplicable and unhelpful to the issues in this motion, which also renders it irrelevant. Finally, the declaration's focus on macro-economic indicators and forecasts is confusing even if somehow relevant and

**14**

therefore it should be excluded under Federal Rule of Evidence 403. As a result of Proposed Intervenors' misguided macro-economic focus, the Michael Declaration addresses an entirely separate and irrelevant issue, opining that the major cause of the economic troubles in the San Joaquin Valley is the result of the nationwide recession, foreclosure crisis, and credit crunch. For example, Dr. Michael opines that "data suggests that local unemployment is being primarily driven by the foreclosure crisis, real estate crash, and credit crunch." (Michael Declaration ¶ 7.) (emphasis added) Elsewhere, Dr. Michael states "the distress in this region is being primarily driven by the housing collapse, and the broad recession sweeping across the globe." (Michael Declaration ¶ 14.) (emphasis added) He also concludes that "[c]urrent data does not support the claim that farm layoffs are behind rising local unemployment." (Michael Declaration ¶ 14.)

As explained in Section II.A, above, and as confirmed by the testimony of Dr. Richard Howitt of the University of California at Davis, Dr. Michael only looked at regional, countywide statistics because he used only coarse grained, macro-economic data. (Howitt Decl. ¶ 9) Accordingly, Dr. Howitt concludes that the Michael Declaration's data and opinions are "largely irrelevant to the question of measuring the incremental loss in employment due to water reductions to the Westside of the San Joaquin Valley." (*Id.*) This is so because the Michael 702 as unhelpful and for failure to apply the principles and methods to the facts of this case.

Doc. 68 at 5-6.

Although Plaintiffs' objections and the Howitt declaration question the weight the trier of fact should give Dr. Michael's declaration, they do not undermine its admissibility. Plaintiffs do not question his methods relative to the limited, region-wide conclusions he reaches. As to relevancy, Mr. Michael's declaration provides information about overall trends in employment in the Central Valley, which help to provide broad context applicable to the regional economy, and for the more specific information provided by other declarants with respect to the societal conditions in those communities on the West side of

the San Joaquin Valley that are most dependent on CVP water
deliveries.

Plaintiffs' objections to the Michael Declaration are
OVERRULED.

### III.  CONCLUSION

For the reasons set forth above, all of the evidentiary
objections raised by Environmental Intervenors and Plaintiffs are
OVERRULED.


SO ORDERED

Dated: May 29, 2009


                                    /s/ Oliver W. Wanger
                                   Oliver W. Wanger
                              United States District Judge