UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY; WESTLANDS WATER DISTRICT, | 1:09-CV-00407 OWW DLB |
| Plaintiffs, | FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER RE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| KENNETH LEE SALAZAR, as Secretary of the Interior, *et al.*, | |
| Defendants, | |
| NATURAL RESOURCES DEFENSE COUNCIL and THE BAY INSTITUTE, | |
| Defendant-Intervenors. | |

I.  **INTRODUCTION**

This case concerns the United States Fish and Wildlife Service's ("FWS") December 15, 2008 biological opinion ("BiOp" or "2008 BiOp") concerning the impact of coordinated operations of the Central Valley Project ("CVP") and State Water Project ("SWP") on the threatened delta smelt.  San Luis & Delta-Mendota Water Authority ("Authority") and Westlands Water District ("Westlands") (collectively "Plaintiffs") move for a preliminary injunction to enjoin the application of Component 2 of the

1

Reasonable and Prudent Alternative ("RPA") in the BiOp, which imposes certain flow restrictions on CVP operations in the Old and Middle Rivers ("OMR") of the Sacramento-San Joaquin Delta. Doc. 31, filed April. 24, 2009 (Notice of Mot.); Doc. 32 (Mem. in Sup. of Mot.).

Plaintiffs' underlying complaint and motion for preliminary injunction raise claims against FWS based on the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"). Plaintiffs have filed numerous supporting evidentiary declarations. Docs. 34-47, 71, 73-76, 78. Federal Defendants oppose the issuance of an injunction, and filed several evidentiary declarations. Doc. 56. Environmental Intervenors also oppose injunctive relief and filed an opposing evidentiary declaration. Doc. 58. The parties agreed to submit the Motion on the papers following oral argument.

Oral argument was heard May 22, 2009. Plaintiffs were represented by Kronick, Moskovitz, Tiedemann & Girard by Daniel J. O'Hanlon, Esq. Federal Defendants, including the Secretary of the Interior Kenneth Lee Salazar, the United States Department of the Interior, FWS, Acting Director of FWS Rowan Gould, Regional Director of FWS Ren Lohoefenor, United States Bureau of Reclamation ("Bureau" or "Reclamation"), Acting Commissioner of Reclamation J. William McDonald, and Regional Director Donald Glaser, were represented by James A. Maysonett, Esq., and William J. Shapiro, Esq., Trial Attorneys, Environment and Natural Resources Division, U.S. Department of Justice. Defendant-Intervenors, The Bay Institute and Natural Resources Defense Council ("NRDC") were represented by George M. Torgun,

1 Esq., Katherine Poole, Esq. and Doug Obegi, Esq.  After

2 considering all of the briefs, oral argument, and evidence, the

3 following findings of fact and conclusions of law are entered.

4

5                              II.  <u>BACKGROUND</u>

6     The 2004 Biological Opinion on the effects of the

7 coordinated operations of the CVP and SPW on the delta smelt, a

8 species currently listed as "threatened" under the ESA, was found

9 unlawful in a May 25, 2007 decision, *NRDC v. Kempthorne*, 1:05-CV-

10 1207 ("*NRDC*"), 506 F. Supp. 2d 322 (E.D. Cal. 2007).  *See NRDC*

11 Doc. 323.  After remand and a requested extension of time, on

12 December 15, 2008, FWS issued a new biological opinion ("BiOp" or

13 "2008 BiOp").  *See* Plaintiffs' Request for Judicial Notice

14 ("PRJN"), Doc. 33, at Ex. A.[1]  In the 2008 BiOp, FWS concludes

15 that CVP and SWP operations, as proposed, are "likely to

16

_____

17     [1]    Plaintiffs request that the court take judicial notice
of the following:  (1) FWS December 15, 2008 biological opinion
18 on proposed coordinated operations of the CVP and SWP, PRJN Ex.
A; (2) Proclamation, State of Emergency – Water Shortage,
19 Governor of the State of California, Arnold Schwarzenegger,
February 27, 2009, PRJN Ex. B; (3) Executive Order S-06-08,
20 Governor of the State of California, Arnold Schwarzenegger, June
4, 2008, PRJN Ex. C; (4) Proclamation, State of Emergency –
21 Central Valley Region, Governor of the State of California,
Arnold Schwarzenegger, June 12, 2008, PRJN Ex. D; (5)
22 Proclamation of Existence of a Local Emergency and Request for
the Governor to Proclaim a State of Emergency and Request for a
23 Presidential Declaration and Request for State and Federal
Assistance by the Board of Supervisors, County of Fresno, State
24 of California, Resolution 09-134, signed April 14, 2009, PRJN Ex.
E.   Pursuant to Federal Rule of Evidence 201, these public record
25 are subject to judicial notice as to their content and existence
but not for the truth of the matters stated therein.  Plaintiffs'
26 request is GRANTED.

27

28

                                 3

jeopardize the continued existence of" the delta smelt and "adversely modify" its critical habitat.  BiOp at 276-79.  Because FWS reached a "jeopardy" conclusion, it adopted a "reasonable and prudent alternative" ("RPA") designed to avoid jeopardy and/or adverse modification.  BiOp at 279-85.  Component 2 of that RPA requires Reclamation and the California Department of Water Resources ("DWR") to operate the Projects to limit negative water flows in OMR during a defined period in the spring to "no more negative than -1,250 to -5,000 [cubic feet per second (cfs)]," ending on June 30, or when water temperature reaches 25°C for three consecutive days, whichever is sooner.  BiOp at 282, 357-68.

OMR flow restrictions have been the subject of a previous order.  In July 2007, NRDC's motion for a preliminary injunction on OMR flow restrictions was denied.  *NRDC*, Doc. 394.  In December 2007, after a seven day remedies trial, extensive findings of fact were issued on the effects of negative OMR flows and Reclamation and DWR were ordered, among other things, to "operate the CVP and SWP to achieve a daily average net upstream flow in OMR of between 750 and 5,000 cfs on a seven-day running average" during a defined period in the spring.  *NRDC*, Doc. 560 at 7; *see also NRDC*, Doc. 561 at 15-20.


## III.  FINDINGS OF FACT

A.    Status of the Species.

1.    The available, uncontradicted data indicates a precipitous decline (by as much as several orders of magnitude) in the relative abundance of delta smelt since 2000.  In

previous, related proceedings, the expert witnesses were in agreement that the species is in serous trouble. *NRDC*, Doc. 561 at ¶11.

2.    More recent evidence shows that the species has declined even further since its status was last reviewed in December 2007.  Recent fall mid-water trawl ("FMWT") abundance indices are among the lowest ever recorded.  BiOp at 153-156. The 2008 index was 23, the lowest level ever recorded.  Doc. 38, First Hanson Decl. at ¶7; Doc. 56-2, Goude Decl. at ¶2.  Cay Goude, FWS's Assistant Field Supervisor for the endangered species program in FWS's Sacramento Fish and Wildlife Office, opines that the delta smelt's failure to rebound in 2009 is not surprising because of the smelt's low abundance and the fact that California is in its third consecutive year of dry or critically dry conditions.  Goude Decl. at ¶11.

3.    On March 6, 2009, the California Fish and Game Commission reclassified delta smelt from threatened to endangered under the California Endangered Species Act ("CESA"), finding that the species has "declined significantly since its listing as threatened and the species' abundance is now extremely low." Doc. 59-2, Obegi Decl. at ¶7 & Attch. 6.  On July 10, 2008, FWS announced a ninety-day finding that uplisting delta smelt as endangered under the ESA may be warranted.  73 Fed. Reg. 39,639 (July 10, 2008).

B.    Development of FWS's December 15, 2008 Biological Opinion.

4.    On remand from the Court, the Bureau and DWR, with the advice and assistance of Plaintiffs and other water contractors,

prepared a biological assessment ("BA") describing the proposed operations for the consultation and evaluating the impact of proposed operations on the smelt.  The BA included no measures to protect delta smelt, except for those measures required by the terms and conditions of the Projects' water rights permits and licenses.  Obegi Decl. at ¶ 6 & Attch. 5.

5.  FWS prepared a preliminary draft BiOp that was reviewed by both FWS's internal and an independent peer review team.  *See* BiOp at vi.  The final BiOp, issued December 15, 2008, concluded that the operations proposed in the BA would cause jeopardy to the continued existence and recovery of delta smelt and would adversely modify its critical habitat.  *Id*. at 276-279.  As a result of the jeopardy and adverse modification finding, FWS included a reasonable and prudent alternative ("RPA") designed to avoid jeopardy.  *Id*. at 279-85.

C.  <u>The Reasonable and Prudent Alternative</u>.

6.  The RPA comprises five (5) components.  Components 1, 2 and 3 establish a range of permissible OMR flows during different times of the winter and spring, with biologically based triggers to begin, suspend, or terminate each component.  *Id*. at 279-285; *see also* BiOp Attch. B.[2]  These components are designed to

---

[2]  Component 4, which requires DWR to implement a program to create or restore habitat in the Delta and Suisun Marsh, is "intended to provide benefits to delta smelt habitat to supplement the benefits resulting from the flow actions" described in Components 1 through 3.  BiOp at 283.  Component 5 requires the Bureau and DWR to implement a monitoring and reporting program.  *Id*. at 284.

prevent entrainment of adults, juveniles, and larvae, as well as to improve flow conditions to allow delta smelt to spawn and rear successfully.  *Id.*  Once flow restrictions are triggered, FWS establishes the particular flow standard using an adaptive management process which incorporates current delta smelt surveys and sampling (including the FMWT, Spring Kodiak Trawl, 20-mm Survey, and TNS), water quality monitoring (turbidity and flow levels), particle tracking model ("PTM")[3] results, recent salvage data, and the advice of the Smelt Working Group ("SWG") and Water Operations Management Team ("WOMT").  *Id.*; *see* Goude Decl. at ¶7 & Ex. F (SWG notes).  Plaintiffs' expert's initial suggestion that the adaptive management process places undue weight on PTM results, while ignoring actual delta smelt distribution, First Hanson Decl. at ¶15, is wrong.

     7.   The RPA is designed to avoid jeopardy to the continued existence and recovery of delta smelt and to prevent the adverse modification of critical habitat by:

> 1) preventing/reducing entrainment of delta smelt at Jones and Banks; 2) providing adequate habitat conditions that will allow the adult delta smelt to successfully migrate and spawn in the Bay-Delta; 3) providing adequate habitat conditions that will allow larvae and juvenile smelt to rear; and 4) providing suitable habitat conditions that will allow successful recruitment of juvenile delta smelt to adulthood.

BiOp at 279.

     8.   The current motion only seeks to enjoin application of Component 2.  Doc. 32 at 5, 13-14.  The period for Component 1

---

     [3]   PTM focuses on the impact of flows upon imaginary particles "injected" into a particular location in the Central Delta, station 815.  BiOp at 366.

7

has expired, and Component 3 will not be implemented this year. *Id*. at 5 n.2.  Component 2 is designed to protect larval and juvenile delta smelt from entrainment and to provide adequate flow conditions "so that larval and juvenile delta smelt can successfully rear in the Central Delta and move downstream when appropriate."  BiOp at 282.  It is triggered by one of three events: completion of Component 1; capture of spent delta smelt females in salvage or surveys; or a 3-station average of Delta water temperatures reaching 12°C.  *Id*.  Component 2 ends when the three-day average of water temperatures at Clifton Court Forebay reaches 25°C, or June 30, whichever event comes first.  *Id*.  RPA Component 2 requires an OMR flow standard of between -1,250 and -5,000 cfs, on a 14-day running average, with the five-day running average within 25% of the required flow.  *Id*.

9.    The actual OMR flow levels permitted under Component 2 in May and June are based on an adaptive process developed in consultation with the SWG[4] starting in 2007, called "Influence-Exposure-Intensity-Response (IEIR) Analysis," which incorporates salvage data, distributional data from surveys, the location of X2, water temperature data, PTM results, and prior year FMWT data.  *Id*. at 358-359, 364-366.  "During most conditions, it is expected that maximum negative OMR flows will range between -2000 and -3500.  During certain years of higher or

---

[4]    The SWG is no longer known as the "delta smelt working group" because it now also routinely considers protections for longfin smelt, another pelagic species that became a state candidate for listing under the California Endangered Species Act ("CESA") in 2008.  *See* BiOp at 30.

lower predicted entrainment risk, flow requirements as low as -1,250 or -5,000 will be recommended to the Service by the SWG." *Id*. at 357, fn. 10; *see also id*. at 360, 363. FWS will set negative OMR flows in a range between -1,250 cfs and -5,000 cfs, depending upon whether entrainment risk is deemed "low," "lesser," or something greater. *Id*. at 359.

10. If "available physical and biological real-time monitoring data" indicate a "low-entrainment risk scenario," then OMR flows can be as negative as -5,000 cfs. *Id*. at 358. "Low" entrainment risk is indicated only when "there has been no evidence of delta smelt in the South and Central Delta or larval delta smelt are not yet susceptible to entrainment." *Id*. The BiOp's "high-entrainment risk scenario" arises when any delta smelt have been found in the South and Central Delta from the Spring Kodiak Trawl or the 20 mm survey, or when there is ongoing entrainment at the pumps. BiOp at 358. In these conditions, FWS will be more restrictive than -5,000 cfs. *Id*. at 358-59.

11. Component 2 is designed to "minimize the entrainment of larval/juvenile delta smelt in the Central and South Delta." BiOp at 360. "In recent years, the densest concentrations of both spawners and larvae have been recorded in the Cache Slough/Sacramento Deepwater Ship Channel complex in the North Delta." *Id*. at 148. The BiOp provides that "[w]hen the distribution of delta smelt is in the North or North/Central Delta," minimization of take will be accomplished "by holding entrainment to ~1 percent of the individuals utilizing the Central and South Delta (south and east [upstream] of Station 815, see Map 2) across a 14-day particle modeling interval." *Id*.

1  at 360.   FWS calls this 1% entrainment standard its

2  "protectiveness criterion."  *Id.*  Under this criterion, FWS will

3  seek to limit entrainment to approximately 1% of the larvae and

4  juveniles at Station 815 in the Central Delta, even if only a

5  small portion of the overall recorded population of larvae and

6  juvenile delta smelt is in the Central and South Delta.

7      12.   The BiOp further explains:

8          In circumstances where it is known or suspected that
           the Central Delta or South Delta is a principal source
9          of emerging larvae, as occurred in WY 2003, OMR
           restrictions might be calculated using reduction of
10         14-day Station 815 entrainment below 1 percent, or
           other methods as needed to ensure protection of the
11         larval population in conditions of such severe
           vulnerability. <u>The Action utilizes OMR restrictions to</u>
12         <u>achieve the desired end, as OMR flow is a strong</u>
           <u>predictor of geographical variation in entrainment risk</u>
13         <u>in the Central and North Delta</u>.

14  *Id.* (emphasis added).

15      13.   In addition to the adaptive management framework

16  provided in the BiOp, the RPA also includes a provision stating

17  that in consecutive dry or critically dry years, CVP/SWP export

18  rates will never be required to drop below -1,500 cfs "in order

19  to allow the CVP/SWP to provide health and safety needs, critical

20  refuge supplies, and obligation[s] to senior water rights

21  holders."  BiOp at 296.   The BiOp also allows for the

22  reinitiation of consultation under certain circumstances.  *Id.* at

23  296-297.

24      14.   Since December 15, 2008, FWS and the Bureau have been

25  using the adaptive management framework to implement the BiOp.

26  The SWG has met approximately every week to provide guidance to

27  FWS in setting OMR flow requirements and has based its

28  recommendations on survey, salvage, water quality, and other data

1  sets, in combination with PTM results.  *See* Goude Decl. at ¶7 &

2  Ex. F (SWG notes).

3

4  D.  Current Location of Smelt & Entrainment Risk.

5      15.  The Spring Kodiak Trawl surveys completed by the

6  California Department of Fish and Game ("DFG") in January,

7  February, March, and April of 2009 reflect the distribution of

8  adult spawning delta smelt.  First Hanson Decl. at ¶8.  The

9  results of these surveys indicate that, up until May of this

10 year, most of the adult delta smelt spawned in the northern and

11 western reaches of the Delta.  *Id*.  However, the month of May is

12 historically a period when high numbers of smelt become entrained

13 at the export facilities.  Fed. Def. Ex. B (Service Decision May

14 21, 2009).  The April 20-24 20 mm survey results found delta

15 smelt at several stations in the Central and South Delta,

16 including stations 705, 815, 910, and 914, while the May 5-8 20

17 mm survey results found delta smelt at stations 901, 815, 705,

18 and 801.  Goude Decl., Ex. A; Obegi Decl., Attach. 4.  As of May

19 21, 2009, the most recent 20 mm survey again indicates that some

20 delta smelt were caught in the Central Delta.  Fed. Def. Ex. B.

21     16.  Salvage has also increased:  on May 16, 12 delta smelt

22 were salvaged; 24 on May 17; 20 on May 18; 4 on May 19; 28 on May

23 20; and 8 on May 21.  Fed. Def. Ex C (Central Valley Operations

24 Office, Delta Smelt and Splittal, May-09).  Larvae smaller than

25 20 mm are not counted in these salvage reports.  BiOp at 163.

26

27 E.  Implementation of Related Actions.

28     17.  On February 23, 2009, DFG issued a permit to DWR

authorizing the legal take of longfin smelt under CESA. Obegi
Decl. at ¶2 & Attch. 1 (ITP permit). That permit imposes OMR
flow restrictions to protect juvenile longfin smelt between
January and June, which are very similar to those required by
FWS's delta smelt BiOp. When triggered, OMR flows must remain
between -1,250 and -5,000 cfs, based on "survey data, including
all of the distributional and abundance data, and other pertinent
biological factors that influence the entrainment risk of larval
and juvenile delta smelt." *Id*. (ITP at 10-11). DFG identified
likely flow conditions of -2,000 to -5,000 cfs for April and May,
and -5,000 cfs for June. *Id*. (ITP at 11). One reason why DFG
has not imposed pumping restrictions to protect longfin smelt is
that "Current delta smelt advice will be protective of longfin
smelt larvae." *See* Goude Decl., Ex. F (2009 SWG notes from 3/16,
3/23, 3/30, 4/6).

    18. Action by the DWR or DFG is not a concern that need be
addressed here due to the protections afforded by the RPA.

**F.    Socioeconomic and Environmental Effects of Water Shortage,
       Drought, and Recession**.

    19. On February 27, 2009, the Governor of California
declared a state-wide drought emergency, based on his finding
that "conditions of extreme peril to the safety of persons and
property exist in California caused by the current and continuing
severe drought conditions and water delivery restrictions." PRJN
Ex. B. On April 14, 2009, the Fresno County Board of Supervisors
adopted a proclamation declaring an emergency and requesting
federal and state assistance to address soaring unemployment and

12

shortages of food.  According to the proclamation, due to water
shortages "thousands of people who once relied on employment in
the agricultural sector are now unemployed and struggling to meet
their most basic needs, such as providing food for their family."
PRJN Ex. E at 2:8-10.  The Community Food Bank has inadequate
capacity to meet the overwhelming increase in need.  *Id*. at
2:21-3:2.

     20.  Plaintiffs' members are trying to compensate for these
shortages through the use of groundwater.  Doc. 36, Diedrich
Decl. at ¶¶ 4, 7; Doc. 35, Coburn Decl. at ¶4; Doc. 39, First
Harris Decl. at ¶¶ 2-3; Doc. 43, Nelson Decl. at ¶¶ 3, 7; Doc.
37, First Freeman Decl. at ¶¶ 7, 11, 12.  However, groundwater
supplies cannot meet all crop demands, and often contain
undesirably high concentrations of salts and minerals.  *See* First
Freeman Decl. at ¶12.  Pumping of groundwater also entails
increased energy usage.  *Id*. at ¶17.  Without replacement water
supplies, many farmers' only other option is to fallow land.
Harris Decl. at ¶¶ 4-5; Diedrich Decl. at ¶4; Freeman Decl. at
¶ 11, 12.  The water supply situation has resulted in loss of
on-farm employment, reduced crop production, destruction of some
permanent crops, and may require some farmers to sell their land
and abandon farming altogether.  Coburn Decl. at ¶¶ 5-7; Allen
Decl. at ¶5; Harris Decl. at ¶¶ 7-8; Diedrich Decl. at ¶8.

     21.  Based on the initial 2009 water year zero percent
allocation from the CVP by Reclamation, 220,000 to 250,000 acres
(of the total 560,000 normally under production) are expected to
be fallowed within Westlands this year.  Freeman Decl. at ¶¶ 3,
11.  Substantial land fallowing is expected in other districts

13

that depend upon CVP water deliveries for irrigation.  Doc. 43,
Nelson Decl. at ¶¶ 10-11; Doc. 40, Harrison Decl. at ¶11.

22.  Plaintiffs submit the declarations of Robert Silva,
Mayor of the City of Mendota, and Marcia Sablan, Mayor of the
City of Firebaugh, who describe, from their perspective, the
impact of agricultural job losses on their communities.  These
declarations assert that the current unemployment rate in Mendota
and Firebaugh is 40 percent.  Silva Decl. at ¶3; Sablan Decl. at
¶4.  That reductions in employment and farm and farmworker
incomes have resulted in a loss of tax revenue available to fund
municipal services, leading to a reduction in staffing of local
government.  Silva Decl. at ¶4; Sablan Decl. at ¶6.  Ms. Sablan
believes that if the City of Firebaugh's tax revenues continue to
decrease "it is possible that fire and police protection services
will be faced with substantial cuts."  Sablan Decl. at ¶6.
Although the City of Mendota currently has no independent police
force, the economic conditions have stalled the City's
implementation of plans to start its own police department.
Silva Decl. at ¶4

23.  Local schools are suffering as well.  Sablan Decl. at
¶7.  Families of displaced farm workers are often forced to
combine households resulting in crowded and stressful conditions
impacting affected students' academic performance.  *Id*.
Additionally, as families and students relocate from rural areas
due to a lack of employment, the rural school districts lose much
needed revenue from the State.  *Id*.; *see also* Hernandez Decl.,
Doc. 41.

24.  Plaintiffs also submit the declaration of Dana Wilkie,

14

the CEO of the Community Food Bank, a non-profit organization that provides food to hungry families in Fresno, Madera, and Kings Counties. Doc. 47. She declares that "[t]he number of people in our service area experiencing food insecurity has recently increased substantially." *Id.* at ¶6. In response, the Food Bank is endeavoring to increase its distribution of food to needy members of the community to respond to the increasing number of people requiring such assistance. *Id.* at ¶4.

25. There is also a possibility that increased reliance upon groundwater will lead to unsustainable overdraft of the groundwater basin and resulting land subsidence, causing damage to wells and water distribution facilities, as well as increased soil salinity and toxicity as a result of applying water with higher salinity and minerals to the soil. Freeman Decl. at ¶¶ 13-16. Increased land fallowing is also known to cause increased dust emissions which degrade air quality. *Id.* at ¶21.

26. Environmental Plaintiffs present the declaration of Jeffrey A. Michael, Ph.D., an economist who analyzes data from California's Employment Development Department regarding recent employment trends in the farm and non-farm sectors around the state. Dr. Michael explains that the San Joaquin Valley, like the rest of the United States, is suffering from the deepest recession since the Great Depression and that the recession is largely caused by foreclosures and the collapse of the real estate market. Doc. 58-2, Michael Decl. at ¶2. California has experienced the largest drop in real estate prices in the nation, and the San Joaquin Valley is experiencing among the highest foreclosure rates in the nation. *Id.* at ¶3. These factors have

15

contributed to widespread unemployment across the state, particularly in non-farm sectors such as the construction and hospitality sectors. *Id.* at ¶¶2-3.

27. Dr. Michael opines that employment in the farm sector has fared "relatively well," with farm employment <u>increasing</u> by 2.5% across California between March 2008 and March 2009, and <u>increasing</u> in several Valley counties over the same time period, including Fresno (by 3.2%), Kern (by 4.2%) Tulare (by 4.3%), and Stanislaus-Merced-Madera-Kings (by 5.8%). *Id.* at ¶6 & Ex. 3. These increases in farm employment have buffered the overall decline in employment for metropolitan areas such as Fresno and Bakersfield, which are experiencing lower unemployment rates than eight other large metropolitan areas in the State, including Los Angeles, Sacramento, Oakland, Riverside, San Diego, Orange, San Jose, and San Francisco. *Id.* at ¶7 & Ex. 2. Dr. Michael also opines that declining school enrollment and sales tax revenue are being experienced across California and are largely explained by high rates of residential foreclosures and the real estate downturn. *Id.* at ¶9.

a. In response to Dr. Michael's declaration, Plaintiffs offer the testimony of Dr. Richard Howitt of the University of California at Davis, an agricultural economics professor, who presents the results of his recent, published research on the predicted impacts of the current drought and fishery related pumping restrictions on the communities of the Central Valley. Doc. 74, Howitt Decl. at ¶2. Dr. Howitt opines that more than 34,000 jobs will be lost in the San Joaquin Valley as a result of the water delivery restrictions, and that most of

these job losses will be suffered by farm workers and employees of packing houses and processing plants. *Id*. at ¶5. He further states that these individuals are typically low-income workers with few alternatives for other work. *Id*.

   b.   Dr. Howitt opines that Dr. Michael's declaration is "largely irrelevant to the question of measuring the incremental loss in employment due to water reductions to the Westside of the San Joaquin valley," because, among other things, Dr. Michael used employment data that extends only to the start of the current farm year in March 2009 and therefore cannot project the impacts of cuts in water supply; and the data he used is aggregated over all regions of Fresno County, obscuring relative impacts to the Westside. *Id*. at ¶9.

   c.   In light of Dr. Howitt's undisputed criticisms, Dr. Michael's declaration is only marginally relevant, as it measures economic trends at a "macro" scale.

G.   <u>Predicted Impact of OMR Restrictions on Pumping during Late May and June</u>.

   28.   Under Reclamation's April forecast of operations, released April 21, south-of-Delta CVP water service agricultural contractors are projected to receive a 10% contract allocation, instead of the zero allocation indicated by the March forecast. Snow Decl. at ¶¶ 13-14; Exs. B, C.  However, the volume of water actually delivered will depend, at least in part, upon how FWS regulates negative OMR flows from May 18 through June 30. *Id*. at ¶¶ 15-19.

   29.   Reclamation's April 2009 forecast of CVP operations, on

which the 10% allocation is based, indicates a CVP export pumping for the period beginning May 18 through May 31 of about 65,000 acre-feet. *Id*. at ¶15. The forecast indicates an expected volume of CVP pumping of about 150,000 acre-feet during the month of June. *Id*. Reclamation's forecast further indicates that OMR flows will be at about −3,000 cfs during late May, and -3,900 cfs during June. *Id*. It is undisputed that if the CVP were free to pump water at rates unrestricted by the criteria for negative OMR flows prescribed by the BiOp, the allocation of water for south-of-Delta CVP contractors could be increased by approximately 60,000 acre-feet. *Id*. at ¶16. This is approximately equivalent to an additional 5% allocation. *Id*.

    30.  Relatedly, if FWS restricts OMR flows in late May and June more tightly than the April forecast indicates, the Bureau may not be able deliver the 10% allocation. *Id*. ¶ 18. The 10% allocation depends upon the assumed pumping in late May and June, because, under the current forecast, the CVP pumps will already be at maximum capacity beginning on July 1. *Id*. ¶19. There would be no opportunity to make up for lost May and June pumping using the CVP facility beginning in July. *Id*. Although the SWP pumps can pump CVP water under the "joint point of diversion" provisions of Decision 1641, this procedure is subject to a number of contingencies, including the Bureau having capacity to hold water in storage for pumping after June 30, whether the SWP will have available capacity at the Banks Pumping Plant, and whether the projects would be able to meet water quality requirements. *Id*. at ¶19.

IV.   CONCLUSIONS OF LAW

2   A.   Standard of Review.

3        1.   In general, the standard for granting a preliminary

4   injunction balances plaintiff's likelihood of success against the

5   relative hardship to the parties.  The Ninth Circuit previously

6   recognized two different sets of criteria for preliminary

7   injunctive relief.  Under the traditional test, "a plaintiff must

8   show: (1) a strong likelihood of success on the merits, (2) the

9   possibility of irreparable injury to plaintiff if preliminary

10  relief is not granted, (3) a balance of hardships favoring the

11  plaintiff, and (4) advancement of the public interest (in certain

12  cases)."  *Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007).

13  An "alternative" test required that "a plaintiff demonstrate

14  either a combination of probable success on the merits and the

15  possibility of irreparable injury or that serious questions are

16  raised and the balance of hardships tips sharply in his favor."

17  *Id*.  "These two formulations represent[ed] two points on a

18  sliding scale in which the required degree of irreparable harm

19  increases as the probability of success decreases.  They [were]

20  not separate tests but rather outer reaches of a single

21  continuum."  *Id*.

22       2.   The Supreme Court, in *Winter v. NRDC*, --- U.S. ---, 129

23  S. Ct. 365 (2008), rejected the Ninth Circuit's application of

24  that part of the alternative test which permitted an injunction

25  where there was only the "possibility of irreparable injury."

26  *Winter* found this standard "too lenient," and reiterated that its

27  own "frequently reiterated standard requires plaintiffs seeking

28  preliminary injunctive relief to demonstrate that irreparable

1    injury is likely in the absence of an injunction." *Id*. at 375.

2        3.    Following *Winter*, the Ninth Circuit revised its

3    preliminary injunction standard:

4                In *Winter*, the [Supreme] Court reversed one of our
                decisions, which, it determined, upheld a grant of a
5                preliminary injunction by use of a standard that was
                much too lenient. As the Court explained, an injunction
6                cannot issue merely because it is <u>possible</u> that there
                will be an irreparable injury to the plaintiff; it must
7                be <u>likely</u> that there will be....

8            The Court [defines] the rule ... as follows:

9                    A plaintiff seeking a preliminary injunction must
                    establish that he is likely to succeed on the
10                   merits, that he is likely to suffer irreparable
                    harm in the absence of preliminary relief, that
11                   the balance of equities tips in his favor, and
                    that an injunction is in the public interest.
12
            To the extent that our cases have suggested a lesser
13           standard, they are no longer controlling, or even
            viable.
14
    *Am. Trucking Ass'ns., Inc. v. City of Los Angeles,* 559 F.3d 1046,
15
    1042 (9th Cir. 2009) (emphasis added).[5]
16

17   B.   <u>Analysis.</u>
18
        1.    <u>Likelihood of Success on the Merits.</u>
19
            a.    <u>Lack of Claims Against Reclamation</u>.
20
        4.    Plaintiffs request Federal Defendants be enjoined "from
21
    limiting pumping at the CVP's Jones pumping plant between now and
22
    June 30, 2009 pursuant to the provisions of the BiOp" unless FWS
23

24            [5]    Although it does not appear to be an issue in this
25   case, district courts within the Ninth Circuit have suggested
    that the second prong of the alternative test, which permits
26   injunctive relief where plaintiff is able to show "serious
    questions going to the merits," survived *Winter*. *See Save
27   Strawberry Canyon v. Dept. of Energy*, --- F. Supp. 2d ---, 2009
    WL 723836, *13 n.2 (N.D. Cal. 2009).
28

provides further justification for its decisions. *See* Doc. 48, Prop'd Order, at 2; Draft Hearing Transcript, May 22, 2009, at 29-30.  Federal Defendants object to the issuance of any injunctive relief against the <u>Bureau</u> because, although Plaintiffs sued Reclamation, they have not alleged any claims against Reclamation. *See* Complaint, Doc. 1.  Plaintiffs name the Bureau as a defendant, Compl. ¶ 18, but do not allege that Reclamation has violated any laws.  Instead, their complaint asserts that they have only named Reclamation as a defendant "so that the Court may provide an adequate remedy ... regarding CVP operations...."  Compl. at ¶51.

5.    To enjoin the Bureau, the court must have jurisdiction over the agency, which requires, at a bare minimum, that Plaintiffs bring claims against the Bureau. *See Or. Natural Desert Ass'n v. Lohn*, 485 F. Supp. 2d 1190, 1196 (D. Or. 2007), vacated on other grounds, 2007 WL 2377011 (D. Or. June 11, 2007) (denying injunctive relief against an action agency in an ESA case where Plaintiffs "brought suit only against the consulting agencies").  However, the preliminary injunction Plaintiffs seek is <u>directed at how FWS will set OMR flows within the -1,250 to -5,000 cfs range</u> through June 30, or until the water temperatures reach 25°C in Clifton Court Forebay.  Plaintiffs rejoin that "[o]nce FWS sets that limitation, Reclamation will presumably comply and pump what water it can consistent with that limitation to fulfill its contractual and other obligations."  Doc. 70 at 12.

6.    Component 2's adaptive management process affords the Bureau some say in the setting of OMR flows, but that input is

subject to FWS's ultimate authority.  Specifically, once FWS
receives a recommendation from the SWG that an action should be
initiated, changed, suspended, or terminated, FWS "determines
whether the proposed action should be implemented, modified, or
terminated; and the OMR flow needed to achieve the protection."
BiOp at 280.  FWS then presents its determination to the WOMT,
which is made up of representatives from the Bureau, DWR, FWS,
NMFS, and DFG.  *Id*. at 28, 280.  The WOMT may either "concur with
the recommendation or provide a written alternative to the
recommendation" to FWS within one calendar day.  *Id*. at 280.  FWS
"shall then make a final determination on the proposed action to
be implemented, which shall be documented and posted" on the
internet.  *Id*.  If FWS determines that an OMR flow change is
required, the Bureau and DWR "shall adjust operations to manage
to the new OMR flow within two days of receipt of [FWS's]
determination."  *Id*.  Because FWS has ultimate control over
setting OMR flows, and the Bureau must comply with those
recommendations, it is sufficient that Plaintiffs filed suit
against and seek to enjoin only FWS's actions.[6]

---

[6]   Under the circumstances, any injunction issued in this
case will bind the Bureau's implementation of OMR flow
restrictions pursuant to Federal Rule of Civil Procedure 65's
provision that "persons who are in active concert or
participation" with a properly named defendant can be bound by an
injunction.

1       2.   **NEPA Claims Against FWS**.

2           a.   **Does the Issuance of the BiOp Trigger the Need for NEPA Compliance**?

7.    Because the admissibility of evidence of economic harm turns on the viability of the NEPA claim, it is appropriate to first evaluate Plaintiffs' likelihood of success on that claim. Plaintiffs argue that FWS was required to prepare an environmental impact statement ("EIS") in connection with the issuance of the BiOp. It is undisputed that no NEPA document was prepared.

8.    NEPA requires all federal agencies to prepare an EIS to evaluate the potential environmental consequences of any proposed "major Federal action[] significantly affecting the quality of the human environment" 42 U.S.C. § 4332(C). The preparation of an EIS serves a number of purposes:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

> Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast. Moreover, the strong precatory language of § 101 of the Act and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies "to respond to the needs of environmental quality." 115 Cong. Rec. 40425 (1969) (remarks of Sen. Muskie).

> Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a

springboard for public comment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (internal citations and quotations omitted). "NEPA does not contain substantive requirements that dictate a particular result; instead, NEPA is aimed at ensuring agencies make informed decisions and 'contemplate the environmental impacts of their actions.'" *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 971 (D. Hi. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)).

9. The Ninth Circuit has held that an agency must prepare an EIS "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005). An agency may choose to prepare an environmental assessment ("EA") to determine whether an EIS is needed. 40 C.F.R. §§ 1501.4, 1508.9(b). The EA must identify all reasonably foreseeable impacts, analyze their significance, and address alternatives. 40 C.F.R. §§ 1508.8, 1508.9, 1508.27. If, based on the EA, the agency concludes that the proposed actions will not significantly affect the environment, it may issue a Finding of No Significant Impact ("FONSI") and forego completion of an EIS. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988); 40 C.F.R. § 1501.4(e).

10. Federal regulations implementing NEPA help to define when "major federal actions" take place:

Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces

24

but does not have a meaning independent of significantly ([40 C.F.R.] § 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) <u>Approval of specific projects, such as</u> construction or <u>management activities located in a defined geographic area</u>. Projects include actions approved by permit <u>or other regulatory decision</u> as well as federal and federally assisted activities.

40 C.F.R. § 1508.18 (emphasis added).

25

11.  "Whether an action may 'significantly affect' the environment requires consideration of 'context' and 'intensity.'" *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (citing 40 C.F.R. § 1508.27).  "Context delimits the scope of the agency's action, including the interests affected."  *Id.* (citing *Nat'l. Parks & Conservation Ass'n v. Babbit,* 241 F.3d 722, 731 (9th Cir. 2001)).

> Intensity refers to the "severity of impact," which includes both beneficial and adverse impacts, "[t]he degree to which the proposed action affects public health or safety," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."

*Id.* at 1185-86 (citing 40 C.F.R. § 1508.27(b)(2), (4), (5), (7)). If an agency does not prepare an EIS, the reviewing court must "determine whether the responsible agency has 'reasonably concluded' that the project will have no significant adverse environmental consequences."  *Upper Snake River Ch. of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir. 1990).

12.  Plaintiffs principally rely on two cases to support their assertion that an EIS was required here:  *Westlands v. United States*, 850 F. Supp. 1388 (E.D. Cal. 1994) and *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996).  The *Westlands* decision denied federal defendants' motion to dismiss water districts' claims that NMFS and the Bureau failed to comply with NEPA by, among other things, not completing an EA or EIS before issuing a biological opinion concerning the effects of coordinated

operations on the winter-run Chinook Salmon and implementing the reasonable and prudent alternative articulated in that biological opinion. *Id*. at 1394-95. Federal defendants in *Westlands* argued that the biological opinion was not a "major federal action" because it was merely advisory. *Id*. at 1420 (citing 40 C.F.R. § 1508.18(b)(3)). The district court acknowledged authority in support of this argument, but ultimately concluded that a case-by-case inquiry is required:

> Formal plans and official documents that guide or prescribe alternative uses, on which future agency action will be based, are "federal actions" for NEPA purposes. *See* 40 C.F.R. § 1508(b)(2).
>
> Plaintiffs argue that a biological opinion that suggests reasonable and prudent alternatives falls within either definition, because an agency must either follow the alternative suggested or risk violation of ESA § 7(a)(2)....

> ***

> A biological opinion is part of the ESA process originated by 16 U.S.C. § 1536(a)(2), which requires federal agencies, with the assistance of the Secretary, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species." The federal agency undertaking such activity must consult the service having jurisdiction over the relevant endangered species. 16 U.S.C. § 1536(a)(3). The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), are jointly responsible for administering the ESA. 50 C.F.R. § 402.01(b) (1992). The consulting service then issues a biological opinion that details how the proposed action "affects the species or its critical habitat," including the impact of incidental takings of the species. 16 U.S.C. § 1536(b)(3)(A).

> "The agency is not required to adopt the alternatives suggested in the biological opinion; however, if the Secretary deviates from them, he does so subject to the risk that he has not satisfied the standard of Section 7(a)(2)." *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir.1988) (citation omitted), cert. denied, 493 U.S. 873 (1989). A Secretary can depart

27

from the suggestions in a biological opinion, and so long as he or she takes "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species," no ESA violation occurs. *Id.* at 1193-95; *Pyramid Lake Paiute Tribe of Indians v. Department of Navy*, 898 F.2d 1410, 1418 (9th Cir.1990) ("a non-Interior agency is given discretion to decide whether to implement conservation recommendations put forth by the FWS"). The Joint Regulations state:

> The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

50 C.F.R. § 402.14(j) (1992). 50 C.F.R. § 402.15(a) states:

> (a) Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion.

Courts have attempted to define the "point of commitment," at which the filing of an EIS is required, during the planning process of a federal project. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C.Cir.1983). "An EIS must be prepared before any irreversible and irretrievable commitment of resources." *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir.1988), cert. denied 489 U.S. 1012 (1989). 40 C.F.R. § 1502.5(a) similarly provides, "For projects directly undertaken by Federal agencies, the environmental impact statement shall be prepared at the feasibility analysis (go/no go) stage and may be supplemented at a later stage if necessary."

[One of the water agency plaintiffs] points out that the Environmental Review Procedures, under the National Oceanic and Atmospheric Administration ("NOAA") Order No. 216-6, § 6.02.c.2(d), require an EIS for:

> Federal plans, studies, or reports prepared by NOAA that could determine the nature of future major actions to be undertaken by NOAA or other federal agencies that would significantly affect the quality of the human environment.

It is undisputed that the NMFS's actions are subject to an EIS requirement, if those actions are a "major federal action significantly affecting the human environment." Under 40 C.F.R. § 1508.18(b)(2), an

28

activity is a federal action if it "guides," rather than binds, the use of federal resources. CVP water is a federal resource. <u>The Bureau's options were narrow had it declined to follow the NMFS's reasonable and prudent alternatives.</u> *See Tribal Village of Akutan*, 869 F.2d at 1193 (agency need not adopt reasonable and prudent alternatives in biological opinion, so long as it complied with ESA Section 7(a)(2) by taking "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species"); *Portland Audubon Society v. Endangered Species*, 984 F.2d 1534, 1537 (9th Cir.1993) (discusses exemptions from ESA, by application to the Committee under 16 U.S.C. §§ 1536(a)(2), (g)(1)-(2)).

The government submits *Bennett v. Plenert*, CV-93-6076, 1993 WL 669429 (D.Or.1993), as authority that biological opinions are not binding on federal agencies, and consequently are not major federal actions. But in Bennett, the court left open the issue that a biological opinion could constitute a major federal action under NEPA. *Id*. at p. 11, n. 4. <u>Biological opinions are not binding on the Secretary, nor do they invariably require an EIS. The inquiry requires a case by case analysis</u>.

*Id*. at 1420-22 (emphasis added) (parallel citations omitted). Applying the required case-by-case approach, because "the biological opinion is part of a systematic and connected set of agency decisions which result in the commitment of substantial federal resources for a statutory program, which resulted in reallocation of over 225,000 acre feet of CVP water under the ESA for salmon protection with the environmental impacts alleged," the biological opinion was major federal action.

13. Here, Federal Defendants argue that if anything constitutes a major federal action, it is the <u>Bureau's</u> implementation of the OMR flow restrictions, not FWS's adoption of the 2008 BiOp itself. Doc. 56 at 20. Federal Defendants argue that FWS's issuance of the BiOp "by itself, is not an irretrievable commitment of resources," and therefore does not trigger NEPA. *Id*. at 17. In theory, the Bureau had the option

29

to reject FWS's RPA, albeit at its own peril under the ESA.
However, in reality, the Bureau is implementing the projects in
accordance with the RPA under an adaptive management structure
that places ultimate control over OMR flows in the FWS.  Although
the facts of *Westlands* do not exactly parallel the circumstances
here, there is a strong likelihood that Plaintiffs will be able
to establish that NEPA was triggered by the issuance of the final
biological opinion in this case.[7]

14.  Federal Defendants argue this case is more like Upper
Snake River , 921 F.2d at 234, in which the Ninth Circuit
"reaffirmed a long-standing principle that a federal action is
not 'major' for NEPA purposes where the agency activity does not
change the status quo and was inferentially part of routine
management action in the operation of the dam."  *Westlands*, 850
F. Supp. 1415 (citing *Upper Snake River*, 912 F.2d at 234).
*Westlands* specifically distinguished *Upper Snake River,*
determining that whether or not an EIS was required "will, of
necessity, depend heavily upon the unique factual circumstances
of each case."  *Id.* (citing *Westside Property Owners v.*

---

[7]     Environmental Intervenors also correctly point out that
the Ninth Circuit reversed the district court's ruling on a
related issue; i.e., federal defendants' contention that an
irreconcilable conflict between the CVPIA and NEPA existed.
*Westlands Water Dist. v. NRDC*, 43 F.3d 457, 460 (9th Cir. 1994).
The Ninth Circuit found that CVPIA §§ 3406(b)(2) and (d)(1)
required implementation of the CVPIA "upon enactment."  *Id.*
After this ruling, Plaintiffs voluntarily dismissed their claim
that NMFS and the Bureau failed to conduct a NEPA review of the
biological opinion concerning CVP impacts on winter-run Chinook
salmon.  *See Stockton East Water Dist. v. United States*, 75 Fed.
Cl. 321, 326 (2007).  This does not derogate *Westlands'*
substantive NEPA analysis.

*Schlesinger,* 597 F.2d 1214, 1224 (9th Cir. 1979)).

> To some extent, the finding is based on whether the proposed agency action and its environmental effects were within the contemplation of the original project when adopted or approved. *See* [*Port of Astoria, Or. v. Hodel*, 595 F.2d 467, 476 (9th Cir. 1979)]; Robinswood *Community Club* [*v. Volpe*], 506 F.2d 1366 [(9th Cir. 1974)]. The inquiry requires a determination of whether plaintiffs have complained of actions which may cause significant degradation of the human environment. [*City and County of San Francisco v. United States*, 615 F.2, 498, 500 (9th Cir. 1980)].

*Westlands*, 850 F. Supp. at 1415. "[T]he taking of water for non-agricultural purposes is alleged to have changed the operational requirements of the CVP, imposed new standards for reverse flows in the Western Delta, carryover storage in the Shasta reservoir, and caused closure of the Delta cross-channel. Such actions and the environmental effects alleged are not routine managerial changes." *Id.* at 1421.

15. Federal Defendants maintain that, like in *Upper Snake River* and unlike in *Westlands*, "Reclamation's continued management of the CVP – even after issuance of the Service's biological opinion – is within historical operating parameters." Doc. 56 at 18. *Upper Snake River,* specifically concerned the Bureau's decision to reduce flows below Palisades Dam and Reservoir. Although it was standard operating procedure since 1956 to maintain flows below that dam above 1,000 cfs, during previous dry periods, the average flow had "been lower than 1,000 cfs for 555 days (or 4.75% of the total days in operation)." *Id.* at 233. Because the challenged flow fluctuations were within historical operational patterns, no NEPA compliance was required:

> The Federal defendants in this case had been operating the dam for upwards of ten years before the effective date of the Act. During that period, they have from

time to time and depending on the river's flow level, adjusted up or down the volume of water released from the Dam. <u>What they did in prior years and what they were doing during the period under consideration were no more than the routine managerial actions regularly carried on from the outset without change.</u> They are simply operating the facility in the manner intended. In short, they are doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational. Its operation is and has been carried on and the consequences have been no different than those in years past.

The plaintiffs point out that flow rates have been significantly below 1,000 cfs for periods of seven days or more only in water years 1977, 1982, and 1988, all years of major drought. They also note that prior to construction of the dam, the lowest recorded flow rate did not fall below 1400 cfs. From these facts, they argue that the Bureau's reduction of the flow below 1,000 cfs is not a routine managerial action. However, a particular flow rate will vary over time as changing weather conditions dictate. In particular, low flows are the routine during drought years. What does not change is the Bureau's monitoring and control of the flow rate to ensure that the most practicable conservation of water is achieved in the Minidoka Irrigation Project. Such activity by the Bureau is routine.

*Id.* at 235-36 (emphasis added).

16. Here, unlike in *Upper Snake River*, the OMR restrictions imposed by the 2008 BiOp are <u>not</u> "routine managerial actions regularly carried on from the outset [of the Project] without change." It is undisputed that the OMR flow restrictions of Component 2 have the potential to impose restrictions on the CVP's ability to export water south of the Delta above and beyond that which would result from natural conditions and pre-existing legal regimes. *See generally* Doc. 46, Snow Decl; Doc. 56-3, Milligan Decl. As was the case in *Westlands*, "the taking of water for non-agricultural purposes is alleged to have changed the operational requirements of the CVP [and] imposed new standards for reverse flows in the Western Delta...." 850 F.

32

Supp. at 1421. Evidence shows that operation at -1250 cfs during the relevant time period will result in a net reduction of water service to Plaintiffs exceeding 200,000 acre feet ("AF"). There is substantial likelihood that Plaintiffs will be able to establish that these changes substantially depart from the type of routine managerial changes that took place prior to the 2008 BiOp.

17. Plaintiffs also rely on *Ramsey*, which held that NMFS was required to comply with NEPA when it issued a biological opinion and incidental take statement under ESA § 7, permitting state regulators to issue salmon fishing regulations consistent with the take statement. 96 F.3d at 441-445. *Ramsey* found the biological opinion and incidental take statement constituted "major federal action," triggering NEPA compliance, as it was "clear ... both from our cases and from the federal regulations, *see* 40 C.F.R. § 1508.18, that if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action and the federal agency involved must conduct an EA and possibly an EIS before granting it." *Id*. at 444.

18. *Ramsey* then determined:

> the incidental take statement in this case is functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the incidental take statement. Accordingly, we hold that the issuance of that statement constitutes major federal action for purposes of NEPA.

*Id*.

19. Federal Defendants suggest *Ramsey* has no direct bearing on this case, because, unlike Washington and Oregon, here, the

33

Bureau does not require a section 10 permit to operate the CVP in compliance with the BiOp:

> Instead, as in the instant case, Section 7 of the ESA provides a procedure whereby federal agencies may obtain an exception to the ESA's 'take' prohibition through the issuance of a biological opinion and incidental take statement; unlike the Section 10 context, if NEPA applies at all in the context of Section 7, it applies when the action agency takes some action.... There is no suggestion in Ramsey that NEPA would apply in the instant case, where the take statement authorized merely the activities of federal agencies, and in no way acts like a Section 10 permit for private parties. The highly unusual circumstances in Ramsey render that holding inapplicable to the case at bar.

Doc. 56 at 18-19.

20.   The federal defendants in *Ramsey* argued that there was insufficient federal participation in a state run project to require an EIS.  The Appeals Court disagreed:  "if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute a major federal action...." triggering NEPA.  96 F.3d at 444 (citing *Jones v. Gordon*, 792 F.2d 821, 827-29 (9th Cir. 1986); *Port of Astoria v. Hodel*, 595 F.2d 467, 478-79 (9th Cir. 1979)).  *Ramsey* held that "the incidental take statement in this case is functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the incidental take statement."  *Id*.  Because the incidental take statement was the functional equivalent of a permit, NEPA applied to the issuance of the biological opinion under *Jones* and *Port of Astoria*, despite federal defendants' contention that the mere issuance of an incidental take statement was insufficient federal participation in a state project.  Here, in contrast, the CVP is

34

an entirely federal project, rendering the "functional
equivalency" analysis from *Ramsey* largely irrelevant.  In a more
general sense, *Ramsey* simply stands for the proposition that it
may be appropriate to apply NEPA to the issuance of a biological
opinion under certain circumstances.

    21.    More directly applicable is 40 C.F.R. § 1508.18(4),
which provides that major federal actions include:

> <u>Approval of specific projects, such as</u> construction or
> <u>management activities located in a defined geographic
> area</u>. Projects include actions approved by permit <u>or
> other regulatory decision</u> as well as federal and
> federally assisted activities.

The BiOp, and specifically Component 2 of the RPA, are management
activities located in a defined geographic area that were
approved by a regulatory decision.

    22.    Environmental Intervenors and Federal Defendants cite a
number of cases for the proposition that *Ramsey* should be limited
to its facts.  For example, in *Southwest Center for Biological
Diversity v. Klasse*, 1999 WL 34689321 (E.D. Cal. Apr. 1, 1999),
the court considered whether FWS failed to comply with NEPA when
it issued a BiOp and incidental take statement after consultation
with the Army Corps of Engineers ("Corps") regarding its
operation of a dam on the Kern River.  The court rejected this
argument, finding that plaintiffs' claim was based on an
"overbroad interpretation" of *Ramsey*, which "did not intend to
require the FWS to file NEPA documents every time it issues an
incidental take statement to a federal agency."  1999 WL 34689321
at *11.  *See also P'ship for a Sustainable Future v. U.S. Fish &
Wildlife Serv.*, 2002 WL 33883548 at *7 (M.D. Fla. July 12, 2002)
("As a cooperating agency, the FWS is not required to duplicate

the work of the Corps by preparing its own EA or EIS"); *City of Santa Clarita v. FWS*, 2006 WL 4743970 at *19 (C.D. Cal. Jan. 20, 2006) (finding that ITSs issued by FWS "were not 'major federal action' triggering separate and additional NEPA obligations on the part of the Service"); *Miccosukee Tribe of Indians of Fla. v. U.S.*, 430 F. Supp. 2d 1328, 1335 (S.D. Fla. 2006) ("To expect or require FWS to submit its own EIS, in spite of the fact that it was not the action agency and that the Corps had already issued one is nonsensical and an utter waste of government resources").[8]

    23.    These cases are not persuasive.    In three of the four cases cited, *City of Santa Clarita*, *Partnership for a Sustainable Future*, and *Miccosukee Tribe*, the action agency either had already or was in the process of completing environmental analysis under NEPA.    The fourth case, *Klasse*, concerned challenge to the Army Corps of Engineers' modification of operations at Isabella Reservoir.    *Klasse* found that the Corps' modifications, like those at issue in *Upper Snake River*, did not

[8]    Plaintiffs point to Federal Rule of Appellate Procedure 32.1 and Ninth Circuit Rule 36-3, which prohibit citation to unpublished <u>appellate</u> decisions issued prior to January 1, 2007. However, these rules do not address citation to unpublished district court opinions, which are, like published district court opinions, only persuasive authority.    *See Carmichael Lodge No. 2103, Benevolent and Protective Order of Elks of the United States of Am. v. Leonard*, 2009 WL 1118896 (E.D. Cal., Apr. 23, 2009) (noting that "there is no prohibition in citing 'unpublished' district court opinions (unless a local rule so provides.    They are either persuasive to the case at bar, or they are not.    District court opinions, published or not, do not set binding precedent for other cases....") (irony of citing unpublished district court opinion as authority for citing unpublished district court opinion noted).

"deviate[] from [the Corps'] standard management scheme regarding water levels."  1999 WL 34689321 at *11.[9]

24.   In the final analysis, while the issuance of an incidental take statement does not necessarily require the preparation of an EIS, *Westlands Water Dist. v. United States Dep't of the Interior*, 275 F. Supp. 2d 1157, 1221 (E.D. Cal. 2002) ("FWS is not required to file NEPA documents every time it issues a biological opinion or an incidental take statement."),

---

[9]   Similarly, federal Defendants cite *Greater Yellowstone Coal v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004), for the proposition that *Ramsey* should be limited to its facts.  But *Greater Yellowstone* simply cites Ramsey's holding, without limiting its reach or scope.  Moreover, the issue in *Greater Yellowstone* was whether the action agency should have prepared an EIS rather than a FONSI, not whether FWS had any NEPA obligations relative to its issuance of a BiOp.  Likewise, *Center for Biological Diversity v. Fish and Wildlife Service*, 2005 WL 2000928 (N.D. Cal. Aug. 19, 2005) ("*CBD*"), involved a challenge to a rule issued pursuant to section 4(d) of the ESA, which requires the Secretary to "issue such regulations as he deems necessary and advisable to provide for the conservation of [a] threatened species."  16 U.S.C. § 1533(d).  *CBD* summarily dismissed the possibility that a section 4(d) regulation could be subject to NEPA because applying NEPA would "confuse matters by overlaying its own independent matrix" on top of the ESA's statutorily defined factors for determining that a species should be listed as threatened.  2005 WL 2000928 at *12.  There is no parallel set of statutory factors with which NEPA could conflict in this case.  Finally, Federal Defendants cite, *Westlands Water District v. United States Department of the Interior*, 275 F. Supp. 2d 1157, 1221 (E.D. Cal. 2002), which involved a no-jeopardy opinion, in which the court cited *Keasee* with approval for the proposition that "FWS is not required to file NEPA documents every time it issues a biological opinion or an incidental take statement."  *Id.* at 1221-22.  Nevertheless, Reclamation and FWS did release an Environmental Impact Statement/Report, *id.* at 1171, and the Court ultimately ordered "Interior" to complete a supplemental EIS.  *Id.* at 1235.

37

rev'd, aff'd, remanded on other grounds, 376 F.3d 853 (9th Cir. 2004), factual circumstances may give rise to NEPA obligations in connection with the issuance of a BiOp/ITS, *see Westlands,* 850 F. Supp. at 1422; *Ramsey*, 96 F.3d at 441-445.

25. FWS's RPA is major federal action that has unquestioned ability to inflict great harm to Plaintiffs and the human environment. The federal action is prescribed by FWS and implemented by Reclamation. These agencies' actions are inextricably intertwined. There is a strong likelihood that Plaintiffs will be able to establish that OMR flow restrictions imposed by the 2008 BiOp will have substantial, detrimental, indirect effects on the Plaintiffs, the community, and the human environment. Because FWS ultimately controls OMR flows, there is a strong likelihood that Plaintiffs will prevail on the merits of their NEPA claim under the specific facts of this case.

### b. Federal Defendants' Reliance on *Metropolitan Edison* is Misplaced.

26. Federal Defendants argue that "as a matter of law, NEPA does not impose requirements for an action that does not, by itself, alter the physical environment," citing *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). The language from *Metropolitan Edison* to which Federal Defendants refer addressed whether NEPA requires agencies to consider effects on human health, specifically psychological health, as part of the "physical environment." *Id*. at 771. The Supreme Court rejected this argument:

> To paraphrase the statutory language in light of the facts of this case, where an agency action

38

> significantly affects the quality of the human
> environment, the agency must evaluate the
> "environmental impact" and any unavoidable adverse
> environmental effects of its proposal. The theme of §
> 102 is sounded by the adjective "environmental": NEPA
> does not require the agency to assess every impact or
> effect of its proposed action, but only the impact or
> effect on the environment. If we were to seize the word
> "environmental" out of its context and give it the
> broadest possible definition, the words "adverse
> environmental effects" might embrace virtually any
> consequence of a governmental action that some one
> thought "adverse." But we think the context of the
> statute shows that Congress was talking about the
> physical environment-the world around us, so to speak.
> NEPA was designed to promote human welfare by alerting
> governmental actors to the effect of their proposed
> actions on the physical environment.

*Id*. at 772.

27.   Whether the OMR flow restrictions set forth in the BiOp significantly affect the physical environment is a question of fact on which *Metropolitan Edison* sheds no light.   Plaintiffs have submitted undisputed evidence that shows the OMR restrictions may have significant effects on the physical environment, including land fallowing and increased groundwater use, as well as adverse effects on the water table, soil quality, and air quality.

### c.   Wrong Lead Agency Argument.

28.   Environmental Intervenors argue that Plaintiffs' NEPA claim must fail because FWS, the only named defendant in that claim, is not the appropriate "lead agency" for NEPA purposes.[10]

---

[10]   In a related argument Environmental Intervenors attempt to further distinguish *Ramsey* based on the fact that, in that case, NMFS both issued and was one of the recipients of the incidental take statement.   In this way, the Ninth Circuit noted in a footnote that *Ramsey* was "factually ... unusual."   96 F.3d

Where more than one federal agency is involved in an action, the agencies are required to coordinate their efforts and determine a "lead agency" responsible for NEPA compliance. 40 C.F.R. § 1501.5(c); *see id.* § 1508.16 (defining "Lead agency"). Other agencies involved are designated as "cooperating agencies." *Id.* § 1501.6; *see id.* § 1508.5 (defining "Cooperating agency"). The lead agency is required to use any environmental analysis from cooperating agencies, which may have jurisdiction by law or expertise in particular areas, in preparing its NEPA documents. § 1501.6.

29. Applicable regulations allow agencies to share NEPA responsibility if more than one agency is involved in the same action or a group of related actions. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215 (11th Cir. 2002); 40 C.F.R. § 1501.5. Environmental Intervenors correctly point out that, in this case, the Bureau has been designated the "lead Federal agency," at least for the purposes of ESA consultation, concerning coordinated CVP-SWP operations. BiOp at i. The Bureau also prepared the BA regarding impacts of CVP operations on the delta smelt, which is a step often taken as part of an agency's NEPA compliance. *See* 16 U.S.C. § 1536(c)(1) (BA "may be undertaken as part of a Federal agency's compliance with the requirements of [NEPA] section 102").

30. However, FWS nevertheless proceeded as the sole issuing

---

at 441 n.11. But, the Ninth Circuit did not assign this unusual factual circumstance any particular weight, other than to note that no party suggested that the agency suffered from a conflict of interest. *Id.*

40

agency of the BiOp, which contains the RPA and incidental take statement, and proscribed the implementation of the adaptive management process, which constitutes and will involve regulated agency actions, in the absence of NEPA compliance.  An agency may not justify, post hoc, its failure to comply with NEPA on the basis that some other agency prepared an environmental assessment in the past or may prepare one in the future.  *See Anacostia Watershed Soc'y v. Babbit*, 871 F. Supp. 475, 485-486 (D.D.C. 1994).

### d.  Is Any Requirement to Comply with NEPA Obviated by the Court-Imposed Time Constraints.

31.  Environmental Intervenors argue that "[e]ven if the BO could be considered a major federal action, this Court's previous orders setting a fixed time period for FWS to issue the opinion precluded NEPA compliance."  Doc. 58 at 19.  The 2004 BiOp was remanded on December 14, 2007, with instructions to complete a new BiOp on or before September 15, 2008.  *NRDC* Doc. 560 at 2. On July 29, 2008, the Federal Defendants informed the Court that "the Service no longer believed that it would be possible to complete a scientifically sound and legally defensible biological opinion by September 15, 2008, and moved to extend the deadline to December 15, 2008."  *See* Doc. 753, Findings of Fact, Conclusions of Law, and Order Granting Federal Defendants' Motion for Extension of Time, at 1-2.  DWR joined in that motion.  *Id.* at 2.  No other party opposed the extension to provide the agency a full year to complete the new BiOp.  *Id.*  The district court granted Federal Defendants' request for additional time based on

41

Federal Defendants submission that:

> The consultation between the Bureau of Reclamation ("Reclamation") and the Service on the OCAP will be one of the most complex "in the history of the [Endangered Species Act ('ESA')]." See Declaration of Cay Collette Goude, Docket No. 712-2 (July 29, 2008), ¶ 6. Reclamation's "biological assessment" ("BA") of the effects of these operations itself totals more than 1,000 pages. Id. The Service is required by the ESA to review all of the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), in preparing this biological opinion, and the statute and its regulations allow the Service 135 days to complete a biological opinion (from the submission and review of the BA). See 16 U.S.C. § 1536(b)(1); 50 C.F.R. § 402.14(e) (allowing 90 days for formal consultation and then 45 additional days to write the biological opinion). For these reasons, holding the Service to the current deadline of September 15, 2008 could result in a biological opinion that was not scientifically sound or legally defensible, and thus result in another cycle of remand, interim remedies, and judicial review that would ultimately delay the completion of an adequate biological opinion and tax the resources of the Court, the agencies, and the parties.

Id.

32.  Environmental Intervenors argue that the expedited timeframe for issuance of a new BO precluded compliance with NEPA.  Even recognizing authority in support of this proposition, *see* H. Conf. Rep., No. 765, 91st Cong., 1st Sess. (1969), reprinted in 1969 U.S.C.C.A.N. 2767, 2770 (indicating that NEPA applies unless "the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible"); *Westlands*, 850 F. Supp. 2d. at 1416-17 (acknowledging the possibility that an evidentiary showing by Federal Defendants could establish that NEPA compliance is impossible), Federal Defendants have expressly declined to invoke this exception here, after direct inquiry in open court at the hearing on this motion.  This exception does

not apply.  Draft Hearing Transcript, May 22, 2009, at 68-69.

### e.   Consequences of Failing to Comply with NEPA.

If a full EIS would have been required for the BiOp, FWS and/or the Bureau would have had to evaluate the cumulative and indirect impacts of, and consider a reasonable range of alternatives to the RPA.  *See Ctr. for Biological Diversity*, 538 F.3d at 1185.  NEPA does not dictate the outcome of agency deliberations; "instead, NEPA is aimed at ensuring agencies make informed decisions and contemplate the environmental impacts of their actions."  *Ocean Mammal Inst.*, 546 F. Supp. 2d at 971 (citing *Idaho Sporting Cong.*, 137 F.3d at 1149).

### 3.   ESA Claims against FWS.

33.   The Complaint and motion for preliminary injunction also raise claims under the ESA.  Because there is likelihood of success on the NEPA claims, it is unnecessary to evaluate the merit of the ESA claims at this time.

### 4.   The Requested Injunction.

34.   Plaintiffs request a limited injunction to prohibit FWS, and those acting in concert or participation with FWS, including the Bureau, from setting or implementing the OMR flow restrictions under BiOp RPA Component 2 unless and until FWS further explains why alternative, less restrictive OMR flows

43

would not adequately protect the delta smelt.[11]

35.  Plaintiffs maintain that further explanation is warranted because it is not clear from the BiOp or FWS's subsequent Decisions implementing the adaptive management protocol why flows have been set at the chosen, allegedly over-protective levels, without considering the adverse environmental consequences and irreparable injury this major federal action will cause.

5.  <u>Balance of the Harms</u>.

a.  <u>Potential Harm to the Species</u>.

36.  Federal Defendants and Environmental Intervenors maintain that enjoining implementation of the RPA would

_____

[11]  Environmental Intervenors note that both the delta smelt and longfin smelt are state-listed species under CESA.  *See* 14 Cal. Code Regs. § 670.5; Obegi Decl. at ¶8 & Attch. 7.  The SWG, which includes DFG staff as members, has repeatedly found that "[c]urrent delta smelt advice will be protective of longfin smelt larvae" and has not imposed additional OMR flow restrictions to protect longfin smelt (or to protect delta smelt, in the event FWS failed to do so).  Goude Decl. at ¶4 & Ex. F (2009 SWG notes from 3/16, 3/23, 3/30, 4/6).  If implementation of the RPA is enjoined, Environmental Intervenors argue that DFG likely would have a legal obligation to impose OMR flow restrictions to protect delta smelt and longfin smelt under state law.  The nature of the requested injunction largely obviates this concern, as Plaintiffs merely request that FWS further justify any OMR flow restrictions under Component 2.  To the extent that the deliberative process engenders any change to the manner in which FWS implements Component 2, FWS is nevertheless obliged to ensure that jeopardy and/or adverse modification is avoided.

44

irreparably harm the species.[12]  Federal Defendants argue that, although "[w]e cannot know exactly what effect unlimited pumping would have on the delta smelt this year because it would depend on hydrologic conditions in the Delta and the geographic distribution of the delta smelt population.... unless conditions are favorable, it could entrain up to 50% of delta smelt larvae and cause a severe reduction in production, which would have a 'substantial' effect on the species."  Doc. 56 at 21 (citing BiOp at 164-65).

37.  FWS's May 21, 2009 Decision regarding Component 2 implementation indicates that salvage increased during the week prior and that, at the current rate, salvage "may exceed the Concern Level in the 2008 biological opinion of 299 delta smelt." Fed. Def. Ex. B.  FWS further noted that delta smelt are "likely just starting to reach a size that they are more effectively detected at the fish salvage facilities.  As the fish get larger, they will be detected more frequently.  Also, the end of May is historically a period when high numbers of delta smelt become entrained at the export facilities.  Salvage usually starts at the CVP before the SWP also salvages delta smelt.  Currently,

---

[12]    As a threshold matter, Federal Defendants frame Plaintiffs' proposal as one that would permit "unlimited pumping."  Doc. 56 at 20-21.  Plaintiffs complain that this "is a straw man argument" insofar as they have not requested "unlimited pumping," because various other legal mandates make truly unlimited pumping out of the question.  Doc. 70 at 2.  However, it appears that Federal Defendants use the term "unlimited" to mean a pumping regime that is not constrained by Component 2. Federal Defendants' argument that "unlimited pumping could cause irreparable harm to the delta smelt" will be interpreted in this light.

delta smelt have been salvaged at the CVP over the past 4 days." *Id*.

38.    The ESA embodies a policy of "institutionalized caution."  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).  It is not inappropriate to err on the side of the species when there is substantial uncertainty, and it is reasonable to do so, so long as FWS does not do so arbitrarily or in violation of NEPA, by ignoring irreparable injury from environmental and related harms that will be effectuated by over-zealous reductions of CVP flows.  FWS must evaluate and avoid, to the extent practicable, irreparable harm to Plaintiffs resulting from unnecessarily overprotective RPA measures.

b.    <u>Harm to Water Users & Dependent Communities.</u>

39.    It is undisputed that current conditions are causing economic hardship for water users and the communities upon which they depend.  There is also substantial evidence establishing additional, non-economic hardships, involving dislocation of families and related impacts, loss of school and tax revenue, widespread food insecurity, and adverse impacts to groundwater supply and quality, soil quality, and air quality.

40.    Despite the general economic downturn and/or natural hydrologic conditions, as opposed to the BiOp's flow constraints, the Westside service areas are almost exclusively farmlands, and farm-related activities support the communities in that region. The absence of water supply directly impairs and harms all of these interests, even if there are concurrent causes.  Federal Defendants "cannot control the weather," and the court "cannot

46

hold [them] responsible for the absence of rain," *Alabama v. U.S. Army Corps of Eng'rs*, 441 F. Supp. 2d 1123, 1134 (N.D. Ala. 2006), or the effects of economic recession. Here, however, substantial evidence shows that the BiOp and RPA's flow constraints, and specifically Condition 2, if overzealously implemented, will worsen the water shortage, causing increased harm. NEPA required consideration of such agency-caused consequences. Federal Defendants failed to engage in this analysis.

a.  Information contained within the declaration of Ronald Milligan, Doc. 56-3, the manager of the Bureau's Central Valley Operations Office, indicates that total pumping by the CVP after May 17 would be reduced from 342,000 AF if OMR flows are set at -5000 cfs, to 90,000 AF if OMR flows are set at -1,250. This difference of 252,000 AF is substantial.

41.  Plaintiffs have shown that irreparable harm will likely occur in the absence of injunctive relief, including loss of water supplies, damage to permanent crops, including orchards and vineyards, crop loss or reduction in crop productivity, job losses, reductions in public school enrollment, limitations on public services, impaired ability to reduce the toxic effects of salt and other minerals in the soil, groundwater overdraft, increased energy consumption, and land fallowing that causes air quality problems

c.  <u>Balance of the Hardships</u>.

42.  The balance of the harms must be evaluated in light of the nature of the requested injunction. Plaintiffs request, that

47

FWS be required to justify why it sets OMR flows at a
particularly restrictive level, instead of at a level that would
be less harmful to Plaintiffs' interests as federal contractors.
The law does not require FWS to take any action that would
imperil the continued survival and jeopardy of the smelt.  the
requested injunction requires FWS to, on an ad hoc basis,
consider the issues it would have evaluated had it engaged in a
NEPA review of the BiOp and RPA.  Such an injunction will not
subject the species to any harm.  In this light, the balance of
the harms tips strongly in favor of Plaintiffs.

    6.    Public Interest.

    43.    The public interest favors granting injunctive relief,
as the harms cannot be remedied by monetary compensation, the
environmental consequences cannot be avoided or reasonably
mitigated, and the damage to the community is now occurring and
will continue to be exacerbated.

            V.    CONCLUSION AND ORDER.

    For the reasons set forth above, Plaintiffs' motion for
Preliminary Injunction is GRANTED.  FWS, its agents, and those
acting in active concert or participation with them, are ENJOINED
AND RESTRAINED as follows:

    1.    The FWS, its agents, and those acting in active concert
or participation with them, are ENJOINED from setting and
implementing unnecessarily restrictive OMR flow restrictions
under BiOp RPA Component 2 unless and until FWS first considers
the harm that these decisions and actions are likely to cause

humans, the community, and the environment, during the period through June 30, 2009, or three consecutive days when water temperatures exceed 25°C, whichever first occurs.  FWS, an agency with expertise in biology, not economics or sociology, need not independently evaluate and/or weigh the harms to humans, the community, and the environment versus any potential harm to the species.  Rather, in light of the likelihood that Plaintiffs will succeed on their claim that the BiOp was unlawfully issued without NEPA compliance and the alternatives analysis such compliance would have required, FWS must explain why alternative, less restrictive OMR flows would not adequately protect the delta smelt, considering location, abundance, entrainment, and all other assessment criteria currently in use, to evaluate risk to the species.

2.    If FWS, its agents, and those acting in active concert or participation with them, determine that OMR flow restrictions under BiOp RPA Component 2 must be imposed to protect the species, FWS must explain why alternative, less restrictive OMR flows would not adequately protect the delta smelt.

3.    For each decision setting or implementing OMR flow restrictions under BiOp RPA Component 2, FWS, its agents, and those acting in active concert or participation with them shall provide to the Court, and all parties to this lawsuit, a written statement explaining why alternative, less restrictive OMR flows would not adequately protect the delta smelt.  These written explanations shall be provided forthwith through the Court's electronic case filing system and by any additional means FWS desires.  Such explanation shall be provided no less frequently

49

than weekly, even if FWS maintains the same OMR flow restriction
from one week to the next.

SO ORDERED

Dated: May 29, 2009

                                    ___/s/ Oliver W. Wanger___
                                       Oliver W. Wanger
                                   United States District Judge