UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DELTA SMELT CONSOLIDATED CASES** | 1:09-CV-407 OWW DLB |
| **SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,** *et al.* **v. SALAZAR,** *et al.* **(1:09-cv-407 OWW DLB)** | MEMORANDUM DECISION RE CROSS MOTIONS FOR SUMMARY JUDGMENT RE COMMERCE CLAUSE (Docs. 233 & 288). |
| **STATE WATER CONTRACTORS v. SALAZAR,** *et al.* **(1:09-cv-422 OWW GSA)** | |
| **COALITION FOR A SUSTAINABLE DELTA,** *et al.* **v. UNITED STATES FISH AND WILDLIFE SERVICE,** *et al.* **(1:09-cv-480 OWW GSA)** | |
| **METROPOLITAN WATER DISTRICT  v. UNITED STATES FISH AND WILDLIFE SERVICE,** *et al.* **(1:09-cv-631 OWW DLB)** | |
| **STEWART & JASPER ORCHARDS** *et al.* **v. UNITED STATES FISH AND WILDLIFE SERVICE (1:09-cv-892 OWW DLB)** | |

I. <u>INTRODUCTION</u>

This case concerns the United States Fish and Wildlife Service's ("FWS") December 15, 2008 biological opinion ("BiOp" or "2008 BiOp") concerning the impact of coordinated operations of the Central Valley Project ("CVP") and State Water Project ("SWP") on the threatened delta smelt, prepared pursuant to

1

Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1536(a)(2).  Before the court for decision are cross motions for summary judgment on Plaintiffs' Stewart & Jasper Orchards', *et al.*, ("Stewart Plaintiffs") sixth claim for relief, which alleges that "[b]ecause the delta smelt is a purely 'intrastate species,' and because it has no commercial value," the application of sections 7(a)(2) and 9 of the ESA to the delta smelt is an "invalid exercise[] of constitutional authority" under the Commerce Clause.  U.S. Const. art. I, § 8, cl. 3; 1:09-cv-892, Doc. 1 ("Compl."), at ¶94.[1]  Plaintiffs move for summary judgment on the narrow ground that the application of ESA § 9's take prohibition to the smelt exceeds Congress' power under the Commerce Clause.  Doc. 228-2.  A coalition of California Farmers and the City of Fresno filed an *amici curiae* brief in support of Plaintiffs' motion, framing the challenge as one involving application of ESA § 7 to protect the smelt.  Doc. 263.[2]

Federal Defendants and Defendant Intervenors, a coalition of environmental organizations ("Environmental Intervenors"), oppose Plaintiffs' motion.  Docs. 270 & 281.  Plaintiffs filed a reply.

---

[1] Unless otherwise indicated, "Doc." References are to Docket entries from the lead case, 1:09-cv-407.

[2] *Amici's* original brief was rejected as "excessively duplicative of motions already presented by the parties."  Doc. 256.  In response, *Amici* submitted a revised brief, in which they argue that application of ESA § 7 to protect the smelt exceeds Congress' authority under the Commerce Clause.  This theory, *Amici* assert, is "fundamentally different" from the position taken by the Stewart Plaintiffs, namely that application of ESA § 9 [cannot] prevent takes of the delta smelt exceeds Congress' Commerce Clause power.  Environmental Intervenors suggest that this, second *Amici* brief should be disregarded as excessively duplicative of the arguments made by the Stewart Plaintiffs. Although, as discussed below, the substance of the arguments is largely the same, different arguments raised by *Amici* will be considered.

1    Doc. 293.

2         Federal Defendants and Defendant Intervenors cross-move for

3    summary judgment on this claim, arguing: (1) that the Stewart

4    Plaintiffs do not have standing to sue; (2) their claim is not

5    ripe; and (3) the application of "Section 7(a)(2) and 9" to the

6    operations of the CVP and SWP is a valid exercise of Congress'

7    power under the Commerce Clause.  Docs. 234 & 244.  Plaintiffs

8    oppose this motion.  Doc. 273.  Federal Defendants and Defendant

9    Intervenors filed replies.  Docs. 294 & 298.

10

11                    II. STATUTORY FRAMEWORK

12        The purpose of the Endangered Species Act ("ESA"), 16 U.S.C.

13   §§ 1531-1544, is "to provide a means whereby the ecosystems upon

14   which endangered species and threatened species depend may be

15   conserved" and "to provide a program for the conservation of such

16   endangered species and threatened species."  16 U.S.C. § 1531(b).

17   In enacting the ESA, Congress made legislative findings that:

18
                    (1) various species of fish, wildlife, and plants in
19                  the United States have been rendered extinct as a
                    consequence of economic growth and development
20                  untempered by adequate concern and conservation;

21                  (2) other species of fish, wildlife, and plants have
                    been so depleted in numbers that they are in danger of
22                  or threatened with extinction;

23                  (3) these species of fish, wildlife, and plants are of
                    esthetic, ecological, educational, historical,
24                  recreational, and scientific value to the Nation and
                    its people;
25

26                  (4) the United States has pledged itself as a sovereign
                    state in the international community to conserve to the
27                  extent practicable the various species of fish or

28
                              3

wildlife and plants facing extinction, pursuant to--

    (A) migratory bird treaties with Canada and Mexico;

    (B) the Migratory and Endangered Bird Treaty with Japan;

    (C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

    (D) the International Convention for the Northwest Atlantic Fisheries;

    (E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;

    (F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

    (G) other international agreements; and

(5) encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

16 U.S.C. § 1531(a).

ESA section 2(c)(1), 16 U.S.C. § 1531(c)(1), further states that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."  The ESA authorizes the Secretary of the Interior to list as endangered "any species which is in danger of extinction throughout all or a significant portion of its range," and to list as threatened "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its

range."  16 U.S.C. §§ 1532(6) and (20), 1533.

ESA § 9 makes it unlawful for any person to:

(A) import any [listed] species into, or export any such species from the United States;

(B) take any such species within the United States or the territorial sea of the United States;

(C) take any such species upon the high seas;

(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species; or

(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

16 U.S.C. § 1538.  "Take" is defined as "harass, harm, pursue,

hunt, shoot, wound, kill, trap, capture, or collect, or to

attempt to engage in any such conduct." § 1532(19).  The term

"person" is defined as "an individual, corporation, partnership,

trust, association, or any other private entity, ... or any other

entity subject to the jurisdiction of the United States."

§ 1532(13).

Section 9's take prohibition also applies to persons engaged

in activities that are not intended or designed to take species

listed under the ESA, but which may nevertheless take species

incidentally.  Incidental taking of listed species by private

5

entities that does not jeopardize the continued existence of that species may be authorized by the Secretary of the Interior pursuant to an incidental take permit issued under Section 10 of the ESA.  *See* 16 U.S.C. § 1539.  Take that complies with the terms and conditions set forth in a Section 10 incidental take permit is exempted from the Section 9 prohibition and is lawful. § 1539(c)(1)(B).

Section 7, entitled "Interagency cooperation, requires "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species."  § 1536(a)(2).  Once the consultation process contemplated by section 7(a)(2) has been completed, "the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." § 1536(b)(3)(A).  This written statement is commonly known as a biological opinion.

Section 7(b)(3)(A) further provides that, "[i]f jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not

violate subsection (a)(2) of [Section 7] and can be taken by the Federal agency ... in implementing the agency action." *Id*. If the Secretary offers such "reasonable and prudent alternatives which the Secretary believes would not violate [the prohibition against jeopardy or adverse modification]," and concludes that the taking of a listed species "incidental to the agency action will [likewise] not violate [the prohibition against jeopardy or adverse modification]," the Secretary must provide the action agency with a written statement that (1) "specifies the impact of such incidental taking on the species" and (2) "specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact," and (3) "sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the [action agency] to implement the measures specified..." § 1563(b)(4)(C). Like that issued under section 10, this written statement is commonly referred to as an "Incidental Take Statement" ("ITS"). Any taking that is in compliance with the terms of the ITS "shall not be considered ... a prohibited taking of the species concerned." § 1536(o)(2).

### III. FACTUAL BACKGROUND

FWS listed the delta smelt as a threatened species on March 5, 1993. 58 Fed. Reg. 12,854; Administrative Record ("AR") 3265. It is undisputed that the smelt is "endemic to California." *Id*.

7

The 2008 BiOp concluded that "the coordinated operations of the CVP and SWP, as proposed, are likely to jeopardize the continued existence of the delta smelt" and "adversely modify delta smelt critical habitat." BiOp 276-78.[3] As a result of this conclusion, the BiOp includes a "reasonable and prudent alternative" ("RPA") designed to allow the projects to continue operating without causing jeopardy or adverse modification. BiOp at 279. The RPA includes various components governing operation of the CVP and SWP, designed to reduce entrainment and other taking of smelt during critical times of the year by controlling water flows to and in the Delta. BiOp. 279-85.

The RPA measures prescribed by the BiOp to prevent takes of delta smelt "are nondiscretionary and must be implemented by Reclamation, working with DWR ... in order for the exemption in section 7(o)(2) to apply."

> If [the Bureau of] Reclamation fails to assume and implement the RPA and terms and conditions or is unable to ensure that [the California Department of Water Resources] adheres to the RPA and terms and conditions of the Incidental Take Statement... the protective coverage of [ESA] section 7(o)(2) may lapse.

BiOp 286.

## IV. STANDARD OF DECISION

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The instant

---

[3] Although the BiOp is part of the administrative record, its internal page references, not AR references, are used for ease of reference.

motions address a challenge to the constitutionality of agency action.  The relevant facts are not in dispute, rendering the issues amenable to summary judgment.

"Due respect for the decisions of a coordinate branch of Government demands that [courts] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."  *United States v. Morrison*, 529 U.S. 598, 607 (2000).  Congressional enactments are, therefore, entitled to a "presumption of constitutionality."  *See id*.  "In assessing the scope of Congress' authority under the Commerce Clause," a court "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a rational basis exists for so concluding."  *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (internal quotation omitted).

## V. DISCUSSION

A.  Threshold Issues: Standing/Ripeness.

The Stewart Plaintiffs' sixth claim for relief alleges that application of "Sections 7(a)(2) and 9 of the ESA ... as applied to the Long Term Operational Criteria and Plan for coordination of the [CVP] and [SWP] are invalid exercises of constitutional authority."  Compl. ¶94.  However, Plaintiffs' motion for summary judgment focuses exclusively on the theory that the application of Section 9's take prohibition to the smelt exceeds Congress'

9

authority under the Commerce Clause.  Doc. 228-2 at 12.[4]

    1.   <u>Standing.</u>

    Federal Defendants assert that the Stewart Plaintiffs lack standing to bring a Commerce Clause challenge to the application of only Section 9 to CVP and SWP operations, because, among other things, "Plaintiffs' Complaint makes no factual allegations of injury resulting from the application of Section 9 to the operations of the CVP and SWP, as it does not allege that Plaintiffs have violated or will violate any of Section 9's provisions...." Doc. 234 at 7.  Federal Defendants' argument continues:

> ....[T]he Complaint makes clear, Plaintiffs are simply members of water districts that use water from the CVP and SWP.  Plaintiffs have not alleged that use of that water, which is delivered to Plaintiffs by third parties, exposes them to liability under Section 9. Plaintiffs thus suffer no injury that is likely to be redressed by an order from this court declaring Section 9 unconstitutional.

*Id.* (citations omitted).

    In response, Plaintiffs suggest that whether <u>they</u> will be subject to section 9 liability is only part of their claim, because Project <u>operators</u> may be subject to Section 9 liability

---

[4] Plaintiffs' focus on Section 9's take prohibition is undoubtedly a deliberate one.  A major element of the Commerce Clause analysis turns on whether the <u>regulated activity</u> is "economic" or "commercial" in nature. Section 7's command to ensure that any "action authorized, funded, or carried out" by a federal agency does not cause jeopardy or adverse modification is arguably more directly linked to economic activity than is Section 9's prohibition against take of listed species.  Notably, *amici* do not share Plaintiffs' focus, arguing instead that Section 7's application in this case exceeds Congress' Commerce Clause power.  *See* Doc. 263.

if they do not abide by the BiOp's terms and conditions.
Plaintiffs correctly point out that, at least in part, the BiOp
is "based on the premise that, without the Service's
authorization, takes of delta smelt that occur as a result of
coordinated [CVP] and [SWP] operations would violate Section 9 of
the ESA."  Doc. 228-2 at 12 (citing BiOp at 286 (noting that the
ITS "must be implemented by Reclamation, working with DWR ... in
order for the exemption in section 7(o)(2) [from section 9
liability] to apply")).  The coordinated operations, under the
BiOp's constraints, reduce CVP and SWP water available to deliver
under Plaintiffs' water service contracts with Interior and DWR.

However, Plaintiffs do not acknowledge Section 7's more
central role, which directly resulted in the issuance of the
challenged BiOp.  Section 7(a)(2) requires every federal agency,
"in consultation with and with the assistance of the Secretary
[of the Interior], insure that any action authorized, funded, or
carried out by such agency is not likely to jeopardize the
continued existence of [listed species] or result in the
destruction of adverse modification of [the critical] habitat of
such species."  16 U.S.C. § 1536(a)(2).  The phrase "jeopardize
the continued existence of" is defined by regulation to mean "to
engage in an action that reasonably would be expected, directly
or indirectly, to reduce appreciably the likelihood of both the
survival and recovery of a listed species in the wild by reducing

11

the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Likewise, the phrase "destruction or adverse modification" means "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." *Id.* Neither section 7(a)(2) nor the definitional regulations mention the term "take." Section 7 operates as an independent requirement that agencies thoroughly examine the potential consequences of their actions for listed species.

Here, FWS concluded that, as proposed, the agency action would cause jeopardy and adverse modification to the smelt and its habitat. As required by Section 7(b), FWS proposed a RPA and included in the BiOp a statement that, if the Projects are operated in accordance with the RPA and other conditions, incidental takes resulting from Project operations would not subject Project operators to Section 9 take liability. The threat of civil or criminal Section 9 liability motivates project operators and users to comply with the terms and conditions of the BiOp. The BiOp directly resulted from the consultation process required under Section 7. Even if Section 7 and Section 9 overlap, the application of one does not necessarily implicate

the other.

Plaintiffs' suggestion that the BiOp was "issued based on the imminent application of Section 9 to delta smelt takes occurring in the CVP and SWP," Doc. 273 at 3, is not supported by the record.  Plaintiffs cite page 286 of the BiOp, which notes that the RPA and terms and conditions of the ITS "must be implemented by Reclamation, working with DWR ... in order for the exemption in section 7(o)(2) [from section 9 liability] to apply."  This simply recognizes that adoption of an RPA and ITS, serve to immunize the action agency from liability under Section 9.  The pleadings and record provide no information that a Section 9 enforcement action against any project operator is "imminent."

To establish Article III standing: (1) a plaintiff "must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."; and (3) "it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal

citations and quotations omitted).

It is undisputed that the issuance of the BiOp has resulted in reduced water deliveries to south-of-Delta users, including Plaintiffs, to protect the smelt.  This has resulted in a number of adverse consequences to water users, discovered in accompanying motions.  Given that there is no threat of imminent Section 9 enforcement in this case, there is no causal connection between Plaintiffs' injury and the conduct complained of, namely Section 9's application to the coordinated operation of the project.[5]  Plaintiffs lack standing to sue under Section 9.

  2.  <u>Ripeness.</u>

Plaintiffs' Section 9 challenge is unripe.  The ripeness doctrine avoids "premature adjudication" of disputes.  *Scott v. Pasadena Unif. Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002).  A pre-enforcement challenge is only ripe if a plaintiff is presented with "the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation."  *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 (1993).  In evaluating "the genuineness of a claimed threat of prosecution," a court must examine:  (1) "whether the plaintiffs have articulated a concrete plan to violate the law in question"; (2) "whether the prosecuting

[5] Plaintiffs assert, and Federal Defendants do not refute, that invalidating the application of section 9 to the facts of this case would preclude enforcement of the BiOp.  In this way, invalidating section 9 would arguably redress Plaintiffs' injury, but this does not establish a sufficient causal connection between section 9 and Plaintiffs' injury.

authorities have communicated a specific warning or threat to initiate proceedings"; and (3) "the history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1139 (9th Cir. 2000).

Here, Plaintiffs point to no concrete plans on the part of project operators to violate the ESA, no communication of a specific warning or threat to initiate enforcement proceedings, nor any history of past prosecution or enforcement against the project operators. Even if, *arguendo*, project operators faced imminent prosecution under Section 9, Plaintiffs do not cite any authority to support the threshold proposition that they can stand in the shoes of project operators to challenge such section 9 enforcement proceedings.

Although Section 9 operates during the consultation process, Plaintiffs have not demonstrated that their injury is fairly traceable to any threatened Section 9 enforcement action. The only viable Commerce Clause challenge in this case is to the constitutionality of FWS's application of Section 7 to the coordinated operation of the Projects.

3.   Conclusion Re: Threshold Issues.

Plaintiffs do not have standing to assert a pure § 9 claim. Even if they did, any such claim would be unripe. Plaintiffs' sixth claim for relief alleges that application of "Sections

15

7(a)(2) and 9 of the ESA ... as applied to the Long Term
Operational Criteria and Plan for coordination of the [CVP] and
[SWP] are invalid exercises of constitutional authority," and
there is no dispute that Plaintiffs have standing to bring a
section 7 claim.  However, Plaintiffs deliberately refuse to
advance section 7 as a basis for their motion for summary
judgment.

Nevertheless, Federal Defendants and Defendant Intervenors
move for summary judgment on Plaintiffs' sixth claim for relief,
arguing that the application of "Sections 7(a)(2) and 9,"
together, to the operations of the CVP and SWP is authorized by
the Commerce Clause.  Doc. 234 at 9; Doc. 244-2 at 13 (joining
Federal Defendants' arguments).  It is therefore appropriate to
adjudicate Federal Defendants' and Defendant Intervenors'
defensive motions for summary judgment, which appropriately focus
on section 7, not section 9, because section 7 directly required
the preparation of the BiOp and RPA about which the Plaintiffs
complain.

B.   Constitutional Analysis.

1.   General Standards.

Article I, section 8, clause 3 of the United States
Constitution authorizes Congress to "regulate commerce with
foreign Nations, and among the several States, and with the
Indian Tribes."   Acts of Congress are presumed to be

16

constitutional.  *See United States v. Morrison,* 529 U.S. 598, 607

(2000).  A court may invalidate a statute "only upon a plain

showing that Congress has exceeded its constitutional bounds."

*Id.*

> 2. *Lopez.*

In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme

Court considered whether a provision of the Gun-Free School Zones

Act, 18 U.S.C. § 922(q)(1)(A), which made it a federal offense to

possess a firearm near a school, exceeded Congress' authority

under the Commerce Clause.  514 U.S. 549, 551 (1995).  The *Lopez*

Court began its analysis with familiar "first principles":

> The Constitution creates a Federal Government of
> enumerated powers. *See* Art. I, § 8. As James Madison
> wrote: "The powers delegated by the proposed
> Constitution to the federal government are few and
> defined. Those which are to remain in the State
> governments are numerous and indefinite." The
> Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961).
> This constitutionally mandated division of authority
> "was adopted by the Framers to ensure protection of our
> fundamental liberties." *Gregory v. Ashcroft*, 501 U.S.
> 452, 458 (1991) (internal quotation marks omitted).
> "Just as the separation and independence of the
> coordinate branches of the Federal Government serve to
> prevent the accumulation of excessive power in any one
> branch, a healthy balance of power between the States
> and the Federal Government will reduce the risk of
> tyranny and abuse from either front." *Ibid*.

> The Constitution delegates to Congress the power "[t]o
> regulate Commerce with foreign Nations, and among the
> several States, and with the Indian Tribes."  Art. I, §
> 8, cl. 3.  The Court, through Chief Justice Marshall,
> first defined the nature of Congress' commerce power in
> *Gibbons v. Ogden*, 9 Wheat. 1, 189-190, 6 L.Ed. 23
> (1824):

> > "Commerce, undoubtedly, is traffic, but it is
> > something more: it is intercourse. It describes
> > the commercial intercourse between nations, and

17

1   parts of nations, in all its branches, and is
    regulated by prescribing rules for carrying on
2   that intercourse."

3   The commerce power "is the power to regulate; that
    is, to prescribe the rule by which commerce is to
4   be governed. This power, like all others vested in
    congress, is complete in itself, may be exercised
5   to its utmost extent, and acknowledges no
    limitations, other than are prescribed in the
6   constitution." Id., at 196. The Gibbons Court,
    however, acknowledged that limitations on the
7   commerce power are inherent in the very language
    of the Commerce Clause.

8
    "It is not intended to say that these words
9   comprehend that commerce, which is completely
    internal, which is carried on between man and man
10  in a State, or between different parts of the same
    State, and which does not extend to or affect
11  other States. Such a power would be inconvenient,
    and is certainly unnecessary.

12
    "Comprehensive as the word 'among' is, it may very
13  properly be restricted to that commerce which
    concerns more States than one.... The enumeration
14  presupposes something not enumerated; and that
    something, if we regard the language, or the
15  subject of the sentence, must be the exclusively
    internal commerce of a State." Id., at 194-195.

16
514 U.S. at 553-54.  *Lopez* held that the Commerce Clause

17
authorizes Congress to regulate "three broad categories of

18
activity":

19

20  First, Congress may regulate the use of the <u>channels of
    interstate commerce</u>. Second, Congress is empowered to
21  regulate and protect the <u>instrumentalities of
    interstate commerce, or persons or things in interstate
22  commerce</u>, even though the threat may come only from
    intrastate activities. Finally, Congress' commerce
23  authority includes the power to regulate those
    <u>activities having a substantial relation to interstate
24  commerce</u>, i.e., those activities that substantially
    affect interstate commerce.

25
*Id*. at 558-59 (citations omitted)(emphasis added).[6]  Focusing on

26

27  _____
    [6] The parties agree that only the third category, permitting regulation of
28  activities that substantially affect interstate commerce, is at issue here.
    *See* Doc. 234 at 1 & Doc. 228-2 at 12.  This is the approach taken by all but

18

the third, "substantial effects" category, the Court articulated

four factors relevant to evaluating whether the Gun-Free School

Zones Act had a substantial affect on interstate commerce.

First, the challenged statute was "a criminal statute that

by its terms has <u>nothing to do with 'commerce' or any sort of</u>

<u>economic enterprise</u>, however broadly one might define those

terms."  514 U.S. at 560-61 (emphasis added).  The Court noted

that it has "upheld a wide variety of congressional Acts

regulating intrastate economic activity where we have concluded

that the activity substantially affected interstate commerce."

*Id.* at 559.

Second, the Act "has no express <u>jurisdictional element</u> which

might limit its reach to a discrete set of firearm possessions

that additionally have an explicit connection with or effect on

interstate commerce."  *Id.* at 562 (emphasis added).  Such a

jurisdictional element, while not required, "may establish that

the enactment is in pursuance of Congress' regulation of

interstate commerce."  *Morrison*, 529 U.S. at 612.

one of the relevant appellate decisions.  *See Alabama-Tombigbee Rivers Coal.
v. Kempthorne*, 477 F.3d 1250, 1271 (11th Cir. 2007)(in challenge to FWS's
power to list a purely intra-state species under ESA § 4, parties agreed that
only the third category was at issue); *Rancho Viejo, LLC v. Norton*, 323 F.3d
1062, 1066-67 (D.C. Cir. 2003) (assuming without discussion that the
"substantially affect interstate commerce" category should be the focus of
analysis in challenge to application of the ESA to a private construction
project); *GDF Realty Inv., Ltd. v. Norton*, 326 F.3d 622, 628 (5th Cir. 2003)
(same); *Gibbs v. Babbit*, 214 F.3d 483, 491 (4th Cir. 2000)(evaluating under
third category a Commerce Clause challenge to regulation allowing the taking
of red wolves on private property only under certain, narrow circumstances);
*but see Nat'l Assoc. of Home Builders v. Babbitt*, 130 F.3d 1041, 1046-49 (D.C.
Cir. 1997)(upholding challenge to application of Section 9 to hospital
construction project to protect a purely intra-state species as within
Congress' power to regulate the "channels of interstate commerce").

Third, "[a]lthough as part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, ... neither the statute nor its legislative history contains express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." *Lopez*, 514 U.S. at 562 (internal citations and quotations omitted). While "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," *id.*, such findings may "enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye," *id.* at 563.

Fourth, *Lopez* rejected the Government's argument that possession of firearms in school zones may affect the national economy because the violent crime that can be expected to result from such possession would: (1) affect the costs of insurance throughout the nation; (2) reduce the willingness of individuals to travel to areas perceived to be unsafe, and (3) hamper the educational process by threatening the learning environment. The Court concluded that these effects were unconvincing because they only "tenuously" connected gun possession in school zones to interstate commerce. *Id.* at 564. If the government's arguments were accepted, the Court would be "hard pressed to posit any

activity by an individual that Congress is without power to regulate." *Id.*

    3.   *Morrison.*

*Morrison* applied *Lopez's* four-step framework to strike down a provision of the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981, affording a federal civil remedy for the victims of gender-motivated violence.  529 U.S. 598.  With respect to the first *Lopez* factor, whether the statute had anything to do with "commerce" or "any sort of economic enterprise," the *Morrison* Court reasoned that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 612. Next, *Morrison* concluded that "§ 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Id.* at 613.

Turning to the issue of congressional findings, *Morrison* noted that "[i]n contrast with the lack of congressional findings that we faced in *Lopez*, § 13981 is supported by numerous findings regarding the serious impact that gender-motivated violence has on victims and their families." *Id.* at 614.  However, the Court held that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Id.*  "[S]imply because Congress may conclude that a particular activity substantially affects

interstate commerce does not necessarily make it so." *Id.*
(internal citations and quotations omitted). "Rather, whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Id.* (internal citations and quotations omitted). Congress' findings regarding VAWA were "substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers." *Id.* at 615. Congress found that gender-motivated violence affects interstate commerce by

> deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; ... by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.

*Id.* (citing H.R. Conf. Rep. No. 103-711, at 385, U.S.Code Cong. & Admin. News 1994, pp. 1803, 1853; S. Rep. No. 103-138, at 54.) The concern "expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded." *Id.* (citing *Lopez*, 514 U.S. at 564).

> If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit,

> or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

*Id.* at 615.

The *Morrison* Court was particularly concerned that the Government's reasoning, if accepted would "be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant." *Id.* at 615-16.  In conclusion, the Court emphasized that, traditionally, the regulation of intrastate violent crime has always been the province of the states:

> We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

*Id.* at 617-18 (internal citations, quotations, and footnotes omitted).

*Morrison* left open the possibility that noneconomic activity

23

might be aggregated under certain circumstances:

> While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.

*Id.* at 613.  *Morrison* requires the identification of "economic activity" as a precondition to the federal power to regulate under the Commerce Clause.   *Id.* at 613.

     4.    *Raich.*

     More Recently, *Raich,* upheld the application of provisions of the Controlled Substances Act ("CSA") criminalizing, the manufacture, distribution, and possession of marijuana by one individual who grew marijuana solely for her own personal, medicinal use and another medicinal user who was provided locally grown marijuana by a caregiver at no charge.  545 U.S. 1.  *Raich* confirmed Supreme Court precedent "firmly establishes Congress' power to regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce."  *Id.* at 17 (internal citations and quotations omitted).

> [E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.  We have never required Congress to legislate with scientific exactitude. When Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class.... In this vein, we have reiterated that <u>when a general</u>

> regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.

*Id*. at 17 (internal citations and quotations omitted) (emphasis added).

*Raich* relies heavily on *Wickard v. Filburn*, 317 U.S. 111 (1942):

> In *Wickard* we upheld the application of regulations promulgated under the Agricultural Adjustment Act of 1938, 52 Stat. 31, which were designed to control the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and consequent abnormally low prices. The regulations established an allotment of 11.1 acres for Filburn's 1941 wheat crop, but he sowed 23 acres, intending to use the excess by consuming it on his own farm. Filburn argued that even though we had sustained Congress' power to regulate the production of goods for commerce, that power did not authorize "federal regulation [of] production not intended in any part for commerce but wholly for consumption on the farm." *Wickard*, 317 U.S., at 118,. Justice Jackson's opinion for a unanimous Court rejected this submission. He wrote:
>
>> "The effect of the statute before us is to restrict the amount which may be produced for market and the extent as well to which one may forestall resort to the market by producing to meet his own needs. That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.*, at 127-128, 63 S.Ct. 82.
>
> *Wickard* thus establishes that Congress can regulate purely intrastate activity that is not itself "commercial," in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity.

25

Id. at 17-18.

Raich found the similarities between Wickard and the enforcement of the CSA against purely intra-state medicinal users of marijuana to be "striking," because "a primary purpose of the CSA is to control the supply and demand of controlled substances in both lawful and unlawful drug markets."  Id. at 18-19. "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would ... affect price and market conditions," and/or that it was important to regulate the growth of marijuana for personal use because "the high demand in the interstate market [might] draw such marijuana into [the illicit] market."  Id. at 19.  Just as "the diversion of homegrown wheat tended to frustrate the federal interest in stabilizing prices by regulating the volume of commercial transactions in the interstate market, the diversion of homegrown marijuana tends to frustrate the federal interest in eliminating commercial transactions in the interstate market in their entirety."  Id.  "In both cases, the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity."  Id.

> Given the enforcement difficulties that attend
> distinguishing between marijuana cultivated locally and
> marijuana grown elsewhere, 21 U.S.C. § 801(5), and

> concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA. That the regulation ensnares some purely intrastate activity is of no moment. As we have done many times before, we refuse to excise individual components of that larger scheme.

*Raich* was careful to distinguish the CSA from the statutes disputed in *Lopez* and *Morrison*.

> Unlike those at issue in *Lopez* and *Morrison*, the activities regulated by the CSA are quintessentially economic. "Economics" refers to "the production, distribution, and consumption of commodities." Webster's Third New International Dictionary 720 (1966). The CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market. Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product.[FN36] Such prohibitions include specific decisions requiring that a drug be withdrawn from the market as a result of the failure to comply with regulatory requirements as well as decisions excluding Schedule I drugs entirely from the market. Because the CSA is a statute that directly regulates economic, commercial activity, our opinion in *Morrison* casts no doubt on its constitutionality.
>
> > FN36. See 16 U.S.C. § 668(a) (bald and golden eagles)....

*Id*. at 25-26.  The Court rejected Respondent's contention "that their activities were not "an essential part of a larger regulatory scheme" because they had been "isolated by the State of California, and [are] policed by the State of California," and thus remain "entirely separated from the market":

> The notion that California law has surgically excised a discrete activity that is hermetically sealed off from the larger interstate marijuana market is a dubious proposition, and, more importantly, one that Congress could have rationally rejected.

*Id.* at 30.

### 5. The Relationship Between *Raich* & *Lopez/Morrison,*

The parties (and many learned commentators) debate how *Raich* fits into the *Lopez/Morrison* analytical structure.  Federal Defendants suggest that a court should first determine, under *Raich*, whether the challenged provisions of the ESA are "essential part[s] of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated."  Doc. 234 at 12 (citing *Lopez*, 514 U.S. at 561; *Raich*, 545 U.S. at 17 ("when a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence)).  Then, if the challenged provision is determined to be a part of a larger regulation of economic activity, the court must examine the four remaining *Lopez* factors (i.e., (1) whether the regulated activity is economic in nature; (2) whether there is a jurisdictional element; (3) relevant legislative findings; and (4) the attenuation of the relationship between the statute and interstate commerce).  Doc. 234 at 12.

In contrast, Plaintiffs assert that *Raich* should be

28

considered a "last resort rationale for upholding congressional regulation of noncommercial activity.... not... an independent ground for expanding the scope of Congress' power under the Supreme Court's 'substantial affects' jurisprudence."  Doc. 273 at 5.  But, the law review article cited by Plaintiffs in support of the proposition that Raich is a "last resort" rationale, Randy E. Barnett, *Foreword: Limiting Raich*, 9 Lewis & Clark L. Rev. 743, 746 (2005)(cited at Doc. 273 n.2), observed that the "comprehensive scheme" doctrine could "be considered a fourth distinct rationale for evaluating the reach of the Commerce and Necessary and Proper Clauses, in addition to the three identified in *Lopez*."  This commentator actually opines that *Raich* and Lopez/Morrison provide <u>independent</u> means by which to evaluate a Commerce Clause challenge.  Nothing in *Raich*, *Lopez*, or *Morrison* suggests that *Raich* provides a "last resort" basis for upholding Congressional action against a Commerce Clause challenge.

In *Alabama-Tombigbee Rivers Coalition v. Kempthorne*, the only post-*Raich* appellate decision addressing a Commerce Clause challenge to the ESA, the Eleventh Circuit applied *Raich* as an <u>independent</u> basis to evaluate the ESA under the "substantial effects" test of Commerce Clause power, 477 F.3d 1250 (11th Cir. 2007), *cert. denied* 128 S. Ct. 8775 (2008), finding the challenged provisions of the ESA were essential parts of a "general regulatory statute bear[ing] a substantial relation to

29

commerce," without directly evaluating any of four *Lopez* factors.[7]

C.   <u>Application: Under *Raich*, Is the Regulated Activity An Essential Part of A "General Regulatory Statute Bearing A Substantial Relation to Commerce?"</u>

Four Courts of Appeal have upheld ESA Sections 4 and 9 against Commerce Clause challenges. *Alabama-Tombigbee,* 477 F.3d 1250; *Rancho Viejo v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003)("*Rancho Viejo*"); *GDF Realty Invest. Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003)("*GDF*"); *Gibb v. Babbitt*, 214 F.3d 483 (4th Cir. 2000) ("*Gibb*"); *Nat'l Ass'n of Home Builders v. Babbit*, 130 F.3d 1041 (D.C. Cir 1997) ("NAHB").

*Alabama-Tombigbee*, rejected a Commerce Clause challenge to the listing under ESA § 4 of the Alabama sturgeon, a purely-intrastate fish species with "little, if any, commercial value":

> The [Alabama-Tombigbee Rivers] Coalition [contends] that the Final Rule [listing the Alabama sturgeon] should be vacated because Congress has exceeded the power granted to it under the Commerce Clause by authorizing protection of the Alabama sturgeon, which the Coalition characterizes as an intrastate, noncommercial species. In the Coalition's view, protecting the Alabama sturgeon is not one of the three categories of activities Congress may regulate using its Commerce Clause powers. *See United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *United States v. Morrison*, 529 U.S. 598, 608-09 (2000). As the Supreme Court has recently summarized the law in this area, there are three permissible exercises of congressional authority over commerce: "First, Congress can regulate the channels of interstate commerce. Second, Congress has authority to regulate and protect the instrumentalities

---

[7] In practice, there is substantial overlap in what the *Alabama-Tombigbee* court considered in applying *Raich* (the economic nature of the regulated activity, legislative history, and the relationship of the ESA to interstate commerce), and an analysis of the four *Lopez* factors. The way the analysis is organized is significant.

of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (citations omitted). The parties agree that the third category or power, regulating activities that substantially affect interstate commerce, is the one at issue here.

The Coalition's argument starts with the proposition that the Alabama sturgeon is a purely intrastate species with little, if any, commercial value, as evidenced by the fact that there have been no reported commercial harvests of the fish in more than a century. Because the Alabama sturgeon cannot be commercially harvested, the Coalition reasons that protecting the fish is a non-economic activity akin to those that the Supreme Court held in Lopez and Morrison could not be regulated by Congress. And if protecting the Alabama sturgeon does not involve the regulation of activities that "arise out of or are connected with a commercial transaction," we are not permitted to view the effect of species loss "in the aggregate" to find a substantial connection to interstate commerce. *Lopez*, 514 U.S. at 561, 115.

The Service counters that three circuits, in four published opinions issued since *Lopez*, have already upheld the constitutionality of Congress authorizing the Fish and Wildlife Service to list a purely intrastate species as endangered under the Endangered Species Act. *See GDF* [], 326 F.3d 622 []; *Rancho Viejo*, [], 323 F.3d 1062 []; Gibbs [], 214 F.3d 483 []; *[NAHB]*, 130 F.3d 1041, 1052-54 []. No circuit has held to the contrary. Meanwhile the Supreme Court has had the Endangered Species Act before it several times but has never questioned its constitutionality. *See, e.g., Bennett v. Spear*, 520 U.S. 154 (1997); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995); *[TVA v.] Hill*, 437 U.S. 153 [](1978)]. Not only that, but [] in *Raich* the Supreme Court cited the prohibition on "takes" of eagles in the Bald and Golden Eagle Protection Act, which is a close cousin to the Endangered Species Act's "take" provision, as an example of "a rational (and commonly utilized) means of regulating commerce." 545 U.S. at 26 n. 36. Compare 16 U.S.C. § 668 (declaring it illegal to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import" a bald eagle), with 16 U.S.C. § 1538(a)(1) (declaring it illegal to "take," "possess, sell, deliver, carry, transport, or ship," or "sell or offer for sale" an endangered or threatened species).

The Coalition characterizes its claim as an as-applied

31

challenge to the Final Rule, and its briefs are
carefully tailored to the argument that federal
protection of the Alabama sturgeon, which is one homely
looking fish to be found only with the greatest effort
in one river system in one state, does not concern
commerce or economic activity. Nonetheless, the
necessary first step in addressing its challenge is an
examination of the total economic impact of the
Endangered Species Act itself. In *Lopez*, the Supreme
Court held that aggregation of economic effects is
permissible where the federal action in question is "an
essential part of a larger regulation of economic
activity, in which the regulatory scheme could be
undercut unless the intrastate activity were
regulated." 514 U.S. at 561; *see also United States v.*
*Ballinger*, 395 F.3d 1218, 1250 (11th Cir.2005) (en
banc) (Birch, J., dissenting) ("Realizing that certain
acts which are wholly intrastate in character may
affect interstate commerce, and thereby frustrate
Congress' express power to regulate interstate
commerce, the Supreme Court has permitted federal
regulation of such activity where it substantially
affects interstate commerce in the aggregate.").

In *Raich*, the Court upheld the application of
provisions in the Controlled Substances Act
criminalizing the manufacture, distribution, and
possession of marijuana to intrastate growers and users
of marijuana for medicinal purposes. 545 U.S. 1, 125.
In doing so, the Court explained the statement it had
made in *Lopez* regarding the regulation of intrastate
activity as part of a larger regulation of economic
activity: "Our case law firmly establishes Congress'
power to regulate purely local activities that are part
of an economic 'class of activities' that have a
substantial effect on interstate commerce." *Id*. at 17
(*citing Perez v. United States*, 402 U.S. 146, 150
(1971); *Wickard v. Filburn*, 317 U.S. 111, 128-
29(1942)). The courts "have never required Congress to
legislate with scientific exactitude. When Congress
decides that the 'total incidence' of a practice poses
a threat to a national market, it may regulate the
entire class." *Id*. at 17 (citing *Perez*, 402 U.S. at
154-55).

This principle poses a problem for the Coalition's as-
applied challenge, because "when 'a general regulatory
statute bears a substantial relation to commerce, the
*de minimis* character of individual instances arising
under that statute is of no consequence.'" *Id*. (quoting
*Lopez*, 514 U.S. at 558). If the process of listing
endangered species is "an essential part of a larger
regulation of economic activity," then whether that
process "ensnares some purely intrastate activity is of
no moment." Id. at [22, 24]; *see also Gibbs*, 214 F.3d

32

at 497 (applying *Lopez's* "essential part of a larger regulation" test to the Endangered Species Act). When Congress can and has regulated a class of activities, we "have no power to excise, as trivial, individual instances of the class." *Raich*, 545 U.S. at 23 (quotation marks and citations omitted).

We agree with the three circuits that have concluded the Endangered Species Act is a general regulatory statute bearing a substantial relation to commerce. *See GDF*, 326 F.3d at 640; *Rancho Viejo*, 323 F.3d at 1073; *Gibbs*, 214 F.3d at 497. *The Coalition* does not argue to the contrary, nor could it do so persuasively. The Act prohibits all interstate and foreign commerce in endangered species. 16 U.S.C. § 1538(a)(1)(F). Although the true size of an illegal market is difficult to gauge, the United Nations Environment Programme estimates the illegal component of the worldwide trade in wildlife generates $5 billion to $8 billion in proceeds annually. *See* Int'l Inst. for Env't & Dev. & Traffic Int'l, Making a Killing or Making a Living 12 (2002). Other reports state that the trade in wildlife products comprises the world's second largest black market, trailing only trade in illegal narcotics. See id. The United States is not a bit player in this market. The Service conservatively estimates that Americans pay $200 million annually for illegally caught domestic animals and $1 billion for those illegally caught in other countries. *See* Christine Fisher, Comment, Conspiring to Violate the Lacey Act, 32 Envtl. L. 475, 478 (2002).

The commercial impact of the Endangered Species Act is even greater than those large numbers suggest, because the economic value of endangered species extends far beyond their sale price. The House Report accompanying the Endangered Species Act explains that as human development pushes species towards extinction, "we threaten their-and our own-genetic heritage. The value of this genetic heritage is, quite literally, incalculable." H.R. Rep. No. 93-412, at 4 (1973). Biodiversity's value is not ethereal; its preservation produces economic gain in even the most narrow sense. For example, species diversity is essential to medicine. Half of the most commonly prescribed medicines are derived from plant and animal species. See Gibbs, 214 F.3d at 494; NAHB, 130 F.3d at 1052-53. Nine of the ten most commonly used prescription drugs in the United States are derived from natural plant products. Ecological Soc'y of Am., Ecosystem Services: Benefits Supplied to Human Societies by Natural ecosystems, 2 Issues in Geology 1.6 (1997).

Genetic diversity is also important to improving agriculture and aquaculture. As the D.C. Circuit

33

explained in NAHB, "the genetic material of wild species of plants and animals is inbred into domestic crops and animals to improve their commercial value and productivity." 130 F.3d at 1053. Of the explosive growth in this nation's farm production since the 1930s, genetic diversity is responsible "for at least one-half of the doubling in yields of rice, soybeans, wheat, and sugarcane, and a three-fold increase in corn and potatoes." *Id.*; see also Gibbs, 214 F.3d at 495 (noting that wildlife management can help agriculture by protecting crops and livestock). The growing use of genetic modification in aquaculture, meanwhile, may prove essential to meeting the rising world demand for fish and fishmeal. *See* Christopher L. Delgado et al., The Future of Fish 2-6 (Int'l Food Policy Research Inst. 2003).

A species' simple presence in its natural habitat may stimulate commerce by encouraging fishing, hunting, and tourism. A Fish and Wildlife Service report found that in 2001 recreational anglers spent $35.6 billion, recreational hunters spent $20.6 billion, and wildlife watchers spent $38.4 billion. United States Fish & Wildlife Serv., 2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation 4 (2001); see also Gibbs, 214 F.3d at 493 (describing wildlife-related tourism's substantial effect on interstate commerce). The report estimated direct expenditures only, and the total commercial impact of each activity may be greater still. A 1996 estimate found that recreational anglers alone had "a nationwide economic impact of about $108.4 billion, support[ed] 1.2 million jobs, and add[ed] $5.5 billion to Federal and State tax revenues." United States Fish & Wildlife Serv., Final Environmental Impact Statement Double-crested Cormorant Management in the United States 43 (2003). All of the industries we have mentioned-pharmaceuticals, agriculture, fishing, hunting, and wildlife tourism-fundamentally depend on a diverse stock of wildlife, and the Endangered Species Act is designed to safeguard that stock.

Just as it is apparent that the "comprehensive scheme" of species protection contained in the Endangered Species Act has a substantial effect on interstate commerce, it is clear that the listing process is "an essential part" of that "larger regulation of economic activity." *Raich*, 545 U.S. at 24. The decision to list a species as endangered or threatened is a necessary precondition to the protections afforded species under the Act. There would be no point to the Act if no species could be listed as endangered or threatened. *See* generally 16 U.S.C. § 1538 (Section 9's "prohibited acts").

1
2
3
4
5
6
7
8
9
10

The Coalition does seek a more narrow remedy than a declaration that Congress' delegation of listing authority to the Service is unconstitutional. It wants us to treat the Alabama sturgeon, a purely intrastate species, separately from all species that have demonstrated commercial value. Congress could have excluded all intrastate species from the scope of the Endangered Species Act, but it chose not to do so. This court has "no power to excise, as trivial, individual instances of the class." *Raich*, 545 U.S. at 23 (internal quotation marks and citation omitted). The only remaining question before us "is whether Congress' contrary policy judgment, i.e., its decision to include this narrower 'class of activities' within the larger regulatory scheme, was constitutionally deficient." *Id.* at 26. That depends on whether Congress could have rationally concluded that the regulation of intrastate species was an essential part of the larger regulatory scheme. *Id.* at 26-27.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

There are several reasons for Congress' decision to regulate all endangered species, instead of only interstate ones. For one thing, Congress was concerned with "the unknown uses that endangered species might have." *Hill*, 437 U.S. at 178-79. The extinction of species poses the risk that humanity may lose forever the opportunity to learn some of nature's secrets. Deforestation drove the rosy periwinkle, a delicate pink flower native to Madagascar, nearly to extinction before scientists discovered that it contained two substances now used to treat childhood leukemia and Hodgkin's lymphoma. Cheryl Wittenauer, Mission is to Protect and Preserve; Conservationists Target Native Plants, S.D. Union-Trib., May 11, 2003, at A9. Inside fragile living things, in little flowers or even in ugly fish, may hidden treasures lie. Because Congress could not anticipate which species might have undiscovered scientific and economic value, it made sense to protect all those species that are endangered. *See GDF*, 326 F.3d at 632 ("Who knows, or can say, what potential cures for cancer or other scourges, present or future, may lie locked up in the structures of plants which may yet be undiscovered, much less analyzed? More to the point, who is prepared to risk those potential cures by eliminating those plants for all time? Sheer self-interest impels us to be cautious.") (alteration and citation omitted). Because a species' scientific or other commercial value is not dependent on whether its habitat straddles a state line, Congress had good reason to include all species within the protection of the Act. It did not behave irrationally by taking the broader approach.

28

Congress also recognized "the unforeseeable place such creatures may have in the chain of life on this

35

planet." *Hill*, 437 U.S. at 178-79. As biologist Edward O. Wilson explained: "Every species is part of an ecosystem, an expert specialist of its kind, tested relentlessly as it spreads its influence through the food web. To remove it is to entrain changes in other species, raising the populations of some, reducing or even extinguishing others, risking a downward spiral of the larger assemblage." i, 130 F.3d at 1053 n. 11 (quoting Edward O. Wilson, The Diversity of Life 308 (1992)). An insect with no apparent commercial value may be the favorite meal of a spider whose venom will soon emerge as a powerful and profitable anesthetic agent. That spider may in turn be the dietary staple of a brightly colored bird that people, who are notoriously biased against creepy crawlers and in favor of winsome winged wonders, will travel to see as tourists. Faced with the prospect that the loss of any one species could trigger the decline of an entire ecosystem, destroying a trove of natural and commercial treasures, it was rational for Congress to choose to protect them all.

Congress also reasoned that protection of an endangered species could "permit the regeneration of that species to a level where controlled exploitation of that species can be resumed. In such a case businessmen may profit from the trading and marketing of that species for an indefinite number of years, where otherwise it would have been completely eliminated from commercial channels." *See* S. Rep. No. 91-526, at 3 (1969), reprinted in 1969 U.S.C.C.A.N. 1413, 1415; see also Gibbs, 214 F.3d at 495 (documenting how successful conservation efforts for the American alligator has restarted a trade in alligator hides). The Alabama sturgeon is potentially an example of that congressional hope. It was once harvested commercially, and over harvesting was one of the factors in the species' decline. Final Rule at 26,440-41. The protection the Endangered Species Act affords may one day allow the replenishment of its numbers and eventual, controlled commercial exploitation of the fish. Indeed, this possibility underscores the fundamental irony in the Coalition's position. Under the Coalition's theory, Congress is free to protect a commercially thriving species that exists in abundance across the United States because it has economic worth, but once economic exploitation has driven that species so close to the brink of extinction that it desperately needs the government's protection, Congress is powerless to act.

As the Fourth Circuit stated in Gibbs, "[s]uch reasoning would eviscerate the comprehensive federal scheme for conserving endangered species and turn congressional judgment on its head." *Gibbs*, 214 F.3d at

498. That result need not be, because just as Congress has the power to preserve its right-of-ways over unused railroad lines for use in future commerce, *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1 (1990), it has the power to protect and nurture endangered species so that controlled commercial exploitation of those species may someday resume. *See Gibbs*, 214 F.3d at 496 (applying Preseault to the Endangered Species Act). Speaking for the Supreme Court, Holmes expressed a related thought this way: "But for the treaty and statute there soon might be no birds for any powers to deal with. We see nothing in the Constitution that compels the government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed." *Missouri v. Holland*, 252 U.S. 416, 435 (1920).

These reasons collectively convince us that Congress was not constitutionally obligated to carve out an exception for intrastate species from the otherwise comprehensive statutory scheme that is the Endangered Species Act. The issue, therefore, does not turn on the present or potential commercial value of the Alabama sturgeon alone. Even if we found a commercial nexus completely lacking here, we could not "excise individual applications of a concededly valid statutory scheme." *Raich*, 545 U.S. at 72 (quotation marks omitted).

The Coalition makes only passing note of Congress' power to regulate intrastate activities as part of a comprehensive regulatory scheme. It casts the Raich decision as part of a peculiar two-case sequence along with *Wickard v. Filburn*, 317 U.S. 111 (1942). Both of these cases, the Coalition notes, involve circumstances in which intrastate consumption of a fungible good could affect demand for that good in the interstate market.

We are not convinced that the principle that Congress may regulate some intrastate activity as an essential part of a larger permissible regulation is limited to the facts of *Raich* and *Wickard*. The principle has a much richer history. *See Perez v. United States*, 402 U.S. 146, 151-53 (1971) (tracing the history of the "class of activities" principle through ten Supreme Court decisions). The decisions espousing and applying the principle are concerned not merely with commodities pricing, but with ensuring sufficient deference to Congress' legislative authority. *See id*. at 154 ("[W]e acknowledged that Congress appropriately considered the 'total incidence' of the practice on commerce .... Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual

instances' of the class." (citations omitted)). As the
Court explained in *Hodel v. Indiana*: "It is enough that
the challenged provisions are an integral part of the
regulatory program and that the regulatory scheme when
considered as a whole" can survive a Commerce Clause
challenge. 452 U.S. 314, 329 n. 17 (1981).

Because of the depth of the decisional law, the
Coalition's assertion that *Raich* "was not a major
development in Commerce Clause jurisprudence," may be
right, but not for the reason the Coalition argues.
*Raich* is but the logical application of the Court's
prior Commerce Clause jurisprudence. The discussion in
*Raich* of the effect of intrastate marijuana use on
national drug prices was not intended to limit to the
sale of fungible goods a doctrine that had already been
applied to discriminatory accommodations, see
*Katzenbach v. McClung*, 379 U.S. 294, 302 (1964), to
fair labor standards, *see Darby*, 312 U.S. at 115, to
extortionate credit transactions, *see Perez*, 402 U.S.
at 154, 91, and to mining safety standards, *see Hodel*,
452 U.S. at 329. Instead, the Court's discussion of
commodity pricing in *Raich* was part of its explanation
of the rational basis Congress had for thinking that
regulating home-consumed marijuana was an essential
part of its comprehensive regulatory scheme aimed at
controlling access to illegal drugs. 545 U.S. at 19.

This case, like *Raich*, also turns on whether Congress
had a rational basis for believing that regulation of
an intrastate activity was an essential part of a
larger regulation of economic activity. Unlike the
statute involved in *Raich*, Congress did not rely on
commodity pricing in justifying the Endangered Species
Act. Instead, it made a determination that the most
effective way to safeguard the commercial benefits of
biodiversity was to protect all endangered species,
regardless of their geographic range. That rational
decision was within Congress' authority to make.

*Alabama-Tombigbee*, 477 F.3d at 1271-77.

The parallels between *Alabama-Tombigbee* and the present case
are myriad, and the distinctions immaterial.  The Eleventh
Circuit's conclusion that the ESA is a comprehensive scheme
designed to protect economic resources is rational.  The ESA "is
a general regulatory statute bearing a substantial relation to
commerce."  *Id*. at 1273 (citing *GDF*, 326 F.3d at 640; *Rancho*

38

*Viejo*, 323 F.3d at 1073; *Gibbs*, 214 F.3d at 497).  The ESA prohibits all interstate and foreign trade in endangered species. 16 U.S.C. § 1538(a)(1)(F); *Alabama-Tombigbee*, 477 F.3d at 1273.

Plaintiffs argue that "[t]o the extent economic concerns are present [in the ESA], they are either incidental or they are so fanciful as to ... annihilate any vestige of the federal-state division of power."  Doc. 273 at 11.  Although Plaintiffs cite myriad law review articles to support this proposition, *see id*. at 13, their argument is noticeably devoid of citation to the statute or caselaw.[8]  To the contrary, such contentions are annihilated by the economic analysis of the 11th Circuit in *Alabama-Tombigbee* and have been rejected by every circuit to which the arguments have been presented.

The ESA's concern with markets and commercial activities are neither "incidental" nor "fanciful."  The ESA <u>directly regulates</u> the international and interstate trade in endangered species, 16 U.S.C. § 1538(a)(1)(F), a market that exceeds $1 billion dollars in the United States alone.  *Alabama-Tombigbee*, 477 F.3d at 1273. "The commercial impact of the [ESA] is even greater" than that evidenced by illicit trade in the species "because the economic value of endangered species extends far beyond their sale price." *Alabama-Tombigbee*, 477 F.3d at 1273.  Although economics may not

---

[8] On the authoritative effect of scholarly discourse: "easy access to publication helps law professors remain productive 'regardless of whether their work is relevant or even particularly good.'"  *See* Elizabeth Chambliss, 71 Law. & Contemp. Probs. 17, 27 n.74 (2008).

be the only impetus behind the ESA, the legislative history, reviewed in *Alabama-Tombigbee*, reveals that it was a strong motivating factor.  *Id.* (citing H.R. Rep. No. 93-412, at 4 (1973) ("The value of this genetic heritage is, quite literally, incalculable.").

Plaintiffs concede that some endangered species have been commoditized, but argue that "simply because <u>some</u> endangered or threatened species are commodities is no basis to feign the existence of markets for <u>all</u> such species."  Doc. 273 at 14 n.12 (emphasis added).[9]  Plaintiffs distort the inquiry.  The relevant question is not whether the application of the ESA to a particular species is of direct economic consequence.  Rather, under *Raich*, the issue is whether, once Congress has determined it is important to regulate in an area connected to commerce, the challenged regulation is an essential part of that regulatory scheme.  545 U.S. at 24-25.

In *Alabama-Tombigbee*, the Eleventh Circuit concluded that section 4's listing process was an essential part of the overall

---

[9] This argument suggests that the Delta smelt are <u>not</u> one of those listed species that have been treated as commodities.The record contains some evidence suggesting otherwise, i.e., that "delta smelt were harvested commercially with other smelt (Osmeridae) and silverslide (Atherinidae) species during the 19th and early 20th centuries in a prosperous 'smelt' fishery (Skinner 1962 (Sweetnam and others 2001)."  AR 17005.  As pointed out in *Alabama-Tombigbee*, "Congress ... reasoned that protection of an endangered species could 'permit the regeneration of that species to a level where controlled exploitation of that species can be resumed. In such a case businessmen may profit from the trading and marketing of that species for an indefinite number of years, where otherwise it would have been completely eliminated from commercial channels.'"  466 U.S. at 1275 (citing S. Rep. No. 91-526, at 3 (1969)).  Plaintiffs dispute that the historic record actually demonstrates a commercial harvest of delta smelt, as opposed to other types of smelt.

regulatory scheme because "the decision to list a species as endangered or threatened is a necessary precondition to the protections afforded under the Act."  477 F.3d at 1274.  Here, the relevant statutory provision is section 7, which requires federal agencies to carefully consider whether their actions cause jeopardy or adverse modification to a species and its habitat.  The ESA evidences Congressional intent to use section 7 as, if not the principle, an affirmative mechanism to implement the purposes of the ESA.  The Supreme Court articulated in *TVA v. Hill*, that section 7's legislative history "reveals an explicit congressional decision to require agencies to afford <u>first</u> priority to the declared national policy of saving endangered species."  437 U.S. at 185.  Section 7 is an essential part of the legislative scheme.[10]

   Moreover, under section 7 the regulated activity is the operation of the CVP and SWP, not the listing, or even the take, of individual species.  Project operations provide water to municipal and agricultural users throughout California.  Application of the ESA to Project operations undeniably regulates the conditions under which water is provided to contractors.  The direct and secondary effects on interstate commerce of the

---

[10] The essential nature of section 9, on which Plaintiffs rely, is even more obvious.  Without the ability to prohibit take of species, it would be impossible to regulate commerce in those species.  Congress could have excluded intrastate species from the scope of the ESA, but it chose not to do so.  A court has no power to excise, as trivial, individual instances of the class.  *Id*. at 1274; *Raich*, 545 U.S. at 23.

regulated activity (operation of the Projects) are undeniable.

Just as the plaintiffs in *Alabama-Tombigbee* sought only a declaration that application of the ESA to Alabama sturgeon, a purely intra-state species, exceeded Congress' Commerce Clause Power, the Stewart Plaintiffs seek a declaration that California's endemic delta smelt is beyond Congress' reach.  This raises the question of whether applying section 7 to intra-state species is an essential part of the larger regulatory scheme.

This issue is expressly addressed by *Alabama-Tombigbee*:

> There are several reasons for Congress' decision to regulate all endangered species, instead of only interstate ones. For one thing, Congress was concerned with "the unknown uses that endangered species might have." *Hill*, 437 U.S. at 178-79. The extinction of species poses the risk that humanity may lose forever the opportunity to learn some of nature's secrets. Deforestation drove the rosy periwinkle, a delicate pink flower native to Madagascar, nearly to extinction before scientists discovered that it contained two substances now used to treat childhood leukemia and Hodgkin's lymphoma. Cheryl Wittenauer, Mission is to Protect and Preserve; Conservationists Target Native Plants, S.D. Union-Trib., May 11, 2003, at A9. Inside fragile living things, in little flowers or even in ugly fish, may hidden treasures lie. Because Congress could not anticipate which species might have undiscovered scientific and economic value, it made sense to protect all those species that are endangered. *See GDF*, 326 F.3d at 632 ("Who knows, or can say, what potential cures for cancer or other scourges, present or future, may lie locked up in the structures of plants which may yet be undiscovered, much less analyzed? More to the point, who is prepared to risk those potential cures by eliminating those plants for all time? Sheer self-interest impels us to be cautious.") (alteration and citation omitted). Because a species' scientific or other commercial value is not dependent on whether its habitat straddles a state line, Congress had good reason to include all species within the protection of the Act. It did not behave irrationally by taking the broader approach.

> Congress also recognized "the unforeseeable place such

42

creatures may have in the chain of life on this planet." *Hill*, 437 U.S. at 178-79. As biologist Edward O. Wilson explained: "Every species is part of an ecosystem, an expert specialist of its kind, tested relentlessly as it spreads its influence through the food web. To remove it is to entrain changes in other species, raising the populations of some, reducing or even extinguishing others, risking a downward spiral of the larger assemblage." i, 130 F.3d at 1053 n. 11 (quoting Edward O. Wilson, The Diversity of Life 308 (1992)). An insect with no apparent commercial value may be the favorite meal of a spider whose venom will soon emerge as a powerful and profitable anesthetic agent. That spider may in turn be the dietary staple of a brightly colored bird that people, who are notoriously biased against creepy crawlers and in favor of winsome winged wonders, will travel to see as tourists. <u>Faced with the prospect that the loss of any one species could trigger the decline of an entire ecosystem, destroying a trove of natural and commercial treasures, it was rational for Congress to choose to protect them all</u>.

477 F.3d at 1274-75 (emphasis added).

Plaintiffs argue that "Congress' supposed determination that the most effective way to safeguard the commercial benefits in biodiversity was to protect all endangered species, regardless of their geographic range," is reasoning that could easily permit a determination that is impermissible under the Commerce Clause, e.g., "that the most effective way to safeguard the commercial benefits of crime-free communities is to protect all communities by regulating all crime." Doc. 273 at 20 (internal citations and quotations omitted; modifications adopted). Plaintiffs miss the point. In *Lopez*, where gun free school zones were too tenuously connected to their supposed economic benefits, including reduced crime, there was no comprehensive economic regulatory scheme at issue. Accordingly, the *Lopez* court did not examine whether the

43

prohibition of guns in school zones was an essential part of a regulation designed to control a weapons-related marketplace.

Here, by contrast, although Congress had multiple motivations for passing the ESA, including ethical and aesthetic considerations, the ESA has strong underpinnings in market regulation.  Among other things, one of the ESA's regulatory goals is to protect a <u>monetarily</u> valuable natural resource, our planet's biodiversity, which is proclaimed by express Congressional findings. "[T]o allow extinction of animal species is ecologically, economically, and ethically unsound."  119 Cong. Rec. 25,668 (1973) (statement of Sen. Tunney).  "The value of this genetic heritage is, quite literally, incalculable .... From the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations."  H.R. Rep No 93-307, at 57.  It is "hard to imagine a stronger expression of Congress' belief that species preservation substantially affects the national economic interest." *Bldg. Indus. Ass'n of Superior Cal. v. Babbit*, 979 F. Supp. 893, 907 (D.D.C. 1997).

Protecting "biodiversity" as a whole cannot be accomplished by protecting only those species that are mobile enough to cross state lines or those whose ranges happen to extend over multiple states.  Congress had a rational basis for believing that requiring federal agencies to evaluate the impacts of planned

44

activities on all threatened or endangered species, regardless of their geographic range, was the most effective way to protect the commercial benefits of biodiversity.  The application of section 7 to the facts of this case is a valid exercise of Congress' Commerce Clause power.  *See Raich,* 545 U.S. at 23-24 (approving of aggregation of "subdivided class of activities" that was part of a larger economic regulatory scheme)*; NAHB*, 130 F.3d at 1053-54 ("In the aggregate ... we can be certain that the extinction of species and the attendant decline in biodiversity will have a real and predictable effect on interstate commerce.").

It is not necessary or appropriate to decide Federal Defendants' alternative theories of Constitutional authority based upon the Spending and Welfare or Property Clauses.  *See County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140, 154 (1979)("Federal courts are courts of limited jurisdiction. They have the authority to adjudicate specific controversies between adverse litigants over which and over whom they have jurisdiction.  In the exercise of that authority, they have a duty to decide constitutional questions when necessary to dispose of the litigation before them.  But they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration.").

*///*

45

# VI. CONCLUSION

All of Plaintiffs' and Amici's contentions and arguments have been fully considered.  They are not new and have been universally unsuccessful before other courts.  The analysis here is not different.

For the reasons stated above:

(1) Plaintiffs do not have standing to contest the application of ESA §9, and, even if they did, arguendo, any such claim would be unripe and if the merits reached, the section 7 analysis is equally applicable to reject the claim as a matter of constitutional law on the merits.  Plaintiffs' motion for summary judgment is DENIED.

(2) A section 7 claim is raised in the complaint, Plaintiffs have standing to bring such a claim, and Federal Defendants' and Defendant Intervenors' motions for summary judgment focus on section 7.  These motions are ripe for adjudication.

(3) The application of section 7 to require federal agencies to evaluate effects of planned Project operations on the delta smelt is a valid exercise of Congress' Commerce Clause power. Federal Defendants' and Defendant Intervenors' motions for summary judgment on Plaintiffs' sixth claim for relief are GRANTED.

DATED:  October 7, 2009.

/s/ Oliver W. Wanger
Oliver W. Wanger
United States District Judge