1

2

3                    UNITED STATES DISTRICT COURT

4

5              FOR THE EASTERN DISTRICT OF CALIFORNIA

6

7  | DELTA SMELT CONSOLIDATED CASES | 1:09-CV-407 OWW DLB |

8  **SAN LUIS & DELTA-MENDOTA**     **MEMORANDUM DECISION RE CROSS**
   **WATER AUTHORITY,** *et al.* **v.**  **MOTIONS FOR SUMMARY JUDGMENT**

9  **SALAZAR,** *et al.* **(1:09-cv-407**  **RE REASONABLE AND PRUDENT**
   **OWW DLB)**                      **ALTERNATIVE CLAIMS (Docs.**

10                                  **230 & 236).**

11 **STATE WATER CONTRACTORS v.**
   **SALAZAR,** *et al.* **(1:09-cv-422**

12 **OWW GSA)**

13 **COALITION FOR A SUSTAINABLE**
   **DELTA,** *et al.* **v. UNITED**

14 **STATES FISH AND WILDLIFE**
   **SERVICE,** *et al.* **(1:09-cv-480**

15 **OWW GSA)**

16 **METROPOLITAN WATER DISTRICT**
   **v. UNITED STATES FISH AND**

17 **WILDLIFE SERVICE,** *et al.*
   **(1:09-cv-631 OWW DLB)**

18 **STEWART & JASPER ORCHARDS** *et*
   *al.* **v. UNITED STATES FISH**

19 **AND WILDLIFE SERVICE (1:09-**
   **cv-892 OWW DLB)**

20

21                    I. <u>INTRODUCTION</u>

22

23      This case is before the court on the parties' cross

24 motions for summary judgment to adjudicate the United

25 States Fish and Wildlife Service's ("FWS") December 15,

26 2008 biological opinion ("BiOp" or "2008 BiOp") regarding

27 the impact of coordinated operations of the Central

28
                              1

Valley Project ("CVP") and State Water Project ("SWP") (the "Projects") on the threatened delta smelt, prepared pursuant to Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1536(a)(2).  Because the BiOp found that planned Project operations would jeopardize the continued existence of the delta smelt and/or adversely modify its critical habitat, FWS proposed a Reasonable and Prudent Alternative ("RPA") that imposes certain operating restrictions on the Projects.

Plaintiffs in all five consolidated cases ("Plaintiffs") argue that FWS was required to make certain findings in the text of the BiOp related to the RPA, namely whether (1) the RPA is consistent with continued operations of the SWP and CVP, (2) implementation of the RPA is economically and technologically feasible, and (3) the RPA is capable of being implemented within the legal authority and jurisdiction of the operators, the Bureau of Reclamation ("Reclamation") and the California Department of Water Resources ("DWR").  Doc. 237.  Real Party in Interest, California Department of Water Resources ("DWR") filed a brief in support of Plaintiffs' motion.  Doc. 246. Federal Defendants oppose.  Doc. 274.  Plaintiffs and DWR replied.  Docs. 295 & 300.

Federal Defendants cross-move for summary judgment on this claim, arguing that the RPA satisfies the requirements of the ESA and its regulations because:

> (1) Reclamation and FWS "worked together throughout the consultation process, to identify an RPA that will avoid jeopardy";
>
> (2) If the entire record is examined, the RPA satisfies all of the criteria set forth in the ESA and its regulations; and (3) the ESA does not permit Federal Defendants to balance the survival of the Delta smelt against the potential economic effects of the RPA.

Doc. 231.

Plaintiffs oppose this motion, insisting that:

> (1) FWS cannot satisfy the relevant requirements by arguing that they collaborated with Reclamation because:
>
>> (a) FWS has ultimate responsibility for the RPAs,
>>
>> (b) FWS has a duty to examine the relevant requirements on the face of the BiOp, and
>>
>> (c) FWS improperly and without explanation disregarded RPAs offered by DWR without explanation;

3

(2) Federal Defendants fail to otherwise show
that the RPA satisfies the requirements of law;
and

(3) Federal Defendants have a duty, not
performed, to assess the feasibility of the RPA.

Doc. 273.  DWR filed its own, complimentary opposition.
Doc. 282.  Federal Defendants filed a reply.  Doc. 296.
Plaintiffs also move to strike Federal Defendants' cross
motion.  Doc. 284.

## II. STATUTORY/REGULATORY FRAMEWORK

Section 7 of the ESA "prescribes the steps that
federal agencies must take to ensure that their actions
do not jeopardize endangered wildlife and flora."
*National Ass'n. of Homebuilders v. Defenders of Wildlife*,
551 U.S. 644, 651 (2007).  Section 7(a)(2) provides that
"[e]ach Federal agency shall, in consultation with and
with the assistance of the Secretary [of Commerce or the
Interior], insure that any action authorized, funded, or
carried out by such agency (hereinafter in this section
referred to as an 'agency action') is not likely to
jeopardize the continued existence of any endangered
species or threatened species."  16 U.S.C. § 1536(a)(2).
"Each Federal agency shall review its actions at the
earliest possible time to determine whether any action

4

may affect listed species or critical habitat.  If such a determination is made, formal consultation is required." 50 C.F.R. § 402.14.

Formal consultation involves a process of sharing information between the action agency and the wildlife agency (in this case FWS).  *Id.*  Among other things, during formal consultation, FWS is directed to:

(1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

(2) Evaluate the current status of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

(5) Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g)(1)-(3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the

reasonable and prudent alternatives....

\*\*\*

(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation.

50 C.F.R. § 402.14(g).

At the conclusion of the consultation process, "the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A).  This written statement is commonly known as a "biological opinion."

Section 7(b)(3)(A) further provides that, "[i]f jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) of [Section 7] and can be taken by the Federal agency ... in implementing the agency action." *Id*.  "Reasonable and prudent alternatives refer to alternative actions identified during formal consultation [1] that can be

implemented in a manner consistent with the intended

purpose of the action, [2] that can be implemented

consistent with the scope of the Federal agency's legal

authority and jurisdiction, [3] that is economically and

technologically feasible, and [4] that the Director

believes would avoid the likelihood of jeopardizing the

continued existence of listed species or resulting in the

destruction or adverse modification of critical habitat."

50 C.F.R. § 402.02 (the "four RPA requirements").

Where the Secretary concludes that an action, or the

implementation of an RPA, will result in incidental take

of listed species, but that take will not violate section

7(a)(2)'s prohibition against jeopardy and/or adverse

modification, the Secretary must provide the action

agency with a written statement that (1) "specifies the

impact of such incidental taking on the species" and (2)

"specifies those <u>reasonable and prudent measures</u>[1] that

the Secretary considers necessary or appropriate to

minimize such impact," and (3) "sets forth the terms and

conditions (including, but not limited to, reporting

---

[1] Reasonable and prudent measures, as distinguished from reasonable and prudent alternatives, "refer to those actions the Director believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take."  50 C.F.R. § 402.02.  The regulations further explain that "[r]easonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes."  50 C.F.R. § 402.14(i)(2).

requirements) that must be complied with by the [action agency] to implement the measures specified..."
§ 1563(b)(4)(C).   This written statement is commonly referred to as an "Incidental Take Statement" ("ITS").[2]

The implementing regulations echo these requirements, mandating that a biological opinion include:

> (1) A summary of the information on which the opinion is based;

> (2) A detailed discussion of the effects of the action on listed species or critical habitat; and

> (3) The Service's opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy biological opinion"); or, the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion). <u>A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any</u>. If the Service is unable to develop such alternatives, it will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

50 C.F.R. 402.14(h)(emphasis added).

The regulations further specify that an ITS must:

> (i) Specif[y] the impact, i.e., the amount or extent, of such incidental taking on the species;

---

[2] Any taking that is in compliance with the terms of the ITS "shall not be considered ... a prohibited taking of the species concerned." § 1536(o)(2).

1
        (ii) Specif[y] those reasonable and prudent
2       measures that the Director considers necessary
        or appropriate to minimize such impact;

3                                   ***

4       (iv) Set[] forth the terms and conditions
5       (including, but not limited to, reporting
        requirements) that must be complied with by the
6       Federal agency or any applicant to implement the
        measures specified under paragraph (i)(1)(ii)
7       and (i)(1)(iii) of this section; and

8       (v) Specif[y] the procedures to be used to
9       handle or dispose of any individuals of a
        species actually taken.
10
11  50 C.F.R. § 402.14(i)(1)(i)-(v).

12      In addition, FWS and NMFS issued a "Consultation

13  Handbook" that "provides internal guidance and

14  establishes national policy for conducting consultation

15  and conferences pursuant to Section 7 of the Endangered

16  Species Act of 1973, as amended."  Plaintiffs' Request

17  for Judicial Notice ("PRJN"), Exh. B (FWS/NMFS:

18  Procedures for Conducting Consultation and Conference

19  Activities Under Section 7 of the Endangered Species

20  Act," at Foreword, (March 1998))("Consultation

21  Handbook").[3]

22
23      The Consultation Handbook explains that during the

24  formal consultation period, FWS should "meet or

25  communicate with the action agency ... to gather any

26
    ────────────────────
27  [3] Plaintiffs' request for judicial notice of seven documents, all of
    which are public records the content of which are not in dispute, is
    GRANTED.  Doc. 240.  They are admissible to prove their existence
28  and content, but not the truth of the matters asserted therein.

                                    9

additional information necessary to conduct the consultation." Consultation Handbook at 4-6. Among other things, the formal consultation period should be used to "develop reasonable and prudent alternatives to an action likely to result in jeopardy or adverse modification...." *Id.*

Consultation "should be undertaken cooperatively with the action agency and any applicant, thus allowing the Services to develop a better understanding of direct and indirect effects of a proposed action and any cumulative effects in the action area. Action agencies also have the project expertise necessary to help identify reasonable and prudent alternatives, and reasonable and prudent measures. Other interested parties (including the applicant, and affected State and tribal governments) should also be involved in these discussions....These cooperative efforts should be documented for the administrative record." *Id.*

The Handbook contains a section on RPAs, which provides as follows:

> Reasonable and prudent alternatives
>
> This section lays out reasonable and prudent alternative actions, if any, that the Services believe the agency or the applicant may take to avoid the likelihood of jeopardy to the species or destruction or adverse modification of designated critical habitat (50 CFR §

402.14(h)(3)). When a reasonable and prudent alternative consists of multiple activities, it is imperative that the opinion contain a thorough explanation of how each component of the alternative is essential to avoid jeopardy and/or adverse modification. The action agency and the applicant (if any) should be given every opportunity to assist in developing the reasonable and prudent alternatives. Often they are the only ones who can determine if an alternative is within their legal authority and jurisdiction, and if it is economically and technologically feasible.

If adopted by the action agency, the reasonable and prudent alternatives do not undergo subsequent consultation to meet the requirements of section 7(a)(2). The action agency's acceptance in writing of the Services' reasonable and prudent alternative concludes the consultation process.

Section 7 regulations (50 CFR §402.02) limit reasonable and prudent alternatives to:

- alternatives the Services believe will avoid the likelihood of jeopardy or adverse modification,

- alternatives that can be implemented in a manner consistent with the intended purpose of the action,

- alternatives that can be implemented consistent with the scope of the action agency's legal authority and jurisdiction, and

- alternatives that are economically and technologically feasible.

If the Services conclude that certain alternatives are available that would avoid jeopardy and adverse modification, but such alternatives fail to meet one of the other three elements in the definition of "reasonable and prudent alternative," the Services should document the alternative in the biological

11

opinion to show it was considered during the
formal consultation process. This information
could prove important during any subsequent
proceeding before the Endangered Species
Committee (established under section 7(e) of the
Act), which reviews requests for exemptions from
the requirements of section 7(a)(2).

Although a strong effort should always be made
to identify reasonable and prudent alternatives,
in some cases, no alternatives are available to
avoid jeopardy or adverse modification.

Examples include cases in which the corrective
action relies on:

• an alternative not under consideration
(e.g., locating a project in uplands instead
of requiring a Corps permit to fill a
wetland);

• actions of a third party not involved in the
proposed action (e.g., only the County,
which is not a party to the consultation,
has the authority to regulate speed limits);

• actions on lands over which the action
agency has no jurisdiction or no residual
authority to enforce compliance; and

• data not available on which to base an
alternative.

In these cases, a statement is included that no
reasonable and prudent alternatives are
available, along with an explanation. When data
are not available to support an alternative, the
explanation is that according to the best
available scientific and commercial data, there
are no reasonable and prudent alternatives to
the action undergoing consultation. The Services
are committed to working closely with action
agencies and applicants in developing reasonable
and prudent alternatives. The Services will, in
most cases, defer to the action agency's
expertise and judgment as to the feasibility of
an alternative. When the agency maintains that
the alternative is not reasonable or not

12

> prudent, the reasoning for its position is to be
> provided in writing for the administrative
> record. The Services retain the final decision
> on which reasonable and prudent alternatives are
> included in the biological opinion. When
> necessary, the Services may question the
> agency's view of the scope of its authorities to
> implement reasonable and prudent alternatives.

Consultation Handbook, 4-41 - 4-42.

### III. FACTUAL BACKGROUND

The 2008 BiOp concluded that "the coordinated operations of the CVP and SWP, as proposed, are likely to jeopardize the continued existence of the delta smelt" and "adversely modify delta smelt critical habitat." BiOp 276-78.[4]  As required by law, the BiOp includes an RPA designed to allow the projects to continue operating without causing jeopardy or adverse modification.  BiOp 279.  The RPA includes various operational components designed to reduce entrainment of smelt during critical times of the year by controlling water flows in the Delta.  BiOp 279-85.

Component 1 (Protection of the Adult Delta Smelt Life Stage) consists of two Actions related to OMR flows: Action 1, requiring OMR flows to be no more negative than -2,000 cubic feet per second ("cfs") on a 14-day average and no more negative than -2,500 cfs for a 5-day running

---

[4] Although the BiOp is part of the administrative record for ease of reference, its internal page references, rather than AR references, will be used herein.

average, is triggered during low and high entrainment risk periods based on physical and biological monitoring, BiOp 281, 329; Action 2, setting maximum negative flows for OMR, is triggered immediately after Action 1 ends or if recommended by the SWG, BiOp 281-282, 352.

Under Component 2 (Protection of Larval and Juvenile Delta Smelt), OMR flows must remain between -1,250 and -5,000 cfs (specific flows to be determined by FWS) beginning when Component 1 is completed, when Delta water temperatures reach 12° Celsius, or when a spent female is detected in trawls or at salvage facilities.  BiOp 282, 357-358.  Specific flows are maintained until June 30 or when the Clifton Court Forebay water temperature reaches 25° Celsius. BiOp 282, 368.

Component 3 (Improve Habitat for Delta Smelt Growth and Rearing), requires sufficient Delta outflow to maintain average mixing point locations of Delta outflow and estuarine water inflow ("X2") from September to December, depending on water year type, in accordance with a specifically described "adaptive management process" overseen by FWS.  BiOp 282-283, 369.

Under Component 4 (Habitat Restoration), DWR is to create or restore 8,000 acres of intertidal and subtidal habitat in the Delta and Suisun Marsh within 10 years.

14

BiOp 283-284, 379.

Under Component 5 (Monitoring and Reporting), the Projects gather and report information to ensure proper implementation of the RPA actions, achievement of physical results, and evaluation of the effectiveness of the actions on the targeted life stages of delta smelt so that the actions can be refined, if needed.  BiOp 284-285, 328, 375, 37.

The BiOp describes the regulatory definition of "reasonable and prudent alternatives" and the four RPA factors:

> The regulations (50 CFR 402.02) implementing section 7 of the Act define reasonable and prudent alternatives (RPA) as alternative actions, identified during formal consultation, that 1) can be implemented in a manner consistent with the intended purpose of the action; 2) can be implemented consistent with the scope of the action agency's (i.e. Reclamation's) legal authority and jurisdiction; 3) are economically and technologically feasible; and, 4) would, the Service believes, avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

BiOp 279.

It is undisputed that the BiOp does not explicitly discuss the first three factors -- consistency with the purpose of the action; consistency with the legal authority and jurisdiction of the action agency; and

15

economic and technological feasibility -- at all.  *See*
BiOp at 279-285 & Attachment B.  None of the terms
"consistent with the intended purpose of the action,"
"jurisdiction," "legal authority," or "economically and
technologically feasible," are used in the RPA section of
the BiOp.  These motions focus on the question:  If no
analysis or discussion of these RPA issues is included in
the BiOp itself, is the BiOp facially arbitrary,
capricious, and/or contrary to law?  Whether and to what
extent these factors are evaluated elsewhere in the
administrative record is for the next round of motions.

### IV. <u>STANDARD OF DECISION</u>

Summary judgment is appropriate where there are no
genuine issues of material fact and the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P.
56(c).  Plaintiffs' RPA claim against Federal Defendants
is brought under the ESA's citizen suit provision, and is
governed by APA section 706, because the ESA contains no
independent standard of review.  *Village of False Pass v.
Clark*, 733 F.2d 605, 609 (9th Cir. 1984).  The APA
requires that the agency action be upheld unless it is
found to be "arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law," or
"without observance of procedure required by law."  5

16

U.S.C. § 706(2)(A), (D).   The inquiry is designed to "ensure that the agency considered all of the relevant factors and that its decision contained no clear error of judgment."   *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001).   Agency action should only be overturned if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."   *Id*.   In sum, a court must ask "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made."   *Id*.

## V. DISCUSSION

### A.   Motion to Strike DWR's Briefs.

Defendant-Intervenors, a coalition of environmental organizations, move to strike DWR's brief on the ground that Federal Rule of Civil Procedure 56 only permits a "party claiming relief" or a "party against whom relief is sought" may move for summary judgment.   Doc. 299. This motion is without merit.   First, DWR is not moving for summary judgment, it is merely supporting Plaintiffs'

motion.   Second, Defendant-Intervenors signed a stipulation regarding procedures for briefing the instant motions, which specifically provides for DWR's participation in briefing.  *See* Doc. 148.  Defendant-Intervenors are estopped from taking a position inconsistent with this stipulation.  *See MWS Wire Indus. Inc., v. Cal. Fine Wire Co.*, 797 F.2d 799, 803 (9th Cir. 1986).  Defendant-Intervenors' motion to strike is DENIED.  Federal Defendants' similar complaint, asserted within its opposition, is likewise without merit.  Doc. 274 at 3.

B.   **Plaintiffs' Motion to Strike Federal Defendants' Cross-Motion.**

Plaintiffs move to strike Federal Defendants' entire cross-motion for summary judgment on the RPA claims on the ground that it exceeds the scope of non-record claims set for early resolution in the amended Scheduling Order. Doc. 284.  The Second Amendment to the Scheduling order provided that:

> The moving parties may present their RPA claims with the early disposition claims.  RPA claims that are to be heard with early dispositive motions <u>are to be limited to facial challenges that address whether the requirements of the law have been met, without the necessity of a determination of disputed factual issues</u>.

Doc. 144 at 3 (emphasis added).  The purpose of this limitation was to ensure that arguments and claims

18

requiring reference to the administrative record would
not be heard until _after_ any issues regarding the scope
of the administrative record ("AR"), discovery, and
expert witnesses were resolved.

Federal Defendants' first major argument, that
Reclamation and FWS worked together, through the
consultation process, to identify an RPA that would avoid
jeopardy, makes frequent and extensive references to the
contents of the AR.  Doc. 231 at 5-13.  The same is true
for Federal Defendants' second major argument, that the
RPA satisfies all of the requirements of the ESA and its
implementing regulations, which refer to and rely on the
AR.  _See id_. at 13-21.  Neither of these arguments may be
considered at this time, as the completeness and content
of the AR remains in dispute.

Federal Defendants suggest that neither their own nor
Plaintiffs' RPA motions can "be heard without review of
the administrative record," and note "that is why the
Federal Defendants objected to the briefing of these
claims at this stage of the case."  Doc. 309 at 1.  But,
Plaintiffs' have framed their facial RPA claim very
narrowly, asserting that the ESA and its implementing
regulations require FWS to make certain findings on the
face of the BiOp.  The claim that such findings are

1    legally required can now be resolved.

2         Federal Defendants third major argument, that the ESA

3    does not allow Reclamation and FWS to balance the

4    survival of the delta smelt against the potential

5    economic effects of the RPA, is a merits response to

6    allegations in Plaintiffs' complaints that FWS was

7    required to evaluate the economic impact of the RPA and

8

9    determine on the merits whether the economic impact

10   renders the RPA "economically infeasible" or whether

11   "more economically feasible, less costly alternatives

12   exist that would prevent jeopardy with less economic

13   impact." *See e.g.*, Doc. 292, San Luis Complaint, at

14   ¶95(c).  Although this argument makes no reference to the

15   AR, the issue is intimately intertwined with merits

16   arguments based on the record and will be addressed in

17   the second round of summary judgment motions.  It is

18

19   premature to rule on the economic effects argument at

20   this time, except to say, it cannot now be decided as a

21   matter of law

22         Plaintiffs' motion to strike is GRANTED WITHOUT

23   PREJUDICE to Federal Defendants' renewal of their motion

24

25   on these grounds in the next round of briefing.

26   //

27   //

28
                                   20

C.   **Plaintiffs' and DWR's Motion for Summary Judgment.**

   1.   **Scope of Motion.**

   Plaintiffs and DWR argue that, to determine whether an RPA meets the joint regulations' four requirements must be discussed and analyzed on the face of a jeopardy biological opinion.  If such a requirement exists, it is undisputed that the BiOp's language contains no such discussion.

   Federal Defendants respond that Plaintiffs' and DWR's argument goes much further, asserting:

> The premise of the motions for summary judgment submitted by the Plaintiffs and [DWR] is that the law requires the United States Fish and Wildlife Service [FWS] to follow an elaborate series of procedures when it develops an RPA, and that it failed to follow those procedures here. The Plaintiffs and DWR argue, for example, that the Service is required by law to identify a range of potential RPAs and then undertake a detailed, independent analysis to determine whether they satisfy the four criteria set out in the regulatory definition (at 50 C.F.R. § 402.02). Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Adjudication of Reasonable and Prudent Alternative Issue, Docket No. 237 (Aug. 3, 2009) ("Pl. Mem."); "Real Party in Interest" California Department of Water Resources' Points and Authorities in Support of Plaintiffs' Motion for Summary Adjudication on Reasonable and Prudent Alternative Issue, Docket No. 246 (Aug. 3, 2009) ("DWR Mem."). This analysis, according to the Plaintiffs, must be based on a "broad suite of factors," including the potential effects of the RPAs on political and business interests and a full assessment of the potential economic costs and benefits to affected communities. Pl. Mem. at 19. They also claim that the Service must present this analysis "on

21

the face" of the biological opinion itself and not in the administrative record. Pl. Mem. at 20; DWR Mem. at 1. The Plaintiffs then take their argument to its logical conclusion by arguing that, once the Service has identified a range of potential RPAs and evaluated their economic effects, it must choose the least costly RPA that "best suits" the interests of business. Pl. Mem. at 19.

Doc. 274 at 1.  Federal Defendants assert that Plaintiffs maintain FWS must "follow an elaborate series of procedures when it develops an RPA."  However, Plaintiffs deny they so contend:

Plaintiffs' opening brief sets forth the limited claim that Defendants violated the Joint Consultation Regulations by failing to articulate, on the face of the BiOp, any rational connection between the facts considered and conclusions reached in determining whether and how the RPA adopted in the 2008 BiOp satisfies the definitional requirements of the Joint Consultation Regulations. *See* Pltfs. Memo in Support of MSA at 1-2, 9-20. Hence, Defendants' straw man argument, repeated ad nauseum, that Plaintiffs "demand" a "burdensome analysis" where the Service must identify a "range" of potential RPAs and "weigh" the "economic costs and benefits" of that range of RPAs is misleading and factually incorrect. *See, e.g.,* Fed. Opp. at 1, 3-8, 12, 18-21, 23, 24. Plaintiffs have already acknowledged that the scope of what must be analyzed in adopting an RPA in accordance with the ESA and Section 402.02 is an issue to be addressed in later phases of this case based on the entire administrative record. *See* Pltfs. Mot. to Strike Fed. MSJ at 1:14-17; Pltfs. Opp. to Fed. MSJ at 2:16-20.

Nor have Plaintiffs asserted that the Service is required to identify multiple RPAs and pick the one that imposes the least cost on business interests. Fed. Opp. at 4:10-11. While that

interpretation may be the logical conclusion of the decisions in *Sw. Ctr. For Biological Diversity v. U.S. Bureau of Reclamation* (*Southwest Center*), 143 F.3d 515 (9th Cir. 1998) and *Westlands Water Dist. v. United States of America*, 850 F. Supp. 1388 (E.D. Cal. 1994), it is not the argument raised by Plaintiffs at this stage of the proceedings. <u>Instead, Plaintiffs simply assert that Federal Defendants were required to analyze the RPA requirements of Section 402.02 and present their determinations somewhere within the text of the BiOp</u>. See Pltfs. Memo in Support of MSA at 1-2, 9-20. Inclusion of such a determination is even more critical where, as here, the Service ultimately imposed its RPA over the objections of the Bureau and DWR. Pltfs. Opp. to Fed. MSJ at 11-12.

*See* Doc. 295 at 3.  Plaintiffs are entitled to define their motion's scope.  They advance only the narrow issue of whether Federal Defendants were required to present analysis of all four RPA requirements of 50 C.F.R. § 402.02 within the text of the BiOp; no other issue is before the court for decision.

2.  <u>Consultation Handbook.</u>

Both parties cite passages from the Consultation Handbook to support and oppose the contention that FWS is required to analyze the RPA requirements of 50 C.F.R. § 402.02 on the face of the BiOp.  The Consultation Handbook sets forth guidance and policy "made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case,"

23

and "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1209 (E.D. Cal. 2008) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944)).

Plaintiffs note the general standard regarding biological opinions:

> Clarity and conciseness are extremely important.... A biological opinion should clearly explain the proposed project, its impacts on the affected species, and the Services' recommendations. It should be written so the general public could trace the path of logic to the biological conclusion and complete enough to withstand the rigors of a legal review.

Consultation Handbook at 1-2. These general goals of clarity and conciseness serve the overarching requirement that a BiOp should "clearly explain the proposed project, its impacts on the affected species, and the Services' recommendations." It does not specifically mandate a discussion of the first three RPA requirements.

Other portions of the Handbook instruct FWS to work closely with the action agency, because the action agency possesses much of the expertise necessary to help develop RPAs. The Handbook explains that during the formal consultation period, FWS should "meet or communicate with

24

the action agency ... to gather any additional information necessary to conduct the consultation." *Id.* at 4-6.   Among other things, the formal consultation period should be used to "develop reasonable and prudent alternatives to an action likely to result in jeopardy or adverse modification....":

> [Consultation] should be undertaken cooperatively with the action agency and any applicant, thus allowing the Services to develop a better understanding of direct and indirect effects of a proposed action and any cumulative effects in the action area. <u>Action agencies also have the project expertise necessary to help identify reasonable and prudent alternatives, and reasonable and prudent measures.</u> Other interested parties (including the applicant, and affected State and tribal governments) should also be involved in these discussions....<u>These cooperative efforts should be documented for the administrative record</u>.

*Id.*   This passage clearly indicates that the action agency should play a central role in designing the RPA, and that any cooperative efforts toward such ends should be documented "for" the administrative record.   It says nothing about what RPA-related findings are required in the BiOp itself.

     The Handbook addresses at length the development and documentation of RPA's.   The parties cite passages from this section.   The entire RPA section states:

//

//

25

**Reasonable and prudent alternatives**

This section lays out reasonable and prudent alternative actions, if any, that the Services believe the agency or the applicant may take to avoid the likelihood of jeopardy to the species or destruction or adverse modification of designated critical habitat (50 CFR §402.14(h)(3)). When a reasonable and prudent alternative consists of multiple activities, it is imperative that the opinion contain a thorough explanation of how each component of the alternative is essential to avoid jeopardy and/or adverse modification. The action agency and the applicant (if any) should be given every opportunity to assist in developing the reasonable and prudent alternatives. Often they are the only ones who can determine if an alternative is within their legal authority and jurisdiction, and if it is economically and technologically feasible.

If adopted by the action agency, the reasonable and prudent alternatives do not undergo subsequent consultation to meet the requirements of section 7(a)(2). The action agency's acceptance in writing of the Services' reasonable and prudent alternative concludes the consultation process.

Section 7 regulations (50 CFR §402.02) limit reasonable and prudent alternatives to:

- alternatives the Services believe will avoid the likelihood of jeopardy or adverse modification,

- alternatives that can be implemented in a manner consistent with the intended purpose of the action,

- alternatives that can be implemented consistent with the scope of the action agency's legal authority and jurisdiction, and

- alternatives that are economically and technologically feasible.

> If the Services conclude that certain alternatives are available that would avoid jeopardy and adverse modification, but such alternatives fail to meet one of the other three elements in the definition of "reasonable and prudent alternative," the Services <u>should document the alternative in the biological opinion to show it was considered during the formal consultation process</u>. This information could prove important during any subsequent proceeding before the Endangered Species Committee (established under section 7(e) of the Act), which reviews requests for exemptions from the requirements of section 7(a)(2).

***

*Id.* at 4-41 - 4-42 (emphasis added).[5]

The first sentence emphasizes the link between RPAs and FWS's obligation to ensure that the proposed action does not cause jeopardy or adverse modification to critical habitat.  Jeopardy has been found to be the "guiding standard" for determination of RPAs.  *Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1268 (W.D. Wash. 1999) (rejecting third party's argument that NMFS must balance the benefit to the species of an RPA against the economic and technical burden on an impacted industry, as "inconsistent with the purposes of the ESA and with case law interpreting the Act").  The second sentence translates the focus on jeopardy into a

---

[5] This section concludes with a discussion of what should be done when no RPAs are available, a circumstance not applicable here.

27

specific requirement that "that the __opinion__ contain a thorough explanation of how each component of the alternative is essential to avoid jeopardy and/or adverse modification" (emphasis added), when an RPA consists of multiple parts.  Federal Defendants argue the BiOp does so.  In contrast, there is no explicit requirement that the BiOp discuss any of the other three RPA requirements.

The latter part of the first paragraph reemphasizes the central role of the action agency in developing RPAs, noting that "[o]ften they are the only ones who can determine if an alternative is within their legal authority and jurisdiction, and if it is economically and technologically feasible."  This language omits any requirement that FWS, as consulting agency, must make findings as to the legal authority and jurisdiction of the action agency, and/or the economic and technological feasibility of the RPA.  The second paragraph explicates that the consultation process is not complete until the action agency accepts the RPA in writing.

The Handbook quotes 50 C.F.R. § 402.02's definition of the term "reasonable and prudent alternative" and states:

> If the Services conclude that certain alternatives are available that would avoid jeopardy and adverse modification, but such alternatives fail to meet one of the other three

28

> elements in the definition of "reasonable and
> prudent alternative," the Services should
> document the alternative in the biological
> opinion to show it was considered during the
> formal consultation process. This information
> could prove important during any subsequent
> proceeding before the Endangered Species
> Committee (established under section 7(e) of the
> Act), which reviews requests for exemptions from
> the requirements of section 7(a)(2).

*Id.* at 4-41.  This language concerns situations in which

FWS concludes that an RPA will avoid jeopardy and/or

adverse modification, but will not meets the other three

RPA requirements.  In such a case, that RPA must be

documented in the BiOp to facilitate subsequent

proceedings before the Endangered Species Committee

("ESC").

Plaintiffs argue that this language supports imposing

a requirement that the BiOp contain explicit findings

with respect to all four RPA requirements whenever an RPA

is proposed, because failing to include such findings

would fail to "facilitate" proceedings before the ESC.

*See* Doc. 237 at 10.  The efficacy of this assertion can

be evaluated by considering the purpose of the ESC and

the 1978 amendments to the ESA that created the ESC.

//

//

//

29

3.   <u>**The ESC and Related Legislative History.**[6]</u>

The ESC was added with the 1978 amendments to the ESA.  After construction of the Tellico Dam was halted by the Supreme Court's ruling in *TVA v. Hill*, 437 U.S. 153 (1978), Congress sought to "introduce some flexibility into the Act."[7]  After competing Senate (S. 2899) and House (H.R. 14104) bills were reconciled, the final bill adopted two significant changes to the ESA.  First, upon reaching a jeopardy conclusion, the Secretary of the Interior or Commerce is required to "suggest" RPAs "which [s]/he believes" would avoid jeopardy and/or adverse modification.  16 U.S.C. § 1536(b)(3)(A).

The statute did not define term "reasonable and prudent alternative."  The House report emphasized that

---

[6] Where the meaning of a statute or regulation is unclear, resort to legislative history is appropriate.  *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1114 (9th Cir. 2003).  Here, Congress has not directly defined the term "reasonable and prudent alternative" in the ESA, nor does the statute directly address the question presented by these cross motions, that the BiOp itself, rather than the AR, must include a detailed analysis of the three additional elements of the definition of an RPA.

[7] Congressman Bowen, the manager of the 1978 Amendments in the House, stated the following in debate regarding H.R. 14104:

> [W]e have a statute which we have lived with since 1973.  It was an attempt to balance environmental and developmental interest.  I, frankly, am of the opinion that it has not been successful in that regard, and I think most of the Members of this House agree.  For that reason, we have rewritten that legislation this year, and we have made a diligent effort to take into consideration more accurately the development needs of this Nation.

PRJN, Ex. D (Cong. Rec. (Oct. 14, 1978), reprinted in Leg. History at 801).

"search for alternatives in the consultation process should be limited to those that are 'reasonable and prudent.'  The committee does not intend that the Secretary and the Federal agency should, at the consultation stage, be required to review all possible alternatives to the agency action including those inconsistent with the project's objectives and outside of the Federal agency's jurisdiction."  PRJN, Ex. C (H.R. Rep. No. 95-1625, reprinted in A Legislative History of the Endangered Species Act of 1973, As Amended in 1976, 1977, 1978, 1979, and 1980 ("Legis. History") at 746).

Second, the 1978 Amendments created the ESC (otherwise known as the "God Squad"), a group of mostly Cabinet-level officials, including the Secretaries of the Interior, the Army, and Agriculture, as well as the Administrator of the Environmental Protection Agency and others.  *See* 16 U.S.C. § 1536(e).  The ESC was given the authority to exempt a project from the ESA's prohibitions against take, jeopardy, and adverse modification of critical habitat, if the Committee determines, among other things, that the benefits of the agency's action "clearly outweigh" the benefits of alternative courses of action and the action is "of regional or national significance."  16 U.S.C. § 1536(h)(1)(A)(ii), (iii).

The procedure to invoke the ESC is as follows.  If FWS concludes during an ESA consultation that an agency action would violate Section 7(a)(2) of the ESA, the action agency, the Governor of the State where the action would occur, or a permit or license applicant may apply for an exemption from Section 7(a)(2).  16 U.S.C. § 1536(g)(1).  Once an application is received, the Secretary of the Interior (or the Secretary of Commerce for species falling under that agency's jurisdiction) must make a "threshold" determination of whether that application meets the necessary requirements including whether the action agency and the exemption applicant carried out their "consultation responsibilities ... in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate" Section 7(a)(2).  16 U.S.C. § 1536(g)(3)(A)(i).  If these requirements have not been satisfied, the Secretary may deny the application.  16 U.S.C. § 1536(g)(3)(B).  If, however, the application passes this threshold test, the Secretary, in consultation with the ESC, holds public hearings on the issue.  16 U.S.C. § 1536(g)(4).

ESC hearings are formal adjudicatory proceedings, 16

U.S.C. § 1536(g)(4), presided over by an Administrative law Judge ("ALJ"), 50 C.F.R. § 452.05(a)(2).  The ESC and the ALJ have the authority to take evidence at these hearings and may subpoena the attendance and testimony of witnesses and the production of documents.  16 U.S.C. § 1536(e)(9); 5 U.S.C. §§ 554-56.

The Secretary uses the record developed at these hearings to develop a report to present to the ESC. 16 U.S.C. §§ 1536(g)(4), (5).  The report must analyze the "availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat."  *Id.* § 1536(g)(5)(A).[8]  It must also include a "summary of the evidence concerning whether or not the agency action is in the public interest and is of national or regional significance."  *Id.* § 1536(g)(5)(B).  The Secretary's report is to be based on the record

---

[8] DWR correctly points out that both the consultation procedure set forth in Section 7(a) and (b), as well as the ESC procedure set forth in Section 7(g) use the term "reasonable and prudent alternative."  In debate over the use of the term "reasonable and prudent," Senator Baker explained that "[t]he value of the term 'reasonable' is that it permits members of the [ESC] to consider a wide range of factors.  It is the intent of the [Committee] that the [ESC] in evaluating alternatives examine not only engineering 'feasibility,' but also environmental and community impacts, economic feasibility and, other relevant factors."  124 Cong. Rec. 21,590 (1978).  DWR cites this legislative history in support of the proposition that "economic feasibility" should be considered when designing an RPA.  Doc. 246.  It is premature to address this issue, as it only incidentally bears upon what RPA-related findings must be included on the face of the BiOp.

33

developed at the public hearings, which includes "[t]he transcript of testimony and exhibits, together with all papers and requests filed in the proceeding."  50 C.F.R. § 452.08(a); 5 U.S.C. § 556(e).

To grant an exemption, the ESC must determine, among other things, that (1) "there are no reasonable and prudent alternatives"; (2) "the benefits of such action clearly outweigh the benefits of alternative courses of action"; and (3) the action is in the "public interest," and it is "of regional or national significance." 16 U.S.C. §§ 1536(h)(1)(A).  The ESC's final determination must be based "on the record, based on the report of the Secretary, the record of the hearing held ... and on such other testimony or evidence as it may receive...."  16 U.S.C. § 1536(h)(1)(A).

The House Report compared the Services' obligation during consultation to that of the ESC as follows:

> Section 7 consultation is intended to focus attention on the agency action, its objectives, and the aspects of the agency action which gave rise to the problem initially.  The focus of section 7 consultation should be on solving the problem in a way which is clearly within the jurisdiction and expertise of the consulting parties.  In contrast, the review board and the Endangered Species Committee should focus on a wider variety of alternatives.  Their search should not be limited to original project objectives or the acting agency's jurisdiction.

*Id.*  The requirement of considered analysis of RPAs at

the BiOp stage is more easily understood as facilitating the ESC process.

    4.   **Application to the Consultation Handbook Language.**

    The Consultation Handbook requires that if FWS "conclude[s] that certain alternatives are available that would avoid jeopardy and adverse modification, but such alternatives fail to meet one of the other three elements in the definition of 'reasonable and prudent alternative,' [FWS] should document the alternative in the biological opinion to show it was considered during the formal consultation process." Handbook at 4-41.  Any such rejected alternatives may be relevant the Secretary's "threshold" determination of whether the action agency and the exemption applicant carried out their "consultation responsibilities ... in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate" Section 7(a)(2).[9]

    Although it may be critical to make the Secretary aware of rejected alternatives by documenting them in the

_____
[9] No other decision during the ESC process relies directly on the content of the BiOp, as the Secretary's report to the ESC and the ESC's final determination are to be based on the record made at the ESC hearing.

35

BiOp to permit determination of whether the exemption applicant made a good faith effort to consider RPAs, such a determination does not logically turn on whether or not FWS determines that any particular RPA (1) can be implemented in a manner consistent with the intended purposes of the action; (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; and/or (3) is economically and technologically feasible.

The relevant legislative history reveals the purpose of the Secretary's threshold evaluation:

> The basic premise of S. 2899 is that the integrity of the interagency consultation process designated under section 7 of the act be preserved.  Many, if not most, conflicts between the Endangered Species Act and Federal actions can be resolved by full and good faith consultation between the project agency and [FWS] or [NMFS], as appropriate.  <u>The committee intends that only in those instances where the consultation process has been exhausted and a conflict still exists should the Endangered Species Committee consider granting an exemption for a Federal action</u>.... [I]n the process of deciding whether to review fully an action for an exemption the Endangered Species Committee would be required to determine that an irresolvable conflict does indeed exist.... <u>An irresolvable conflict cannot be found to exist unless the project agency had thoroughly reviewed all modifications and alternatives to the action that are within its jurisdiction and consistent with the objectives of the project, but has determined that even with the adoption of such modification or alternatives the activity cannot be completed without adversely affecting a listed species or critical habitat</u>.

RJN, Exh. "E" (S. Rep. No. 95-874 (1978), reprinted in Congress' Leg. History, at 943-944) (emphasis added). The Secretary is concerned with the conduct of the action agency, referred to in the report as the "project agency."  If the action agency "thoroughly reviewed all modifications and alternatives to the action that are within its jurisdiction and consistent with the objectives of the project, but [] determined that even with the adoption of such modification or alternatives the activity cannot be completed without adversely affecting a listed species or critical habitat," the Secretary may conclude that an irreconcilable conflict exists, warranting further consideration by the ESC. Whether or not the FWS analyzes all four RPA factors on the face of the BiOp has absolutely no bearing on the Secretary's ESC threshold inquiry.

The Consultation Handbook contains no express requirement that FWS make findings in the BiOp regarding the final three RPA requirements, in contrast with the express instructions that the BiOp must contain "a thorough explanation of how each [RPA] component of the alternative is essential to avoid jeopardy and/or adverse modification."  Nor does the ESC process demand that FWS makes such findings.  No such findings are necessary to

enable the Secretary to make its threshold determination regarding whether the exemption applicant made a good faith effort to engage in consultation, and the latter stages of the ESC process rely on a record wholly independent of the BiOp, built during a formal administrative hearing.  An examination of the ESC statutory language, the consultation regulations, and the Consultation Handbook, coupled with the legislative history, establish that no express language mandates that the additional three definitional elements of an RPA be discussed on the face of the BiOp, as opposed to the administrative record supporting the BiOp.

     5.   <u>Caselaw.</u>

Plaintiffs and DWR rely on caselaw to support their contention that, despite the lack of an explicit requirement, the BiOp must include findings treating the first three RPA requirements.  It is undisputed that an agency acts arbitrarily and/or capriciously when it fails to consider an important aspect of a problem before it. *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001) ("*PCFFA I*").  But, whether an agency must expressly consider any particular issue on the face of its decisional document, as opposed to elsewhere in the administrative record, is a different

question.  On the one hand, an agency action may be upheld even if it is of "less than ideal clarity" as long as "the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974).  However, a court "cannot infer an agency's reasoning from mere silence..." but must "rely only on what the agency actually said...." *Compare Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1072 n.9 (9th Cir. 2004) (holding that the court "may only rely on what the agency said in the record to determine what the agency decided and why"); *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 426 F.3d 1082, 1092 (9th Cir. 2005) ("*PCFFA II*") (citing *Gifford Pinchot* for the proposition that a court must "rely only on what the agency actually said in the biological opinion").  Does the caselaw require that the RPA requirements be discussed on the face of the BiOp?

Plaintiffs place great weight on the Ninth Circuit's decision in *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 518 (9th Cir. 1998), upholding a FWS biological opinion concluding that Reclamation's operations on Lake Mead and the Lower Colorado River would jeopardize an endangered bird species, the Southwestern Willow Flycatcher.  Before the

BiOp was finalized, FWS sent Reclamation a draft RPA comprised of a number of short and long-term components. *Id.* Some of the short-term measures would have required Reclamation to lower the level of Lake Mead. Reclamation advised FWS that it lacked discretion to do so. *Id.* FWS's final BiOp confirmed that project operations would jeopardize the species, but proposed a new RPA which no longer required Reclamation to take the originally-proposed short term actions, replacing them with other short term measures. *Id.*

Environmental plaintiffs argued that FWS improperly rejected the draft RPA in favor of the final RPA, which does less to preserve habitat near Lake Mead, "based on Reclamation's alleged lack of discretion to lower the level of Lake Mead." *Id.* at 523. Specifically, Plaintiffs complained "that the secretary never independently reviewed Reclamation's representation that it lacked such discretion." *Id.*

The Ninth Circuit rejected this argument on several grounds. First, "under the ESA, the Secretary was not required to pick the first reasonable alternative the FWS came up with in formulating the RPA. The Secretary was not even required to pick the best alternative or the one that would most effectively protect the Flycatcher from

jeopardy.... **The Secretary need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the agency**." *Id.* at 523 (emphasis added).

Second, "under the ESA, the Secretary was not required to explain why he chose one RPA over another, or to justify his decision based solely on apolitical factors.[FN5]" *Id.* Footnote 5 further explains:

> The Secretary must rely on "the best scientific and commercial data available" in formulating an RPA, 16 U.S.C. § 1536(a)(2). However, the ESA does not explicitly limit the Secretary's analysis to apolitical considerations. <u>If two proposed RPAs would avoid jeopardy to the Flycatcher, the Secretary must be permitted to choose the one that best suits all of its interests, including political or business interests</u>.

*Id.*

The Ninth Circuit then articulated the governing standard: "The only relevant question before [the court] for review was whether the Secretary acted arbitrarily and capriciously or abused his discretion in adopting the final RPA." *Id.* "In answering this question, the court had only to determine if the final RPA met the standards and requirements of the ESA. The court was not in a position to determine if the draft RPA should have been adopted or if it would have afforded the Flycatcher better protection." *Id.*

41

1      The Ninth Circuit reviewed the evidence and found no

2  APA violation:

3          Upon careful review of the evidence, we cannot
           say the district court erred in finding that the
4          final RPA met the standards and requirements of
           the ESA. The district court determined that the
5          FWS considered the relevant factors and
           reasonably found that the Flycatcher could
6          survive the loss of habitat at Lake Mead for
           eighteen months until 500 acres could be
7          protected, then survive an additional two years
           until an additional 500 acres could be
8          protected, and finally survive through the MSCP
           process until compensation could be made for the
9          historical habitat lost on the Lower Colorado
           River and until an extensive ecological
10         restoration could be undertaken. Southwest
           failed to present any convincing evidence to
11         contradict the FWS' findings. Southwest merely
           relied upon the discarded draft RPA which had
12         indicated that preservation of the Lake Mead
           habitat was necessary to the survival of the
13         Flycatcher. However, upon further consideration
           of the matter, the FWS was entitled to, and did,
14         in fact, change its mind. The FWS concluded in
           the final BO that the proposed short-term and
15         long-term provisions of the final RPA would
           avoid jeopardy to the Flycatcher,
16         notwithstanding the failure to modify
           Reclamation's operation of Hoover Dam at Lake
17         Mead. Because there was a rational connection
           between the facts found in the BO and the choice
18         made to adopt the final RPA, and because we must
           defer to the special expertise of the FWS in
19         drafting RPAs that will sufficiently protect
           endangered species, we cannot conclude that the
20         Secretary violated the APA.

21
22
23  *Id.* (emphasis added).

24      Plaintiffs argue the emphasized text, approving FWS's

25  RPA because there was a rational connection between the

26  facts "found in the BiOp" and that decision, establishes

27

28

that the FWS must make findings on all four RPA requirements on the face of the BiOp.  This overstates the Ninth Circuit's holding.  First, *Southwest Center* says nothing about requiring findings on the face of the BiOp.  The requisite findings were, unsurprisingly, in the BiOp in that case, because those findings concerning how each component of the final RPA would avoid jeopardy, were explicitly required by the Consultation Handbook. Consultation Handbook 4-41 ("When a reasonable and prudent alternative consists of multiple activities, it is imperative that the opinion contain a thorough explanation of how each component of the alternative is essential to <u>avoid jeopardy and/or adverse modification</u>.")(emphasis added).  Neither the Handbook, the ESA, nor any of its implementing regulations explicitly require that the BiOp contain an analysis of any of the other three RPA requirements.

Plaintiffs suggest the second sentence from the *Southwest Center* language delineates that findings are required for all four RPA requirements.  Plaintiffs quote that sentence as authority to claim the "'FWS considered the relevant factors and reasonably found'" the Joint Consultation Regulations requirements were satisfied with respect to an RPA issued in a biological opinion for the

43

Southwest Willow Flycatcher....”  Doc. 237 at 10.  This
is misleading, because the entire sentence makes clear
that the only “findings” discussed in *Southwest Center*
were findings concerning the capacity of the Flycatcher
to survive in the short term while the RPA was being
implemented.  143 F.3d at 523.  *Southwest Center* only
stands for the proposition that FWS must justify its
conclusion that the RPA would prevent jeopardy and/or
adverse modification in the BiOp.  *See Greenpeace*, 55 F.
Supp. 2d at 1268 (finding the jeopardy determination to
be the “guiding standard” for determination of RPAs).
*Southwest Center* does not create the discussion
requirement Plaintiffs suggest.

     *PCFFA II*, on which Plaintiffs also rely, is not
contrary.  426 F.3d 1082.  There, the Ninth Circuit
overturned an RPA adopted for coho salmon because NMFS
failed to articulate the bases for its assumptions
underlying the RPA.  *Id.* at 1090-95.  The district court
concluded that the agency had “implicitly considered”
whether all three phases of the RPA would ensure against
jeopardy.  *Id.* at 1091.  The Ninth Circuit emphasized
that “it is a basic principle of administrative law that
the agency must articulate the reason or reasons for its
decision.”  *Id.*

The Ninth Circuit found "little substance to the discussions of Phases I and II" in the BiOp. *Id*. at 1093.  Although some language suggested that "the agency believed that the RPA would avoid jeopardy to the coho, this assertion alone is insufficient to sustain the BiOp and the RPA." *Id*.  The Ninth Circuit refused to "take [the agency's] word that the species will be protected if its plans are followed." *Id*.  As in *Southwest Center*, *PCFFA II* only discussed whether the RPA would avoid jeopardy, the analysis of which is explicitly required in the BiOp.  Here, Plaintiffs seek to extend this logic to mandate that FWS include specific findings concerning the three other RPA requirements in the BiOp.  *PCFFA II* does not require this.

Plaintiffs also cite *NRDC v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007), which held that, although certain, potentially critical data was part of the administrative record, its significance, or lack thereof, was not discussed in the BiOp.  *Id*. at 362-363.  The government's post hoc reasoning was rejected, that, even if the data had been addressed in the BiOp, the ultimate opinion reached by the Service would not have been different.  "Although a decision of less than ideal clarity may be upheld if the agency's path may reasonably

45

be discerned, [a court] cannot infer an agency's

reasoning from mere silence.  Rather, an agency's action

must be upheld, if at all, on the basis articulated by

the agency itself."  *Id.* at 366 (citing *PCFFA*, 426 F.3d

at 1091).  The district court further reasoned "[h]ad FWS

examined the FMWT 2004 data in the BiOp, the weight it

gave to that data would have been entitled to deference.

The agency's silence cannot be afforded deference."

*Kempthorne*, 506 F. Supp. 2d at 366.

Plaintiffs argue that this language reflects a

requirement that analysis of the data must be included in

the BiOp, suggesting that if such analysis was instead

found elsewhere in the administrative record it would be

insufficient.  This reads too much into *Kempthorne*, where

the necessary reasoning was found in neither the BiOp nor

the administrative record.  *Id.* at 380 (district court

searched for, but did not find, certain analyses in the

BiOp or "elsewhere in the administrative record).

*Kempthorne* found the content of the BiOp lacking in light

of the entire AR, both of which entirely failed to

competently perform the required ESA jeopardy and habitat

modification analyses.  The practical fact is that a BiOp

is much more accessible than the administrative record,

which can be tens of thousands of pages long.  *Kempthorne*

did not address or decide the issue presented here.[10]

In APA review cases, it is well established that, in determining whether agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.... the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.  The "whole record," includes "everything that was before the agency pertaining to the merits of its decision."  *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir. 1993).  *See also Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1308 (W.D. Wash. 1994) (finding declarations properly considered to "explain the agency's actions or to determine whether its course of inquiry was inadequate.").[11]

_____

[10] *Westlands Water Dist. v. U.S. Dept. of Interior, Bureau of Reclamation*, 850 F. Supp. 1388, 1425-26 (E.D. Cal. 1992), does not demand a contrary conclusion.  In that case, decided on a motion to dismiss, plaintiffs alleged that NMFS was required to consider, and balance, the economic and/or environmental effects of an RPA on south-of-Delta water users, because the ESA's regulations require RPAs to be "economically and technologically feasible."  The complaint sufficiently raised the issue of economic feasibility under 40 C.F.R. § 402.02.  *Id.* at 1426.  However, neither the parties nor the court suggested in *Westlands* that a discussion of economic feasibility was required on the face of the BiOp.

[11] Similarly*,* in *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1072 (9th Cir. 2004), the Ninth Circuit rejected the agency' argument that the BiOp's analysis implicitly considered "recovery," holding that a court "cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals."  *Gifford* carefully examined the text of

1    DWR's cases do not undermine this reasoning.  *Motor*

2  *Vehicle Manufacturers Association of the United States,*

3  *Inc., v. State Farm Mutual Auto Insurance Company*, 463

4  U.S. 29 (1983), concerned the National Highway Traffic

5  Safety Administration's ("NHTSA") decision to rescind

6  passive restraint crash safety requirements for new motor

7  vehicles.  When NHTSA learned that automakers opted to

8  install automatic seatbelts which users could easily

9  detach, the agency rescinded the order in light of the

10  expense required to implement a program that would have

11  only minimal safety benefits because it could be

12  disengaged by users.  *Id*. at 38-39.  The Court concluded

13  that this decision was arbitrary and capricious because

14  NHTSA failed to consider modifying the standard to

15  require the installation of airbags.  *Id*. at 46.  In

16  reaching this conclusion, the Court indicated it must

17  "consider whether the <u>decision</u> was based on a

18  consideration of the relevant factors and whether there

19  has been a clear error of judgment."  *Id*. (emphasis

20  added).

---

several BiOps, finding that in two of the BiOps, the critical
habitat analyses mentioned the word "recovery" only in an
introductory paragraph while in four other BiOps, the word
"recovery" was not mentioned at all, and there was no discussion of
how critical habitat plays a role in recovery of the species.  *Id*.
at 1073.  The Ninth Circuit held it could not infer any overarching
concern for recovery from the silence of this text."  *Id*. at 1074.
Although the *Gifford* court focused on the text of the BiOps, the
Ninth Circuit explicitly "consider[ed] [] the <u>entire record</u>," before
finding the BiOp to be inadequate.  *Id*. at 1066.

Focusing on *State Farm's* use of the word "decision," DWR asserts that all relevant factors must be considered in the text of the agency's decision document, rather than elsewhere in the administrative record.  But, *State Farm* also emphasized that the relevant statue required a "record of the rulemaking proceedings to be compiled," *id*. at 43-44, and indicated that "Congress established a presumption against.... changes in current policy that are not justified by the rulemaking record," *id*. at 43. *State Farm* does not support DWR's position that the "whole record" rule should be ignored in favor of a requirement that any and all analytical reasoning must be included in the decision document (the BiOp).

DWR also relies on *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962), which criticized the Interstate Commerce Commission's ("ICC") failure to make any findings or include any analysis to justify a particular decision.  The Court noted that "expert discretion is the lifeblood of the administrative process, but unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion." *Id*. at 167 (internal citations and quotations omitted).

*See also Ry. Labor Executives' Ass'n v. ICC*, 784 F.2d 959, 974 (refusing to "rummage around in the record below to find a plausible rationale to fill the void in the agency order under review"). *Burlington* and *Railway Labor Executives'* insistence upon formal findings is unsurprising given that, under the procedures applicable in that case, where the ICC was required to "make findings that support its decision, and those findings must be supported by substantial evidence." *Id*. No such general findings requirement exists here. Rather, the only findings explicitly required by the Consultation Handbook are those concerning the capacity of any RPA to prevent jeopardy and/or adverse modification.[12]

A statute or regulation may specifically require certain reasoning or findings to be included in the ultimate decision document. The above-mentioned requirement that the BiOp explain why each part of a multi-part RPA ensures against jeopardy or adverse modification is one such example. However, there is no parallel requirement that FWS certify or make findings with respect to the other three RPA requirements on the fact of the record. It is not appropriate for a court to

_____

[12] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), is also unhelpful. In that case, although there was an administrative record, it was not before the court, necessitating remand to the district court for review of the agency's decision based on the entire administrative record. *Id.* at 419-20.

"create[] a requirement not found in any relevant statute or regulation."  *The Lands Council v. McNair*, 537 F.3d 981, 991 (9th Cir. 2008).[13]  Rather, the issue of whether FWS properly promulgated the RPA must be decided on the basis of the entire record.

## VI. CONCLUSION

        For the reasons set forth above, Plaintiffs' motion for summary judgment on the narrow issue of whether FWS is required to discuss the first three RPA requirements on the face of the BiOp is DENIED, as is Federal Defendants' cross-motion, WITHOUT PREJUDICE to the next round of dispositive motions which will address on the merits all issues of the BiOp's sufficiency.  Federal Defendants shall submit a form of order consistent with this memorandum decision within ten (10) days of electronic service.


SO ORDERED
Dated:  October 15, 2009
                              /s/ Oliver W. Wanger
                              Oliver W. Wanger
                              United States District Judge

_____

[13] Nor is it dispositive that NMFS included findings concerning all four RPA factors in its related BiOp concerning the impacts of Project operations on salmonids and other species.  *See* PRJN, Ex. A (NMFS, Biological Opinion and Conference Opinion on the Long-Term Operations of the Central Valley Project and State Water Project (June 4, 2009)).  Although NMFS shows an analysis treating all RPA elements can be presented in a BiOp, this action is not an admission binding on a different agency.