1

2                    UNITED STATES DISTRICT COURT

3             FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5   | DELTA SMELT CONSOLIDATED CASES | 1:09-CV-407 OWW DLB |

6   

7   | SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.* v. SALAZAR, *et al.* | MEMORANDUM DECISION RE CROSS-MOTIONS FOR SUMMARY JUDGMENT ON NEPA ISSUES |

8

9   | STATE WATER CONTRACTORS v. SALAZAR, *et al.* |

10

11  | COALITION FOR A SUSTAINABLE DELTA, *et al.* v. UNITED STATES FISH AND WILDLIFE SERVICE, *et al.* |

12

13  | METROPOLITAN WATER DISTRICT v. UNITED STATES FISH AND WILDLIFE SERVICE, *et al.* |

14

15  | STEWART & JASPER ORCHARDS *et al.* v. UNITED STATES FISH AND WILDLIFE SERVICE. |

16

17                      I. INTRODUCTION

18       This case arises out of the United States Fish and

19  Wildlife Service's ("FWS") December 15, 2008 biological

20  opinion ("BiOp" or "2008 smelt BiOp") addressing the impact of

21  coordinated operations of the Central Valley Project ("CVP")

22  and State Water Project ("SWP") (the "Projects") on the

23  threatened delta smelt, prepared pursuant to Section 7(a)(2)

24  of the Endangered Species Act ("ESA"), 16 U.S.C. §§

25  1536(a)(2).  Because the BiOp found that planned coordinated

26  Project operations would jeopardize the continued existence of

27

28                           1

the delta smelt and/or adversely modify its critical habitat, FWS proposed a Reasonable and Prudent Alternative ("RPA") that imposes certain operating restrictions on the Projects.  The Bureau of Reclamation ("Reclamation") provisionally accepted and then implemented the BiOp and its RPA.

Plaintiffs in three of the five consolidated cases, namely San Luis & Delta Mendota Water Authority ("Authority") and Westlands Water District ("Westlands"), State Water Contractors ("SWC"), and Metropolitan Water District of Southern California ("MWD") (collectively, "Plaintiffs") move for summary judgment, arguing that issuance and/or implementation of the BiOp/RPA is a "major federal action" that will inflict harm on the human environment, and that FWS and/or Reclamation should have, but did not conduct an environmental assessment ("EA") or prepare an environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA").  Doc. 245.  Federal Defendants and Defendant-Intervenors oppose, Docs. 290 & 281, and have submitted supporting declarations, Docs. 290-2 (Paul Fujitani), 281-2 (Charles A. Simenstad).  Plaintiffs replied and submitted a supporting declaration.  Docs. 297 & 197-2 (Thomas Boardman).

Defendant-Intervenors cross-move for summary judgment on this claim, arguing that FWS was not required to prepare an

EIS in connection with issuance of the BiOp.  Doc. 244.
Plaintiffs oppose.  Doc. 287.  Defendant-Intervenors filed a
reply.  Doc. 298.

In response to the district court's request for further
argument on Reclamation's liability under NEPA, the parties
submitted supplemental briefs.  Docs. 357-58, 360-61.

## II. STATEMENT OF FACTS

The 2008 BiOp concluded that "the coordinated operations
of the CVP and SWP, as proposed, are likely to jeopardize the
continued existence of the delta smelt" and "adversely modify
delta smelt critical habitat."  BiOp 276-78.[1]  As required by
law, FWS's BiOp includes an RPA designed to allow the projects
to continue operating without causing jeopardy or adverse
modification.  BiOp 279.  The RPA includes various operational
components designed to reduce entrainment of smelt during
critical times of the year by controlling and reducing water
flows in the Delta.  BiOp 279-85.

Component 1 (Protection of the Adult Delta Smelt Life
Stage) consists of two Actions related to Old and Middle River
("OMR") flows.  Action 1, requiring OMR flows to be no more
negative than -2,000 cubic feet per second ("cfs") on a 14-day
average and no more negative than -2,500 cfs for a 5-day

---

[1] Although the BiOp is part of the administrative record ("AR"), for
ease of reference, its internal page references, rather than AR
references, are used.

running average, is triggered during low and high entrainment risk periods based on physical and biological monitoring. BiOp 281, 329.  Action 2, setting maximum negative flows for OMR, is triggered immediately after Action 1 ends or if recommended by the Smelt Working Group ("SWG").  BiOp 281-282, 352.

Under Component 2 (Protection of Larval and Juvenile Delta Smelt), OMR flows must remain between -1,250 and -5,000 cfs beginning when Component 1 is completed, when Delta water temperatures reach 12° Celsius, or when a spent female smelt is detected in trawls or at salvage facilities.  BiOp 282, 357-358.  Component 2 remains in place until June 30 or when the Clifton Court Forebay water temperature reaches 25° Celsius.  BiOp 282, 368.

Component 3 (Improve Habitat for Delta Smelt Growth and Rearing) requires sufficient Delta outflow to maintain average mixing point locations of Delta outflow and estuarine water inflow ("X2") from September to December, depending on water year type, in accordance with a specifically described "adaptive management process" overseen by FWS.  BiOp 282-283, 369.

Under Component 4 (Habitat Restoration), the California Department of Water Resources ("DWR") is to create or restore 8,000 acres of intertidal and subtidal habitat in the Delta

1   and Suisun Marsh within 10 years.  BiOp 283-284, 379.

2       Under Component 5 (Monitoring and Reporting), the

3   Projects gather and report information to ensure proper

4   implementation of the RPA actions, achievement of physical

5   results, and evaluation of the effectiveness of the actions on

6   the targeted life stages of delta smelt, so that the actions

7   can be refined, if needed.  BiOp 284-285, 328, 375, 37.

8

9       It is undisputed that no NEPA documentation was prepared

10  by either FWS or Reclamation in connection with the issuance,

11  provisional adoption, and/or implementation of the BiOp and

12  RPA.

13

14                    III. <u>ANALYSIS</u>

15  A.   <u>Threshold Issues.</u>

16       1.   <u>Requests for Judicial Notice.</u>

17            a.   <u>Plaintiffs' Request for Judicial Notice.</u>

18       Plaintiffs request judicial notice of the May 29, 2009

19  Findings of Fact and Conclusions of Law entered in this case.

20  Doc. 94.  This document is judicially noticeable as part of

21  the court record.  Plaintiffs also request judicial notice of

22  a document authored by DWR, entitled "Delta Water Exports

23  Could be Reduced by Up to 50 Percent Under New Federal

24  Biological Opinion: DWR Director Snow Responds to Delta Smelt

25  Biological Opinion" (Dec. 15, 2008).  This is a judicially

26  noticeable record or report of an administrative body, *see*

27

28

*United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008), although only for its publication and the existence of its content, not for the truth of disputed matters asserted in the document.

> b.   **Defendant Intervenors' Request for Judicial Notice.**

Defendant Intervenors request judicial notice of the following three documents attached to the Declaration of George Torgun, Esq., Doc. 285:

- Exhibit 1:  Reclamation's Draft EIS/EIR for the El Dorado County Water Agency Proposed Water Service Contract.
- Exhibit 2:  A Summary Document, published by CalFed, concerning the Two Gates Project.
- Exhibit 3:  A DWR Fact Sheet on the Two Gates Project.

These are public documents published by administrative bodies and readily available on the internet.  They may be judicially noticed for their publication and their contents, but not for the truth of disputed matters asserted in the documents.

> 2.   **Effect of Preliminary Injunction Decision.**

The May 29, 2009 Findings of Fact and Conclusions of Law and Order Re Plaintiffs' Motion for Preliminary Injunction ("May 29, 2009 PI Decision" or "PI Decision"), found that

Plaintiffs were likely to succeed on their NEPA claim against the FWS.  Doc. 94.  Plaintiffs cite the PI Decision's findings, suggesting that the district court "has already determined" several key issues in this case.  *See, e.g.,* Doc. 245-2 at 7.  But, "decisions on preliminary injunctions are just that -- preliminary -- and must often be made hastily and on less than a full record."  *S. Or. Barter Fair v. Jackson County, Or.*, 372 F.3d 1128, 1136 (9th Cir. 2004) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

> Thus, even [where] the facial challenge presented to the district court here involved primarily issues of law, we see no reason why [a] court should [] deviate[] from the general rule that decisions on preliminary injunctions 'are not binding at trial on the merits, and do not constitute the law of the case.

*Id.* (internal citations and quotations omitted).  Although the PI Decision may be considered, it is not law of the case nor is it dispositive of any issue presently before the court.

There is no requirement that Defendants supply new law or facts to justify a different decision at the summary judgment stage.  Although a court has the discretion to dissolve or modify a preliminary injunction upon introduction of new facts or law, or a showing of changed conditions, *see Mariscal-Sandoval v. Ashcroft*, 370 F.3d 851, 859 (9th Cir. 2004), summary judgment is an

entirely independent proceeding from the preliminary
injunction phase.

    3.   **Burden of Proof.**

    Plaintiffs suggest that the "shift in procedural
posture," from preliminary injunction to summary adjudication,
"lessens Plaintiffs' burden."  Doc. 245-2 at 3.  Their
argument continues.

>           This Court's preliminary injunction was predicated,
>           in part, on the Court's determination that Plaintiffs
>           demonstrated they were *likely* to suffer irreparable
>           harm because of the 2008 BiOp's effects on the human
>           environment.  On summary judgment, however,
>           Plaintiffs' required showing is relaxed: if the Court
>           determines the 2008 BiOp *may* affect the human
>           environment, NEPA's requirements are triggered.

*Id.*  This inaccurately states the governing standards.  In the
preliminary injunction context, "a plaintiff seeking a
preliminary injunction must establish that he is likely to
succeed on the merits, that he is likely to suffer irreparable
harm in the absence of preliminary relief, that the balance of
equities tips in his favor, and that an injunction is in the
public interest."  *Am. Trucking Assns., Inc. v. City of Los
Angeles*, 559 F.3d 1046, 1042 (9th Cir. 2009) (citing *Winter v.
NRDC*, --- U.S. ---, 129 S. Ct. 365 (2008).).  Within the
likelihood of success on the merits prong, a court must
evaluate each claim according to applicable legal standards.
Here, that standard, in part, involves an inquiry into whether
"there are substantial questions about whether a project may

cause significant degradation of the human environment. *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005).  For a preliminary injunction, plaintiffs only had to establish that they are "likely" to meet this burden under.  On summary judgment, plaintiff must actually prove success by a preponderance of the evidence.

B.   Applicable Legal Standards.

     Because NEPA contains no separate provision for judicial review, compliance with NEPA is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A); *NW Resource Info. Ctr., Inc. v. NMFS*, 56 F.3d 1060, 1066 (9th Cir. 1995), provided (1) there is final agency action and (2) Plaintiffs can show that they have suffered a legal wrong or will be adversely affected within the meaning of the statute, *Northcoast Envt'l Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998).  It is undisputed that the challenged agency action, the issuance of the 2008 smelt BiOp and its RPA, is "final agency action."  *See Bennet v. Spear*, 520 U.S. 154, 161, 178 (1997) (issuance of biological opinion is "final agency action").  It is also undisputed that Plaintiffs have been adversely affected by the issuance of the 2008 smelt BiOp and implementation of its RPA controlling the Projects' water flows.

     NEPA requires all federal agencies to prepare an EIS to

evaluate the potential environmental consequences of any proposed "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).[2]  The preparation of an EIS serves a number of purposes:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

> Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.  Moreover, the strong precatory language of § 101 of the Act and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies to respond to the needs of environmental quality.  115 Cong. Rec. 40425 (1969) (remarks of Sen. Muskie).

> Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public comment.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (internal citations and quotations omitted).  "NEPA does not contain substantive requirements that dictate a particular result; instead, NEPA is aimed at ensuring agencies make informed decisions and contemplate the environmental

---

[2] That FWS declares itself a federal agency subject to NEPA, *see* FWS NEPA reference handbook, *available at*: http://www.fws.gov/r9esnepa, is not dispositive of the question of whether NEPA applies here.  This means FWS must undertake a major federal action with the required effect on the human environment, to make FWS subject to NEPA.

impacts of their actions." *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 971 (D. Hi. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)). "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Ctr. for Biological Diversity v. U.S. Forest Service*, 349 F.3d 1157, 1166 (9th Cir. 2003) (internal citation and quotations omitted).

Federal regulations implementing NEPA define major federal action:

> Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly ([40 C.F.R.] § 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.
>
> (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.
>
> (b) Federal actions tend to fall within one of the following categories:

11

1

        (1) **Adoption of official policy**, such as rules,
regulations, and interpretations adopted pursuant

2

to the Administrative Procedure Act, 5 U.S.C. 551
et seq.; treaties and international conventions

3

or agreements; formal documents establishing an
agency's policies which will result in or

4

substantially alter agency programs.

5

        (2) **Adoption of formal plans**, such as official
documents prepared or approved by federal

6

agencies which guide or prescribe alternative
uses of Federal resources, upon which future

7

agency actions will be based.

8

        (3) **Adoption of programs**, such as a group of
concerted actions to implement a specific policy

9

or plan; systematic and connected agency
decisions allocating agency resources to

10

implement a specific statutory program or
executive directive.

11

12

        (4) **Approval of specific projects**, such as
construction or management activities located in
a defined geographic area. Projects include

13

actions approved by permit or other regulatory
decision as well as federal and federally

14

assisted activities.

15

40 C.F.R. § 1508.18.

16

    When an agency takes major federal, the agency must

17

prepare an EIS "where there are substantial questions about

18

whether a project may cause significant degradation of the

19

human environment." *Native Ecosystems*, 428 F.3d at 1239.  An

20

agency may choose to prepare an environmental assessment

21

("EA") to determine whether an EIS is needed.  40 C.F.R. §§

22

1501.4, 1508.9(b).  The EA must identify all reasonably

23

24

foreseeable impacts, analyze their significance, and address

25

alternatives.  40 C.F.R. §§ 1508.8, 1508.9, 1508.27.  If,

26

based on the EA, the agency concludes that the proposed

27

actions will not significantly affect the environment, it may

28

issue a Finding of No Significant Impact ("FONSI") and forego

completion of an EIS.  *See Bob Marshall Alliance v. Hodel*, 852

F.2d 1223, 1225 (9th Cir. 1988); 40 C.F.R. § 1501.4(e).

Whether an action may significantly affect the

environment "requires consideration of context and intensity."

*Center for Biological Diversity v. Nat'l Highway Traffic*

*Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)(citing 40

C.F.R. § 1508.27).  "Context delimits the scope of the

agency's action, including the interests affected."  *Id.*

(quoting *Nat'l. Parks & Conservation Ass'n v. Babbit*, 241 F.3d

722, 731 (9th Cir. 2001)).

> Intensity refers to the "severity of impact," which
> includes both beneficial and adverse impacts, [t]he
> degree to which the proposed action affects public
> health or safety, [t]he degree to which the effects
> on the quality of the human environment are likely to
> be highly controversial, "[t]he degree to which the
> possible effects on the human environment are highly
> uncertain or involve unique or unknown risks," and
> "[w]hether the action is related to other actions
> with individually insignificant but cumulatively
> significant impacts."

*Id.* at 1185-86 (citing 40 C.F.R. § 1508.27(b)(2), (4), (5),

(7)).

The parties debate at length the degree of deference owed

to an agency's decision under NEPA.  However, in this case,

neither agency made any NEPA-related decision to which

deference is owed.  The relevant standard is "reasonableness,"

as articulated in *High Sierra Hikers Ass'n v. Blackwell*:

> Typically, an agency's decision not to prepare an EIS
> is reviewed under the arbitrary and capricious

13

standard; however, where an agency has decided that a project does not require an EIS without first conducting an EA, we review under the reasonableness standard.

390 F.3d 630, 640 (9th Cir. 2004). "Further, when an agency has taken action without observance of the procedure required by law, that action will be set aside." *Id*. (citations omitted).

C.   Major Federal Action.

1.   Was FWS's *Issuance* of the Biological Opinion Major Federal Action?

a.   40 C.F.R. § 1508.18.

Plaintiffs suggest that the issuance of the 2008 BiOp constitutes a "major federal action" under 40 C.F.R. § 1508.18, which provides that the word "major" in the phrase major federal action "reinforces but does not have a meaning independent of" the term "significantly" in "significantly affecting the human environment." Does the issuance of a BiOp constitute a "federal action" under the meaning of the statute? Section 1508.18(b) provides that "[f]ederal actions tend to fall within one of the following categories":

> (1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

> (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be

14

based.

> (3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

> (4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

40 C.F.R. § 1508.18 (emphasis added).  Plaintiffs principally rely on § 1508.18(b)(4) as applicable to the coordinated operations of the Projects.

The only court that has applied 40 C.F.R. § 1508.18(b)(4) to <u>require</u> NEPA analysis for a biological opinion is *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996), which applied NEPA to the National Marine Fisheries Service's ("NMFS") issuance of a biological opinion and incidental take statement ("ITS") under ESA § 7 permitting state regulators to issue salmon fishing regulations consistent with that take statement.  96 F.3d at 441-445.  *Ramsey* found the biological opinion and ITS constituted "major federal action," triggering NEPA compliance, because it was "clear ... both from our cases and from the federal regulations, *see* 40 C.F.R. § 1508.18, that if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action and the federal agency involved must conduct an EA and possibly an EIS before

1    granting it."  *Id.* at 444.

2         *Ramsey* determined:

3              [T]he incidental take statement in this case is
4              functionally equivalent to a permit because the
               activity in question would, for all practical
5              purposes, be prohibited but for the incidental take
               statement.  Accordingly, we hold that the issuance of
6              that statement constitutes major federal action for
               purposes of NEPA.
7    *Id.*

8         The *Ramsey* federal defendants contended that there was

9    insufficient federal participation in a state run project to

10   require an EIS.  The Appeals Court disagreed:  "if a federal

11   permit is a prerequisite for a project with adverse impact on

12   the environment, issuance of that permit does constitute a

13   major federal action...." triggering NEPA.  *Id.* at 444

14   (internal citations and quotations omitted).  *Ramsey* held that

15   "the incidental take statement in [that] case is functionally

16   equivalent to a permit because the activity in question would,

17   for all practical purposes, be prohibited but for the

18   incidental take statement."  *Id.*  Because the ITS was the

19   functional equivalent of a permit, NEPA applied to the

20   issuance of the biological opinion, despite federal

21   defendants' contention that the mere issuance of an ITS was

22   insufficient federal participation in a state project.

23        Here, unlike *Ramsey*, the CVP is an entirely federal

24   project, operated by Reclamation, a federal agency, rendering

25   *Ramsey*'s "functional equivalency" analysis largely irrelevant.

26

27

28

1  *Ramsey* stands for two important principles:  First, under

2  certain circumstances, a biological opinion may qualify as a

3  major federal action for NEPA purposes; second, not every

4  biological opinion is a major federal action.[3]

5

6      Plaintiffs maintain that the 2008 smelt BiOp qualifies as

7  a major federal action under 40 C.F.R. § 1508.18(b)(4) as a

8  matter of course.  *See* Doc. 245-2 at 10 (suggesting, without

9  any analysis that the 2008 smelt BiOp is subject to NEPA

10 because under 1508(b)(4) "actions approved by permit or other

11 regulatory decision are major federal actions").  Plaintiffs

12 do not explicate the basis for § 1508.18(b)(4)'s application

13

14 ─────────────────────

15     [3] Defendant Intervenors and Federal Defendants cite several cases
   that support the general proposition that BiOps are not always subject to
16 NEPA.  For example, in *Southwest Center for Biological Diversity v.
   Klasse*, 1999 WL 34689321 (E.D. Cal. Apr. 1, 1999), the issue was whether
17 FWS failed to comply with NEPA when it issued a BiOp and ITS after
   consultation with the Army Corps of Engineers ("Corps") regarding its
18 operation of a dam on the Kern River.  The court rejected this argument,
   finding that plaintiffs' claim was based on an "overbroad interpretation"
19 of *Ramsey*, which "did not intend to require the FWS to file NEPA documents
   every time it issues an incidental take statement to a federal agency."
20 1999 WL 34689321 at *11.  *See also P'ship for a Sustainable Future v. U.S.
   Fish & Wildlife Serv.*, 2002 WL 33883548 at *7 (M.D. Fla. July 12, 2002)
   ("As a cooperating agency, the FWS is not required to duplicate the work
21 of the Corps by preparing its own EA or EIS."); *City of Santa Clarita v.
   FWS*, 2006 WL 4743970 at *19 (C.D. Cal. Jan. 20, 2006) (finding that ITSs
22 issued by FWS "were not 'major federal action' triggering separate and
   additional NEPA obligations on the part of the Service"); *Miccosukee Tribe
23 of Indians of Fla. v. U.S.*, 430 F. Supp. 2d 1328, 1335 (S.D. Fla. 2006)
   ("To expect or require FWS to submit its own EIS, in spite of the fact
24 that it was not the action agency and that the Corps had already issued
   one is nonsensical and an utter waste of government resources.").
       These cases are distinguishable.  In three of the four cases cited,
25 *City of Santa Clarita*, *Partnership for a Sustainable Future*, and
   *Miccosukee Tribe*, the action agency either had already or was in the
26 process of completing environmental analysis under NEPA.  The fourth case,
   *Klasse*, was a challenge to the Army Corps of Engineers' modification of
27 operations at Isabella Reservoir.  *Klasse* found that the Corps'
   modifications, like those at issue in *Upper Snake River*, discussed below,
28 did not "deviate[] from [the Corps'] standard management scheme regarding
   water levels."  1999 WL 34689321 at *11.

to the 2008 Smelt BiOp.  Plaintiffs' argument that the BiOp is the "functional equivalent" of a permit, premised on *Ramsey*, is unhelpful because *Ramsey* is distinguishable.

Plaintiffs rely on language from the PI Decision suggesting the BiOp is an "approval of [a] specific project[], such as [a] management activit[y] located in a defined geographic area ... approved by ... [a] regulatory decision." *See* 40 C.F.R. 1508.18(b)(4).  No party provides any relevant regulatory definitions, legislative history, or caselaw interpreting the "management activity" language from 1508.18(b)(4).  The BiOp and its RPA/ITS arguably constitute a "management activity," as they prescribe concerted actions to manage federal resources implementing a specific plan designed to "manage" threats to the smelt.  The BiOp is also, arguably, a "formal plan[]... which guide[s] or prescribe[s] alternative uses of Federal resources, upon which future agency actions will be based."  *See* 40 C.F.R. § 1508.18(b)(2).[4]

_____

[4] Plaintiffs do not expressly invoke 40 C.F.R. § 1508.18(b)(3) (federal actions tend to include "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive"). *Westlands Water Dist. v. U.S. Dept. of Interior, Bureau of Reclamation*, 850 F. Supp. 1388, 1422 (E.D. Cal. 1994), found that the BiOp in that case was part of a set of "systematic and connected agency decisions allocating agency resources to implement a specific statutory program," namely the Central Valley Project Improvement Act ("CVPIA").  The 2008 smelt BiOp does not fit this definition, because it resulted from the Bureau's Section 7 consultation on the proposed coordinated operations of the CVP-SWP.  No "specific statutory program or executive directive" like the CVPIA caused federal resources (water) to be reallocated to protect the smelt.  Rather, it was the BiOp, required by the ESA, which determined an RPA was necessary to avoid jeopardy to the smelt and its habitat.

18

1   Federal Defendants counter that the BiOp cannot possibly

2   constitute major federal action because it is not binding upon

3   Reclamation.  They suggest, if the BiOp is merely a suggested

4   course of action, it is not an "__approval__ of [a] specific

5   project[], such as [a] management activit[y] located in a

6   defined geographic area ... approved by ... [a] regulatory

7   decision," or a "formal __plan__[]... which guide[s] or

8   prescribe[s] alternative uses of Federal resources, upon which

9   future agency actions will be based."

10

11          b.    __Is the BiOp Binding Upon Reclamation?__

12   *Westlands Water Dist. v. U.S. Dept. of Interior, Bureau*

13   *of Reclamation*, 850 F. Supp. 1388, 1422 (E.D. Cal. 1994),

14   considered as a factor in deciding if a BiOp is major federal

15   action whether the BiOp is binding upon the action agency.

16   Plaintiffs maintain that "[t]he binding nature of the 2008

17   BiOp is not susceptible to reasonable debate."  Doc. 287 at 8.

18   This is an overstatement.

19          *Westlands* denied federal defendants' motion to dismiss

20   water districts' claims that NMFS and the Bureau failed to

21   comply with NEPA by, among other things, not completing an EA

22   or EIS before issuing a biological opinion concerning the

23   effects of coordinated Project operations on the winter-run

24   Chinook Salmon and implementing the RPA articulated in that

25   biological opinion.  *Id.* at 1394-95.  The federal defendants

26

27

28                               19

in *Westlands* argued that the biological opinion was not a "major federal action" because it was merely advisory. *Id*. at 1420 (citing 40 C.F.R. § 1508.18(b)(3)). The *Westlands* plaintiffs, as the Plaintiffs do here, suggested that the biological opinion and RPA at issue effectively bound Reclamation because Reclamation "must either follow the alternative suggested or risk violation of ESA § 7(a)(2)...." *Id*. at 1420.

*Westlands* found that, as a general rule, "[b]iological opinions are <u>not</u> binding on the Secretary, nor do they invariably require an EIS." 850 F. Supp. at 1422 (emphasis added). Rather, a case-by-case analysis is required:

> A biological opinion is part of the ESA process originated by 16 U.S.C. § 1536(a)(2), which requires federal agencies, with the assistance of the Secretary, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species." The federal agency undertaking such activity must consult the service having jurisdiction over the relevant endangered species. 16 U.S.C. § 1536(a)(3). The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), are jointly responsible for administering the ESA. 50 C.F.R. § 402.01(b) (1992). The consulting service then issues a biological opinion that details how the proposed action "affects the species or its critical habitat," including the impact of incidental takings of the species. 16 U.S.C. § 1536(b)(3)(A).
>
> <u>"The agency is not required to adopt the alternatives suggested in the biological opinion; however, if the Secretary deviates from them, he does so subject to the risk that he has not satisfied the standard of Section 7(a)(2)." *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988) (citation omitted), cert. denied, 493 U.S. 873 (1989). A Secretary can depart from the suggestions in a biological opinion, and so long as he or she takes</u>

20

"alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species," no ESA violation occurs.  *Id.* at 1193 95; *Pyramid Lake Paiute Tribe of Indians v. Department of Navy*, 898 F.2d 1410, 1418 (9th Cir.1990) ("a non Interior agency is given discretion to decide whether to implement conservation recommendations put forth by the FWS").  The Joint Regulations state:

> The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

50 C.F.R. § 402.14(j) (1992).  50 C.F.R. § 402.15(a) states:

> []Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion.

Courts have attempted to define the "point of commitment," at which the filing of an EIS is required, during the planning process of a federal project.  *See Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C.Cir. 1983).  "An EIS must be prepared before any irreversible and irretrievable commitment of resources."  *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988), cert. denied 489 U.S. 1012 (1989).  40 C.F.R. § 1502.5(a) similarly provides, "[f]or projects directly undertaken by Federal agencies, the environmental impact statement shall be prepared at the feasibility analysis (go/no go) stage and may be supplemented at a later stage if necessary."

[One of the water agency plaintiffs] points out that the Environmental Review Procedures, under the National Oceanic and Atmospheric Administration ("NOAA") Order No. 216 6, § 6.02.c.2(d), require an EIS for:

> Federal plans, studies, or reports prepared by NOAA that could determine the nature of future major actions to be undertaken by NOAA or other federal agencies that would significantly affect the quality of the human environment.

It is undisputed that the NMFS's actions are subject to an EIS requirement, if those actions are a "major federal action significantly affecting the human environment."  Under 40 C.F.R. § 1508.18(b)(2), an

21

activity is a federal action if it "guides," rather than binds, the use of federal resources. CVP water is a federal resource. The Bureau's options were narrow had it declined to follow the NMFS's reasonable and prudent alternatives. *See Tribal Village of Akutan*, 869 F.2d at 1193 (agency need not adopt reasonable and prudent alternatives in biological opinion, so long as it complied with ESA Section 7(a)(2) by taking "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species"); *Portland Audubon Society v. Endangered Species*, 984 F.2d 1534, 1537 (9th Cir.1993) (discusses exemptions from ESA, by application to the Committee under 16 U.S.C. §§ 1536(a)(2), (g)(1) (2)).

The government submits *Bennett v. Plenert*, CV 93 6076, 1993 WL 669429 (D.Or.1993), as authority that biological opinions are not binding on federal agencies, and consequently are not major federal actions. But in *Bennett*, the court left open the issue that a biological opinion could constitute a major federal action under NEPA. *Id.* at p. 11, n. 4. Biological opinions are not binding on the Secretary, nor do they invariably require an EIS. The inquiry requires a case by case analysis.

Taking the facts alleged in the plaintiffs' complaints as true, the biological opinion is part of a systematic and connected set of agency decisions which result in the commitment of substantial federal resources for a statutory program, which resulted in reallocation of over 225,000 acre feet of CVP water under the ESA for salmon protection with the environmental impacts alleged. This is NEPA major federal action.

*Id.* at 1420-22 (emphasis added) (parallel citations omitted).[5]

---

[5] Federal Defendants and Defendant-Intervenors place great weight on a line of authority that suggests where the specific "dimensions" of a proposal are still evolving and have not yet reached the point "immediately preced[ing] where there will be 'irreversible and irretrievable commitments of resources' to [an] action affecting the environment," it is premature to require NEPA compliance. *Sierra Club v. Hathaway*, 579 F.2d 1162, 1158 (1978); *see also Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (NEPA analysis not required until decision results in an "irreversible and irretrievable commitment of resources"). Plaintiffs rejoin that the "irreversible and irretrievable commitment of resources" standard concerns the timing of NEPA, not its applicability, and is therefore inapplicable. Plaintiffs are correct that the "irreversible and irretrievable commitment of resources" is most often used to determine when, rather than whether, NEPA analysis is required, and is designed to ensure that agencies engage in the NEPA process early

1   The biological opinion was found <u>not</u> binding on Reclamation,

2   and the court instead applied 1508.18(b)(3) to find that NEPA

3   applied to the BiOp because it was part of a "systematic and

4   connected set of agency decisions which result in the

5   commitment of substantial federal resources for a statutory

6   program," a provision that is inapplicable here.  *Id.* at

7   1422.[6]

8

9       Here, to satisfy its obligations under NEPA, Reclamation

10  initiated formal consultation and prepared a BA to describe

11  the proposed action.  FWS, as the consulting agency, reviewed

12  the BA, disagreed with its conclusion, and issued the 2008

13  BiOp with an RPA.  *See* BiOp i-vi.  Reclamation was free to

14  accept or reject, in whole or in part, FWS's recommendations

15  and advice prescribed in that RPA.  The consultation

16  regulations state that "the Federal [action] agency shall

17  determine whether and in what manner to proceed with the

18  action in light of its section 7 obligations and the Service's

19  biological opinion."  50 C.F.R. § 402.15(a).[7]  However, FWS

20

21

22  enough to "insure that planning and decisions reflect environmental
    values, to avoid delays later in the process, and to head off potential
23  conflicts."  *Metcalf*, 214 F.3d at 1143 (citing 40 C.F.R. § 1501.2).  But,
    this does not render the inquiry irrelevant here.  Rather, the point at
24  which an "irreversible and irretrievable commitment of resources" takes
    place is relevant to determining which agency is responsible for
25  undertaking NEPA analysis in this case.  *See Westlands*, 850 F. Supp. at
    1422.
26      [6] *Westlands* was vacated on other grounds, *Westlands Water Dist. v.
    NRDC*, 43 F.3d 457 (9th Cir. 1994), and the NEPA claim was voluntarily
27  withdrawn by plaintiffs before a merits ruling issued, *see Stockton East
    Water Dist. v. U.S.*, 75 Fed. Cl. 321, 326 (2007).
28      [7] Courts have consistently held that the action agency retains the
    ultimate responsibility for deciding whether, and how, to proceed with the

                                    23

1   could not issue the BiOp without also including an RPA to

2   mitigate jeopardy.  FWS proposed an RPA that called for

3   actions that commit federal water to smelt protection.

4   Reclamation was not "bound" to accept the proposed RPA, but it

5   did so.  Resulting operations reduced 2008-09 water deliveries

6   by several hundred thousand acre-feet.  In this case, actions

7   speak louder than words.

8

9        Plaintiffs argue that the FWS's issuance of the 2008 BiOp

10  requires that __FWS__ prepare an EIS, because a BiOp has a

11  "powerful coercive effect" on the action agency.  Doc. 245-2

12  at 12.  On the one hand, if Reclamation had disregarded the

13  RPA, the 2008 BiOp would not have provided an exemption from

14  the ESA's take prohibitions, potentially subjecting the

15  operators to civil and criminal liability.  16 U.S.C. §§

16  1538(a) (prohibiting the "take" of listed species); 1536(o)(2)

17  (a taking in compliance with a biological opinion's ITS "shall

18  not be considered to be a prohibited taking of the species

19  concerned").[8]  However, Federal Defendants argue Reclamation's

20

21  _____

22  proposed action after Section 7 consultation.  *See, e.g.*, *Pyramid Lake
    Paiute Tribe of Indians v. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th
23  Cir. 1990); *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th
    Cir. 1988) ("[the action] agency is not required to adopt the alternatives
24  suggested in the biological opinion"); *Sierra Club v. Marsh*, 816 F.2d
    1376, 1386 (9th Cir. 1987) ("The ESA does not give the FWS the power to
25  order other agencies to comply with its requests or to veto their
    decisions."); *Westlands*, 850 F. Supp. at 1422 ("Biological opinions are
26  not binding on the Secretary"); *Nat'l Wildlife Fed'n v. Coleman* 529 F.2d
    359, 371 (5th Cir. 1976)("Section 7 does not give [the Service] a veto
27  over the actions of other federal agencies").
         [8] Plaintiffs emphasize *Bennett v. Spear*, 520 U.S. 154, 161, 178
28  (1997), which held that biological opinions have a "virtually
    determinative," and "powerful coercive effect" on an action agency.  But
                                    24

departure from the RPA would not necessarily violate Section 7

of the ESA, if Reclamation took "alternative, reasonably

adequate steps to insure the continued existence" of listed

species.  *Tribal Village of Akutan*, 869 F.2d at 1193.  This is

sophistry.  Reclamation operated the joint Projects and

managed federal resources (CVP water) in accordance with the

RPA, resulting in a major revision of 2008-09 coordinated CVP

operations and substantial reallocation of federal resources.

The only reason Reclamation did so was to meet the mandate of

the ESA and the BiOp.[9]  <u>Both</u> agencies participated to some

degree in the agency action at issue here.

Assuming, *arguendo*, NEPA applies, is it required that one

of the agencies should have acted as "lead agency" in any

effort to comply with NEPA's requirements?  Plaintiffs

acknowledge that "to avoid duplication, applicable regulations

---

*Bennett* concerned "final agency action" requirement under APA, not NEPA's "major federal action" trigger.

[9] Reclamation has considered alternative approaches to mitigating jeopardy. In recent NEPA reviews performed by Reclamation on CVP-SWP projects, Reclamation has indicated that it is "still reviewing" the BiOp to determine if it "can be implemented in a manner that is consistent with the intended purpose of the [2004 Operations Criteria and Plan], is within Reclamation's legal authority and jurisdiction, and is economically and technologically feasible." *See, e.g.,* Defendant Intervenor's Request for Judicial Notice ("DIRJN"), Ex. 1, El Dorado County Water Agency Proposed Water Service Contract Draft EIS/EIR (July 2009) at 1-5.  The Bureau has also evaluated alternatives to the RPA in its NEPA review for the "Two-Gates Project," which proposes an "alternative management strategy" to achieve protection of the delta smelt "with higher than the minimum allowed water exports described in the [2008 Smelt BiOp's RPA] while operating within the other water management requirement (D-1641)."  DIRJN, Ex. 2, Two-Gates Fish Protection Demonstration Project, Summary Document (July 16, 2009) at 1; DIRJN, Ex. 3, DWR Fact Sheet, Two-Gates Project: A project led by the U.S. Bureau of Reclamation (August 2009).  But, Reclamation chose to implement the RPA, rather than any of these alternatives, during the 2008-09 water year.

allow agencies to share NEPA responsibility if more than one agency is involved in the same action or a group of related actions," Doc. 245-2 at 25 (citing *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1215 (11th Cir. 2002); 40 C.F.R. § 1501.5), and that "when more than one federal agency has authority over an action, NEPA does not explicitly specify which agency is responsible for preparing an EIS," *id.* (citing *Sierra Club v. U.S. Army Corps of Engs.*, 701 F.2d 1011, 1041 (2d Cir. 1983)). NEPA permits the relevant federal agencies to decide between themselves which will act as lead agency, subject to reasonable constraints. 40 C.F.R. § 1501.5(c); *Westlands*, 850 F. Supp. at 1422; *see also NRDC v. Callaway*, 524 F.2d 79, 86 (2d Cir. 1975). This is reasonable agency interpretation of law; it makes little sense to have two agencies prepare separate NEPA documents for the same agency action.

If there is a disagreement among several agencies involved in a project as to which is the lead agency, the following factors "shall determine lead agency designation":

> (1) Magnitude of agency's involvement.
> (2) Project approval/disapproval authority.
> (3) Expertise concerning the action's environmental effects.
> (4) Duration of agency's involvement. (5) Sequence of agency's involvement.

40 C.F.R. § 1501.5(c).

1    Plaintiffs maintain that application of these factors

2  demonstrates that FWS is the appropriate lead agency, arguing:

3
            FWS is the agency that researched, drafted, and
4           approved the 2008 BiOp and, thus, has the most
            involvement in the action.  *See* AR 4-7; see also
5           *Bennett*, 520 U.S. at 161, 178 (a biological opinion
            is FWS's decision document).  FWS has the sole
6           approval authority over the 2008 BiOp, and its ITS
            and RPA, while other entities will be liable for
7           incidental take of a listed species if they do not
            comply with it.  AR 300-01.  FWS has expertise in
8           assessing the environmental effects of actions such
            as the instant action.  FWS was involved throughout
9           the development process of the BiOp and RPA, so FWS
            is the agency with authority to shape the 2008 BiOp
10          and its recommendations.  *See* AR 4-7.  And finally,
            FWS was involved from the beginning of the 2008 BiOp
11          development process and is the final decision-maker
            and sole issuing agency, making it the logical agency
12          to develop useful environmental analysis before
            approval, rather than mere post hoc "review" of
13          actions that are too late to be altered.  *See* AR 4-7;
            Doc. 94, Findings of Fact, at p. 40, ¶ 30.
14

15

16 Doc. 245-2 at 26-27

17    This argument assumes that the BiOp itself, rather than

18 the operation of the Projects under the BiOp is the relevant

19 action in need of NEPA evaluation.  Federal Defendants and

20 Defendant Intervenors maintain that this is not the

21 appropriate focus for the "lead agency" inquiry.  Rather, it

22 is Reclamation's planned coordinated operation of the Projects

23 that creates the jeopardy found by the BiOp.  This coincides

24 with FWS's Consultation Handbook, which indicates that FWS

25 should "assist <u>the action agency or applicant</u> in integrating

26 the formal consultation process into their overall

27

28                                27

environmental compliance" for a particular project.

Consultation Handbook at 4-11 (emphasis added).

The appropriate focus is "Project operations," and
Reclamation is the appropriate lead agency.  Reclamation
proposed the action (in the form of the Operations and
Criteria Plan ("OCAP")) to FWS, which triggered the
preparation of the BiOp.  Reclamation has the ongoing
statutory authority to implement project operations as
prescribed by the OCAP.  *See, e.g.*, AR at 10262 (BA at 1-1)
("The Bureau of Reclamation (Reclamation) and the California
Department of Water Resources (DWR) propose to operate the
Central Valley Project (CVP) and State Water Project (SWP) to
divert, store, and convey CVP and SWP (Project) water
consistent with applicable law and contractual obligations.");
AR at 10263-64 (BA at 1-2 - 1-3) (identifying certain laws
authorizing Bureau operation of CVP); AR at 10270-71 (BA at 1-
9 - 1-10) (Coordinated Operation Agreement ("COA") and P.L.
99-546 impose a "Congressional mandate to Reclamation to
operate the CVP in conjunction with the SWP FWS's involvement
with regard to future Project operations is limited,
consisting primarily of its obligation to ensure that those
operations do not impair protection and recovery of threatened
and endangered species, an obligation that it shares with
Reclamation.  16 U.S.C. § 1536(a)(2).").

Reclamation has greater expertise concerning the alleged adverse environmental effects.  The impacts identified by Plaintiffs allegedly occur as a result of reduced water deliveries under Reclamation's water supply contracts.  *See, e.g.,* Doc. 292, San Luis First Amended Complaint ("SLFAC") at ¶44 ("Water supply shortages resulting form [sic] the 2008 Biological Opinion ... threaten numerous adverse environmental effects including ... worsening of groundwater basin overdraft, land subsidence, decreased groundwater recharge, threatened violation of state-adopted basin plan water quality objectives, reductions in crop yields, reduced agricultural employment, endangerment of permanent crops, and decreased air quality.").  Reclamation routinely examines these and related impacts as the lead or co-lead agency on NEPA reviews of proposed CVP-SWP operations[10] and frequently has the ability and authority to propose ways to mitigate these impacts.[11]  FWS

[10] *See, e.g.,* 66 Fed. Reg. 50,213 (Oct. 2, 2001) (San Luis Unit Feature Reevaluation); 70 Fed. Reg. 68,475 (Nov. 10, 2005) (South Delta Improvements Program); 69 Fed. Reg. 71,424 (Dec. 9, 2004) (San Luis Unit Long-Term Contract Renewals); 58 Fed. Reg. 7,242 (Feb. 5, 1993) (Central Valley Project Improvement Act implementation).

[11] *See, e.g.,* 74 Fed. Reg. 37,051 (July, 27, 2009) (Madera Irrigation District Water Supply Enhancement Project proposed "[t]o increase water storage, enhance water supply reliability and flexibility for current and future water demand and reduce local overdraft"); 74 Fed. Reg. 34,031 (July 14, 2009) (Delta-Mendota Canal-California Aqueduct Intertie proposed "to improve the DMC conveyance conditions that restrict the CVP Jones Pumping Plant to less than its authorized pumping capacity of 4,600 cubic feet per second."); 73 Fed. Reg. 29,534 (May 21, 2008) (Red Bluff Diversion Dam); 72 Fed. Reg. 42,428 (Aug. 2, 2007) (San Joaquin River Restoration Program); 69 Fed. Reg. 71,424 (Dec. 9, 2004) (Mendota Pool Ten-Year Exchange Agreements proposed "to provide water to irrigable lands on Mendota Pool Group properties in Westlands Water District and San Luis Water District to offset substantial reductions in contract water supplies attributable to the Central Valley Project Improvement Act (CVPIA), the

29

1    has little to no expertise in or authority over many of these

2    matters.[12]

3        In the final analysis, FWS was asked for its "opinion"

4    whether Reclamation's operations plans would jeopardize the

5    smelt.  FWS provided that opinion, as required by law.

6    Reclamation was not "bound" by the BiOp until it chose to

7    proceed with the OCAP and implement the RPA.  Once Reclamation

8    did so, operation of the Projects became the relevant agency

9    "action," and Reclamation, as action agency, is the more

10   appropriate lead agency under NEPA.  The adaptive management

11   protocol prescribed in the RPA leaves FWS with the final word

12   on exactly what flow requirements will be imposed.

13   Reclamation accepted this arrangement as a constraint upon <u>its</u>

14   <u>operations</u> when it provisionally accepted the RPA.  FWS played

15

16

17

18   Endangered Species Act listings and regulations, and new Bay-Delta water
     quality rules.").
          [12] Federal Defendants and Defendant Intervenors' position that
19   Reclamation is the appropriate lead agency is supported by *Pac. Coast
     Fed'n of Fishermen's Ass'ns v. Gutierrez*, Case No. 1:06-CV-245 OWW LJO
20   ("*PCFFA*"), in which plaintiffs alleged that Reclamation's approval of the
     2004 OCAP was a major federal action that required compliance with NEPA.
21   2007 WL 1752289 (E.D. Cal. June 15, 2007).  The Court determined that the
     OCAP was not reviewable as a "final agency action" under the APA but noted
22   that, after ESA consultation on the OCAP was completed, Reclamation "*may
     decide to take certain actions and, if those actions []rise to the level
23   of a 'final agency action' under the APA, steps could be reviewable.*"  *Id.*
     at *13 (emphasis in original).  *PCFFA* recognized that Reclamation stated
24   in the OCAP that "NEPA compliance is being accomplished on all new
     projects or actions that may change CVP/State Water Project operations
25   such that there is a significant effect on the environment."  *Id.* at *18.
     The district court concluded:
26
          It is explicit that if and when Reclamation ultimately decides to
27        take a new action that is not within the scope of historical
          operations that could have a significant impact on the environment,
          <u>Reclamation will undertake NEPA analysis</u>.

28   *Id.* (emphasis added).

                                      30

a key role in formulation, planning, and implementation of the RPA, with full knowledge that no NEPA compliance had been undertaken.  This is not a shell game in which the agencies may leave the public to guess which agency has taken major federal action.  It is a close call whether FWS's <u>issuance</u> of the BiOp and its RPA under these circumstances is major federal action under NEPA.  This call need not be made, because Reclamation, the agency with the ultimate authority to implement the RPA, is now joined as a party, whose actions must be evaluated under NEPA.

     2.  <u>A NEPA Claim Against Reclamation Has Been Pled and Is Ripe for Adjudication.</u>

On September 4, 2009, shortly after the opening briefs in this round of motions for summary judgment were due, the Authority and Westlands ("San Luis Parties") amended its complaint to include NEPA claims against the Bureau.  Doc. 292, *San Luis* First Amended Complaint ("SLFAC"). Specifically, the SLFAC alleges that Reclamation's decision to provisionally accept and implement the 2008 BiOp is arbitrary, capricious, and contrary to law, because, among other things, "Reclamation did not ... perform[] NEPA analysis of the impacts to the human environment from, or alternative actions to, the 2008 Biological Opinion...."  SLFAC ¶114.  The parties were offered an opportunity and did supplement their briefing to fully consider the amended complaint.  *See* Docs. 336 (Order

Re further NEPA briefing); 357 & 358 (Defendant Intervenors'
supplemental NEPA filings); 360 (Federal Defendants'
supplemental NEPA filing); 361 (Plaintiffs' supplemental NEPA
filing).

        Federal Defendants object to summary adjudication of any
NEPA claim against Reclamation that has "neither been pled nor
argued." Doc. 360 at 5. The objection is overruled, because
such a claim has been pled in the SLFAC. In addition, Federal
Defendants addressed Reclamation's liability under NEPA in
their original briefs, *see* Docs. 290 at 21-23 (Federal
Defendants' Opposition) & 290-2 (Fujitani Declaration), at
oral argument, and have been given further opportunity to
supplement those briefs to fully address Reclamation's role
and actions.

        Federal Defendants also suggest that Reclamation should
be permitted the opportunity to "assemble an administrative
record" on the NEPA issue before it is adjudicated. Doc. 360
at 5. However, the parties previously agreed that NEPA claims
against FWS related to the issuance of the BiOp could be
adjudicated without reference to the administrative record.
*See* Doc. 120 at 6-7. Federal Defendants fail to explain why
NEPA claims against the Bureau related to implementation of
the BiOp should be treated any differently.

3.  **Reclamation's Provisional Acceptance and
    Implementation of the BiOp and its RPA Constitute
    Major Federal Action Because they Represent a
    Significant Change to the Operational Status Quo.**

Projects such as the CVP and SWP, constructed prior to
the date on which NEPA became effective, January 1, 1970, are
not retroactively subject to NEPA.  *See Upper Snake River
Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th
Cir. 1990).  "However, if an ongoing project undergoes changes
which themselves amount to major Federal actions, the
operating agency must prepare an EIS."  *Id.* at 234-35 (citing
*Andrus v. Sierra Club*, 442 U.S. 347, 363 n. 21
(1979)(explaining that major federal actions include the
"expansion or revision of ongoing programs")).  The critical
inquiry is whether the BiOp causes a change to the operational
status quo of an existing project.  *Upper Snake River*, 921
F.2d at 235.

*Upper Snake River* concerned Reclamation's decision to
reduce flows below Palisades Dam and Reservoir to below 1,000
cfs "[d]ue to lack of precipitation ... to increase water
stored for irrigation...."  921 F.2d at 234.  Although it had
been standard operating procedure since 1956 to maintain flows
below that dam above 1,000 cfs, during previous dry periods,
the average flow had "been lower than 1,000 cfs for 555 days
(or 4.75% of the total days in operation)."  *Id.* at 233.
Because the challenged flow fluctuations were within historic

33

operational patterns, no NEPA compliance was required:

> The Federal defendants in this case had been
> operating the dam for upwards of ten years before the
> effective date of the Act. During that period, they
> have from time to time and depending on the river's
> flow level, adjusted up or down the volume of water
> released from the Dam. <u>What they did in prior years
> and what they were doing during the period under
> consideration were no more than the routine
> managerial actions regularly carried on from the
> outset without change</u>. They are simply operating the
> facility in the manner intended. In short, they are
> doing nothing new, nor more extensive, nor other than
> that contemplated when the project was first
> operational. Its operation is and has been carried on
> and the consequences have been no different than
> those in years past.
>
> The plaintiffs point out that flow rates have been
> significantly below 1,000 cfs for periods of seven
> days or more only in water years 1977, 1982, and
> 1988, all years of major drought. They also note that
> prior to construction of the dam, the lowest recorded
> flow rate did not fall below 1400 cfs. From these
> facts, they argue that the Bureau's reduction of the
> flow below 1,000 cfs is not a routine managerial
> action. However, a particular flow rate will vary
> over time as changing weather conditions dictate. In
> particular, low flows are the routine during drought
> years. What does not change is the Bureau's
> monitoring and control of the flow rate to ensure
> that the most practicable conservation of water is
> achieved in the Minidoka Irrigation Project. Such
> activity by the Bureau is routine.

*Id.* at 235-36 (emphasis added).

   *Westlands* specifically distinguished *Upper Snake River*,

and reasoned that whether or not an EIS was required "will, of

necessity, depend heavily upon the unique factual

circumstances of each case."  850 F. Supp. at 1415 (citing

*Westside Property Owners v. Schlesinger*, 597 F.2d 1214, 1224

(9th Cir. 1979)).

> <u>To some extent, the finding is based on whether the
> proposed agency action and its environmental effects
> were within the contemplation of the original project</u>

34

1
2
3
4
5

> **when adopted or approved.** *See* [*Port of Astoria, Or.*
> *v. Hodel*, 595 F.2d 467, 476 (9th Cir. 1979)];
> *Robinswood Community Club* [*v. Volpe*], 506 F.2d 1366
> [(9th Cir. 1974)].  **The inquiry requires a**
> **determination of whether plaintiffs have complained**
> **of actions which may cause significant degradation of**
> **the human environment.** [*City and County of San*
> *Francisco v. United States*, 615 F.2d 498, 500 (9th
> Cir. 1980)].

6

*Westlands*, 850 F. Supp. at 1415.  In *Westlands* "the taking of

7

water for non-agricultural purposes [was] alleged to have

8
9

changed the operational requirements of the CVP, imposed new

standards for reverse flows in the Western Delta, carryover

10

storage in the Shasta reservoir, and caused closure of the

11
12

Delta cross-channel.  Such actions and the environmental

13

effects alleged are not routine managerial changes."  *Id.* at

14

1421.

15

    Plaintiffs contend that the present circumstances are

16

more like those in *Westlands* than in *Upper Snake River*.

17

First, quoting page 280 of the BiOp, Plaintiffs argue that

18
19

"the 2008 BiOp greatly 'decreas[es] the amount of ... the

projects' export pumping plants operations prior to, and

20

during, the critical [delta smelt] spawning period.'"  Doc.

21
22

245-2 at 20 (quoting BiOp 280).  Plaintiffs' partial quotation

23

is not fully accurate, as the entire quoted sentence concerns

24

effects to critical habitat, not pumping rates: "Overall, RPA

25

Component 1 will increase the suitability of spawning habitat

26

for delta smelt by decreasing the amount of Delta habitat

27
28

affected by the projects' export pumping plants' operations

35

1   prior to, and during, the critical spawning period."

2   Nevertheless, the RPA will be implemented by altering flow

3   patterns, which will substantially reduce water availability

4   for water service contractors.[13]

5

6       Plaintiffs argue that the various components of the RPA

7   call for more restrictive OMR flows than under the status quo:

8           RPA Component 1, Action 2 for January and February
            calls for much more restrictive OMR flows of -1,250
9           cfs to -5,000 cfs rather than the -5,000 cfs
            permitted under D-1641.  AR 22, 1867.  As recognized
10          by a DWR comment letter on the BiOp, this is a
            considerable change from the previous regimen because
11          "to meet a -1,250 cfs OMR flow during June, the
            Project could cut pumping to zero and still not meet
12          the OMR target."  AR 6995-96.  In addition, the
            proposed take limits for adult delta smelt have been
13          significantly lowered such that they would have been
            exceeded 19 out of 28 years of historic operations
14          from 1981 to 2007.  AR 1867.

15

16

17 ─────────────
           [13] In addition, Plaintiffs quote BiOp page 281 to posit that the RPA
18  "mandates even greater reductions in Delta water exports whenever 'the
    Service [makes a] final determination as to OMR flows required to protect
19  delta smelt.'"  Doc 245-2 at 20 (quoting BiOp 281).  Although the BiOp
    does contain a sentence that reads, "[t]hroughout the implementation of
20  RPA Component 1, the Service will make the final determination as to OMR
    flows required to protect delta smelt."  The surrounding text does not
21  state that the RPA "mandates even greater reductions" in export pumping
    whenever FWS makes a final determination as to OMR flows.  This partial
22  quotation is inaccurate.
           Plaintiffs also argue that a DWR comment letter included in the
23  administrative record "demonstrates" that "the RPA mandates export
    restrictions well beyond routine Project managerial changes by imposing
24  pumping restrictions in the fall months, viz., the 'X2' requirements
    purported to benefit delta smelt habitat, which have never previously
25  served as the basis for export restrictions during that time period.  AR
    6993."  Doc. 245-2 at 20.  As noted by DWR in that letter, "relative to
26  2008, the actions represent a substantial increase in the level of
    protection.  The addition of a fall action is something new, though.
27  Obviously, water supply would take a larger 'hit.'"  Id.  Although the
    letter includes hearsay opinions, implementing such management actions
28  constitutes a new and unprecedented change in project operations, which
    will have restrictive impacts that have the potential to be major and
    adverse.

                                    36

Doc. 245-2 at 20.   This argument is predominantly based on information in the administrative record, despite the fact that administrative record has not yet been finalized and the scheduling conference order in this case specifically limits the "early resolution" claims to those that do not depend on the administrative record.

Federal Defendants maintain that whether the RPA causes a change to the status quo is an issue of fact, requiring evaluation of all of the evidence in the record.   The parties previously agreed that issues requiring review of the administrative record were not to be decided at this stage in the case.  *See* Doc. 120 at 6-7.[14]   Federal Defendants present the Declaration of Paul Fujitani, Doc. 290-2, which includes a review of historic OMR flows and compares those flows to projected flows under the RPA.   Based on Fujitani's declaration, Federal Defendants argue:

> As the available historical data show ... average OMR flows in January have fluctuated from as high as -3,269 cfs (January 1998) to as low as -8,268 cfs (January 2003).   Daily flows vary even more widely -- for example, in January 1998, daily OMR flows ranged between 2,810 cfs and -9,530 cfs.  *See* Ex. 1.   The flows set forth in RPA Component 1, Action 2 are within these historic parameters.   Similarly, the historical record shows average OMR flows in February have fluctuated from as high as 20,631 cfs (February

---

[14] Plaintiffs misconstrue Defendant-Intervenors' argument that these factual issues should not be decided at this time as an argument that they are not amendable to summary judgment at all.   Plaintiffs' extensive discussion of why NEPA issues are amenable to summary judgment is misplaced.   Issues that require a review of the administrative record are, by the parties' own stipulation, not to be decided at this stage of the case.   Doc. 120 at 6-7.

1    1997) to as low as -9,086 cfs (February 2003).  The
     February flows set forth in RPA Component 1, Action 2
2    are also within these historic parameters.

3    RPA Component 2 provides that under certain
     conditions, OMR flows should be maintained between -
4    1,250 and -5,000 cfs from the date Component 1 is
     completed until June 30 (or until water temperatures
5    at Clifton Court Forebay reach 25 degrees Celsius).
     The available historic data shows a wide range of OMR
6    flows between January and July, and the flow ranges
     set forth in RPA Component 2 are within these
7    historic parameters. *See* Ex. 1.

8    Therefore, even after adopting the OMR flow
     restrictions, Reclamation continues to operate the
9    CVP within existing law and the same overall flow
     parameters, as it has done for decades.
10
*Id.* at 22-23.
11
12      Plaintiffs respond with the declaration of Thomas

13   Boardman, Doc. 297-2, who opines that, under certain

14   scenarios, the RPA constrains export pumping in a manner that

15   departs from the status quo ante:

16   I reviewed historic data and considered how the 2008
     BiOp might affect operations as compared to the pre-
17   existing criteria in D-1641.  Based upon my review of
     those data, I found, in some circumstances, operating
18   the CVP and SWP to meet pre-existing D-1641 criteria
     resulted in OMR flows more positive than -1,250 cfs.
19   If those circumstances occur, the new OMR criteria in
     the 2008 BiOp would not control.  I also found, in
20   some circumstances, operating the CVP and SWP to meet
     the pre-existing D-1641 criteria resulted in OMR
21   flows within the range specified by FWS pursuant to
     the 2008 BiOp.  If those circumstances are presented
22   again, the 2008 BiOp may control CVP and SWP
     operations, depending upon where in the range FWS
23   sets the OMR limit.  In still other circumstances,
     however, I found the pre-existing D-1641 criteria
24   allowed OMR flows more negative than -5,000 cfs, the
     most negative flow rate allowed under the 2008 BiOp.
25   If those circumstances occur, the new operating
     criteria in the 2008 BiOp will definitely control CVP
26   and SWP operations.  The changes in CVP and SWP
27
28
                              38

> operations necessary to meet the new operating
> criteria in the 2008 BiOp will reduce availability of
> the CVP and SWP to supply water.

*Id*. at ¶9.

Boardman also concluded that "[i]n 2009, limits on OMR flows imposed by FWS under the 2008 BiOp resulted in lower rates of CVP and SWP pumping than otherwise would have been allowed if only the preexisting criteria in D-1641 controlled." *Id*. at ¶10.  Boardman estimates "that as a result of the 2008 BiOp limits on OMR flows from mid February to the end of March and from mid May to the end of June, the Jones Pumping Plant was unable to pump approximately 390,000 acre-feet of water that it otherwise could have pumped and provided to water users south of the Delta, if only the pre-existing criteria in D-1641 controlled." *Id*.

Fujitani's and Boardman's conclusions are not inconsistent.  Fujitani concludes that average and daily OMR flows under the RPA fall within historic average and daily flow ranges.  Boardman opines that, even though any given post-RPA average or daily OMR flow figure may fall within historic ranges, under certain circumstances, pre-RPA constraints would permit even more negative flows, resulting in even more export capability.  Although Fujitani's conclusion, that post-RPA operations fall within the range of historic operating conditions, may comply with the letter of

*Upper Snake River*, the RPA's operational changes violate the spirit and reasoning of *Upper Snake River*:

> This circuit has held that where a proposed federal action would not change the status quo, an EIS is not necessary. "An EIS need not discuss the environmental effects of mere continued operation of a facility." *Burbank Anti-Noise Group v. Goldschmidt,* 623 F.2d 115, 116 (9th Cir. 1980) (holding EIS unnecessary for federal financial assistance in purchasing an existing airport since federal action would not change status quo), cert. denied, 450 U.S. 965 (1981); *see also Committee for Auto Responsibility v. Solomon*, 603 F.2d 992 (D.C. Cir. 1979) (holding government lease of parking area to new parking management firm does not trigger EIS requirement since area already used for parking so no change in status quo).

> We find the reasoning of the district court in County of *Trinity v. Andrus* particularly instructive. In *Trinity* the plaintiffs sought to enjoin the Bureau from lowering the level of a reservoir during the drought year of 1977 because of the potential damage to the fish population in the reservoir. The court explained that the issue was "not whether the actions are of sufficient magnitude to require the preparation of an EIS, but rather whether NEPA was intended to apply at all to the continuing operations of completed facilities."  *Id.* at 1388. The court distinguished the case from cases "when a project takes place in incremental stages of major proportions," and from cases where "a revision or expansion of the original facilities is contemplated," *id*. Neither of these situations applied here, the court observed. Instead,

> > [t]he Bureau has neither enlarged its capacity to divert water from the Trinity River nor revised its procedures or standards for releases into the Trinity River and the drawdown of reservoirs. It is simply operating the Division within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions.

> *Id*. at 1388-89. The court then concluded that actions

40

1

2          taken in operating the system of dams and reservoirs
           (in particular, operational responses in a drought
3          year) were not "major Federal actions" within the
           meaning of NEPA.

4
           The Federal defendants in this case had been
5          operating the dam for upwards of ten years before the
           effective date of the Act. During that period, they
6          have from time to time and depending on the river's
           flow level, adjusted up or down the volume of water
7          released from the Dam. What they did in prior years
           and what they were doing during the period under
8          consideration were no more than the routine
           managerial actions regularly carried on from the
9          outset without change. They are simply operating the
           facility in the manner intended. In short, they are
10         doing nothing new, nor more extensive, nor other than
           that contemplated when the project was first
11         operational. Its operation is and has been carried on
           and the consequences have been no different than
12         those in years past.

13
           The plaintiffs point out that flow rates have been
14         significantly below 1,000 cfs for periods of seven
           days or more only in water years 1977, 1982, and
15         1988, all years of major drought. They also note that
           prior to construction of the dam, the lowest recorded
16         flow rate did not fall below 1400 cfs. From these
           facts, they argue that the Bureau's reduction of the
17         flow below 1,000 cfs is not a routine managerial
           action. However, a particular flow rate will vary
18         over time as changing weather conditions dictate. In
           particular, low flows are the routine during drought
19         years. What does not change is the Bureau's
           monitoring and control of the flow rate to ensure
20         that the most practicable conservation of water is
           achieved in the Minidoka Irrigation Project. Such
21         activity by the Bureau is routine.

22

23   921 F.2d at 235-36 (emphasis added).

24
          Here, in contrast to the "routine" activities described
25
     in *Upper Snake River* and *Trinity* (cited in *Upper Snake River*),
26
     Reclamation's decision to implement the RPA is a "revis[ion]
27
     [of] its procedures or standards" for operating the Jones
28
                                    41

pumping plant and other facilities significantly affecting OMR
flows.  This can be determined from the face of the BiOp and
uncontroverted analyses of public data.  Reclamation's and
FWS's joint interest is pellucid:  the Projects' water
delivery operations must be materially changed to restrict
project water flows to protect the smelt.  Reclamation's
implementation of the BiOp is major federal action because it
substantially alters the status quo in the Projects'
operations.

D.    **Significantly Affect the Human Environment**

     If the "major federal action" component is satisfied, an
agency must prepare an EIS "where there are substantial
questions about whether a project may cause significant
degradation of the human environment." *Native Ecosystems
Council*, 428 F.3d at 1239.  Plaintiffs maintain that the 2008
BiOp satisfies this standard because it "reallocates hundreds
of thousands of acre-feet of water annually -- enough water to
serve the needs of millions of people -- from the current
reasonable and beneficial municipal, industrial, agricultural,
and other uses."  Doc. 245-2 at 22.  In support of this and
related assertions, Plaintiffs cite extensively to the AR.  It
has been agreed that this stage of the case will not rely on
the AR, which was not finalized at the time the NEPA claims
were presented.

However, certain, dispositive conclusions can be made without looking to the AR.  First, it is undisputed that implementation of the RPA reduced pumping by more than 300,000 AF in the 2008-09 water year.  *See* Boardman Decl., Doc. 297-2 at ¶10.  FWS admitted in its Answer to the State Water Contractors' Complaint that such "reductions in exports from the Delta" may "place greater demands upon alternative sources of water, including groundwater."  Doc. 141 at ¶¶ 4, 16.  The potential environmental impact of groundwater overdraft is beyond reasonable dispute.  *See, e.g., NRDC v. Kempthorne*, 2008 WL 5054115, *27 (E.D. Cal. Nov. 19, 2008)(noting that the final EIS covering renewal of the Sacramento River Settlement Contracts "predicts that reversion to the pre-settlement regime would have potential effects on the environment, because the Settlement Contractors would rely more heavily on local groundwater, leading to air quality and soil erosion problems, as well as impacts to local streams and wildlife."); *NRDC v. Kempthorne*, 2007 WL 4462395 (E.D. Cal. 2007) (acknowledging "[r]isks that will be created by implementation of [] interim remedial actions" designed to protect smelt "include, but are not limited to ... Adverse effects on agriculture including, but not limited to, loss of jobs, increased groundwater pumping, fallowed land, and land subsidence[;] [and] Air pollution resulting from heavier

reliance on groundwater pumping and decrease in surface irrigation....").  This, in and of itself, raises the kind of "serious questions" about whether a project may cause significant degradation of the human environment, requiring NEPA compliance.  That the Bureau must comply with NEPA is established as a matter of law.

E.   **Miscellaneous Issues.**

   1.   **Will Application of NEPA to the Issuance of the BiOp Frustrate the Purposes of the ESA?**

Federal Defendants and Defendant Intervenors argue that application of NEPA to FWS's **issuance** of the BiOp will frustrate the purposes of the ESA.  Doc. 290 at 15-20; Doc 244-2 at 11-12.  It is not necessary to address this argument because it is not necessary to decide whether NEPA applies to FWS's issuance of the BiOp.  NEPA applies to Reclamation's acceptance and implementation of the BiOp and its RPA.  This dispute over statutory priority is premature.

   2.   **Did the Timing of the Preparation of the BiOp Preclude Compliance with NEPA?**

Defendant Intervenors argue that the "expedited timeframe for FWS's completion of the [BiOp] in this case preclude[d] compliance with NEPA."  Doc. 244-2 at 12.[15]  This argument is directed at FWS's duty under NEPA for issuing the BiOp.

---

[15] Federal Defendants discuss the timing issue, without directly asserting that they did not have enough time to comply with NEPA.  Doc. 290 at 17.

1   Because it is not necessary to determine whether FWS had to

2   comply with NEPA before issuing the BiOp, it is not necessary

3   to address this argument here.

4        Assuming, *arguendo*, resolution of this issue is necessary

5   to resolution of these cross motions, Defendant Intervenors'

6   argument is meritless.  The ESA and its regulations allow the

7   Service 135 days to complete a biological opinion (from the

8   submission and review of the BA).  *See* 16 U.S.C. § 1536(b)(1),

9   50 C.F.R. § 402.14(e).  In this case, FWS was ordered to issue

10  the new BiOp by December 15, 2008.  *See NRDC v. Kempthorne*,

11  1:05-cv-1207, Docs. 560 (requiring BO by September 15, 2008),

12  753 (extending, at FWS's request, deadline to December 15,

13  2008).  The initial BA submitted by the Bureau was

14  insufficient, and FWS received a revised version August 20,

15  2008.  *Id.*, Doc. 712-2 at 3; AR at 2 (BiOp at i).

16       Defendant Intervenors insist that "FWS could not have

17  prepared a NEPA document and still complied with its statutory

18  and Court-ordered duty to issue the BO."  Doc. 244-2.  On the

19  one hand, a 30-day or less statutorily mandated time-frame for

20  completion of a process has been deemed insufficient to

21  prepare an EIS.  *See Flint Ridge Dev. Co. v. Scenic River

22  Ass'n*, 426 U.S. 776 (1976) (30 day statutory mandate left

23  insufficient time to comply with NEPA); *Westlands Water Dist.

24  v. U.S.*, 43 F.3d 457, 460-61 (9th Cir. 1994) (where water

45

delivery had to be completed "immediately upon enactment" of statute, there was no time for NEPA analysis); *Merrell v. Thomas*, 807 F.2d 776, 778 (9th Cir. 1986) (thirty days insufficient). However, absent such a short time frame, NEPA compliance is not excused unless the agency has demonstrated that compliance with NEPA was impossible. *Western Land Exch. Project v. U.S. Bureau of Land Management*, 315 F. Supp. 2d 1068, 1082-83 (D. Nev. 2004). That has not occurred here. Federal Defendants expressly declined, when asked by the Court, to invoke the timing exception during the preliminary injunction hearing. Although they do mention timing in their opposition brief, they do not explain why any form of NEPA compliance was impossible during the more than three months that passed between receipt of Reclamations' final BA and the December 15, 2008 BiOp deadline. Nor do Federal Defendants or Defendant Intervenors suggest that compliance with NEPA was impossible before Reclamation's implementation of the BiOp and its RPA.

### IV. CONCLUSION

For all the reasons set forth above:

Plaintiffs' are entitled to summary judgment on their claim against Reclamation and the Secretary of the Interior that Reclamation violated NEPA by failing to perform any NEPA analysis prior to provisionally adopting and implementing the

46

1    2008 BiOp and its RPA.

2         Plaintiffs shall submit a form of order consistent with

3    this memorandum decision within ten (10) days of electronic

4    service.

5         A telephonic scheduling conference will be held on

6    November 24, 2009 at 10:00 a.m. in Courtroom 3 (OWW) to

7    discuss remedies issues.   The parties may appear

8    telephonically.

9

10

11   SO ORDERED

12   DATED:   November 13, 2009

13                              /s/ Oliver W. Wanger
14                             Oliver W. Wanger
15                        United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28