UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELTA SMELT CONSOLIDATED CASES | 1:09-CV-407 OWW DLB |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.* v. SALAZAR, *et al.* | MEMORANDUM DECISION DENYING WITHOUT PREJUDICE RENEWED APPLICATION FOR TEMPORARY RESTRAINING ORDER (DOC. 562) |
| STATE WATER CONTRACTORS v. SALAZAR, *et al.* | |
| COALITION FOR A SUSTAINABLE DELTA, *et al.* v. UNITED STATES FISH AND WILDLIFE SERVICE, *et al.* | |
| METROPOLITAN WATER DISTRICT v. UNITED STATES FISH AND WILDLIFE SERVICE, *et al.* | |
| STEWART & JASPER ORCHARDS *et al.* v. UNITED STATES FISH AND WILDLIFE SERVICE. | |

## I. INTRODUCTION

Plaintiffs, San Luis & Delta Mendota Water Authority (the "Authority") and Westlands Water District ("Westlands"), move for a Temporary Restraining Order ("TRO") against the implementation of Reasonable and Prudent Alternative ("RPA") Component 1, Action 2 set forth in the United States Fish and Wildlife Service's ("FWS") December 15, 2008 Biological Opinion, which addresses the impacts of the coordinated operations of the federal Central

Valley Project ("CVP") and State Water Project ("SWP") on the threatened delta smelt (*Hypomesus transpacificus*) ("2008 Smelt BiOp"). Doc. 562, filed Feb. 9, 2010.

Plaintiffs State Water Contractors; Metropolitan Water District of Southern California; Kern County Water Agency and Coalition for a Sustainable; Stewart & Jasper Orchards, et al.; and Family Farm Alliance joined the TRO motion. Docs. 571-75. Intervenor California Department of Water Resources ("DWR"), the operator of the SWP, filed a statement of non-opposition. Doc. 570.

The motion came on for hearing, on shortened notice, on February 2, 2010. The parties were represented by counsel, as noted in the record.

## II. BACKGROUND

The 2008 Smelt BiOp, prepared pursuant to Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), concluded that "the coordinated operations of the CVP and SWP, as proposed, are likely to jeopardize the continued existence of the delta smelt" and "adversely modify delta smelt critical habitat." 2008 Smelt BiOp at 276-78. As required by law, the BiOp includes an RPA designed to allow the projects to continue operating without causing jeopardy or adverse modification. *Id*. at 279. The RPA includes various operational components designed to reduce entrainment of smelt during critical times of the year by

2

controlling and reducing water flows in the Delta. *Id. at* 279-85.

Component 1 (Protection of the Adult Delta Smelt Life Stage) consists of two Actions related to Old and Middle River ("OMR") flows. Action 1, which is designed to protect upmigrating delta smelt, is triggered during low and high entrainment risk periods based on physical and biological monitoring. Action 1 requires OMR flows to be no more negative than -2,000 cubic feet per second ("cfs") on a 14-day average and no more negative than -2,500 cfs for a 5-day running average. *Id. at* 281, 329.

At issue in this case is Action 2 of Component 1, which is designed to protect adult delta smelt that have migrated upstream and are residing in the Delta prior to spawning. Action 2 is triggered immediately after Action 1 ends or if recommended by the Smelt Working Group ("SWG"). Flows under Action 2 can be set within a range from -5000 to -1250 cfs, depending on a complex set of biological and environmental parameters. *Id. at* 281-282, 352-56.

Component 2 (Protection of Larval and Juvenile Delta Smelt), requires OMR flows to remain between -1,250 and -5,000 cfs beginning when Component 1 is completed, when Delta water temperatures reach 12° Celsius, or when a spent female smelt is detected in trawls or at salvage facilities. *Id. at* 282, 357-358. Component 2 remains in place until June 30 or when the

3

Clifton Court Forebay water temperature reaches 25° Celsius. *Id. at* 282, 368.

Component 3 (Improve Habitat for Delta Smelt Growth and Rearing) requires sufficient Delta outflow to maintain average mixing point locations of Delta outflow and estuarine water inflow ("X2") from September to December, depending on water year type, in accordance with a specifically described "adaptive management process" overseen by FWS. *Id. at* 282-283, 369.

Under Component 4 (Habitat Restoration), DWR is to create or restore 8,000 acres of intertidal and subtidal habitat in the Delta and Suisun Marsh within 10 years. *Id. at* 283-284, 379.

Under Component 5 (Monitoring and Reporting), the Projects gather and report information to ensure proper implementation of the RPA actions, achievement of physical results, and evaluation of the effectiveness of the actions on the targeted life stages of delta smelt, so that the actions can be refined, if needed. *Id. at* 284-285, 328, 375, 37.

On February 8, 2010, Federal Defendants gave Plaintiffs 48 hours notice, required by the Court, that they planned to implement Component 1, Action 2 as of 5:00PM February 10, 2010.[1] The SWG recommended that protective measures were necessary in part because, since February 3, a total of 5 delta smelt had been salvaged at the pumps. *See* Doc. 579-3, Smelt Working Group

---

[1] At the February 10, 2010 hearing, Federal Defendants indicated that Component 1, Action 2 would not be implemented until 7:00 AM on February 11, 2010.

4

Notes, Feb. 8, 2010. (Because the salvage facility only operates for a portion of the day, observed salvage figures are routinely multiplied by four, to achieve an "expanded salvage" number of 20.) As of the hearing on this motion, the cumulative expanded salvage for the year stood 24 (or 6 fish). *Id.*

The total allowable take for the entire water year is 123, meaning that salvage has already reached 20% of the take limit for this year. Although the majority of the SWG recommended that OMR flows be set at -2000 cfs to accommodate water contractors, FWS determined that an adaptive approach could be implemented, pursuant to which OMR flows would initially be limited to no more negative than -4000 cfs. If observed salvage exceeds 1 smelt per day (for an expanded take of 4), flows will be further decreased by 1000 cfs, a process that is to continue until salvage is reduced to no more than 1 smelt per day, flows average no more negative than -1250 cfs, or the SWG makes a revised recommendation. *See* Doc. 579-3, FWS Determination of Actions Required Under Component 1 of the 2008 OCAP Biological Opinion, Feb. 8, 2010.

### III. SUMMARY OF PLAINTIFFS' MOTION

Plaintiffs seek temporary injunctive relief on the grounds that:

(1) the district court has already found that the United States Bureau of Reclamation ("Reclamation") failed to

5

comply with the National Environmental Policy Act ("NEPA") in implementing the 2008 Smelt BiOp RPAs; and.

(2) the 2008 Smelt BiOp violates the ESA and is arbitrary, capricious, and contrary to law because:

    (a) FWS has failed to show that limiting entrainment is necessary to avoid jeopardy, because, among other things, the best available science does not demonstrate a statistically significant connection between entrainment and smelt abundance from year to year, and the smelt are not present in sufficient numbers at or near the pumps to expose them to jeopardy; and

    (b) the severe OMR flow restrictions in RPA Action 2 are unsupported buy the data in the 2008 Smelt BiOp.

Plaintiffs further claim that the implementation of Component 1, Action 2 will cause them continuing irreparable harm and that the public interest and balance of hardships favor injunctive relief.

## IV. STANDARDS OF DECISION

### A. Temporary Restraining Order.

Injunctive relief, whether temporary or permanent, is an "extraordinary remedy, never awarded as of right." *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 376 (2008); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). The standard for relief applicable to a temporary restraining order

6

is the same as for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

Four factors must be established by a preponderance of the evidence to qualify for temporary injunctive relief:

1. Likelihood of success on the merits;
2. Likelihood the moving party will suffer irreparable harm absent injunctive relief;
3. The balance of equities tips in the moving parties' favor; and
4. An injunction is in the public interest.

*Winter*, 129 S.Ct. at 374; *Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

B. <u>Balancing of the Harms in ESA Cases.</u>

The Supreme Court held in *TVA v. Hill,* 437 U.S. 153, 194 (1978), that Congress struck the balance in favor of affording endangered species the highest of priorities. In adopting the Endangered Species Act ("ESA"), Congress intended to "halt and reverse the trend toward species' extinction, <u>whatever the cost.</u>" *Id*. at 184 (emphasis added). *TVA v. Hill* continues to be viable. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 664, 669-71 (2007); *see also United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496-97 (2001); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 543 n.9 (1987).

7

*Winter* does not modify or discuss the *TVA v. Hill* standard.[2] Although *Winter* altered the Ninth Circuit's general preliminary injunctive relief standard by making that standard <u>more rigorous</u>, *Winter* did not address, let alone change, the Circuit's approach to the balancing of hardships where endangered species and their critical habitat are jeopardized. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1169 (9th Cir. 2002) (Congress removed the courts' traditional equitable discretion to balance parties' competing interests in ESA injunction proceedings); *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510-11 (9th Cir. 1994)(same).

Two post-*Winter* district court cases declined to balance the equities in evaluating requests for injunctive relief under the ESA, applying *TVA v. Hill's* reasoning. *Oregon Natural Desert Ass'n v. Kimbell*, 2009 WL 1663037, at *1 (D. Or. June 15, 2009); *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 105-106 (D. Me. 2008).

---

[2] Although *Winter* involved ESA-listed species, the *Winter* decision did not address any ESA claims. The Stewart & Jasper, et al., Plaintiffs ("Stewart & Jasper") cite *Center for Biological Diversity v. U.S. Forest Service*, 2010 WL 334548 (D. Ariz. Jan. 22, 2010), as an example of an ESA case in which *Winter* was applied. That decision cited *Winter* for the general preliminary injunction standard, but did not discuss the Supreme Court and Ninth Circuit authority prohibiting the balancing of harms in ESA cases, perhaps because plaintiffs in that case entirely failed to demonstrate likelihood of success on their ESA claims. *See id.* at *1 (the court had "already determined that defendants fully complied with their obligations under the ESA...."). Stewart & Jasper also cites *Independent Living Center of Southern California, Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009), which applied *Winter* to a Social Security Act claim. Stewart & Jasper are correct that *Winter* is not a NEPA-only case. *Winter* has had broad effect on the application of the injunctive relief standard in <u>non-ESA</u> cases this Circuit. However, *Jolly* says nothing about whether *Winter* modifies the parallel line of authority precluding balancing in <u>ESA cases</u>.

8

*TVA v. Hill* and related Ninth Circuit authorities foreclose the district court's traditional discretion to balance equities under the ESA. There is no such bar in NEPA injunction proceedings.

C.  Administrative Procedure Act.

The Administrative Procedure Act ("APA") requires Plaintiffs to show that NMFS's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

   1.  Deference to Agency Expertise.

The Court must defer to the agency on matters within the agency's expertise, unless the agency completely failed to address some factor, consideration of which was essential to making an informed decision. *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 798 (9th Cir. 2005). The court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action." *River Runners for Wilderness v. Martin*, --- F.3d ---, 2010 WL 337337 *4 (9th Cir. June 10, 2009).

> In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made ... and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action ... need be only a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

*Id.*

**2. Record Review.**

A court reviews a biological opinion "based upon the evidence contained in the administrative record." *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1245. Judicial review under the APA must focus on the administrative record already in existence, not some new record made initially in a reviewing court. Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the agency's decision." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811-12 (9th Cir. 1980).

Exceptions to administrative record review for technical information or expert explanation make such evidence admissible only for limited purposes, and those exceptions are narrowly construed and applied. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). "Although [any] factual inquiry is to be 'searching and careful' the ultimate standard of review is narrow. The court is not empowered to substitute its judgment for that of the agency." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir. 1980). Federal Courts cannot routinely or liberally admit new evidence in an APA review case, because "[w]hen a reviewing court considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency." *Id.* at 1160.

**3. Best Available Science.**

What constitutes the "best" available science implicates

core agency judgment and expertise to which Congress requires the courts to defer; a court should be especially wary of overturning such a determination on review. *Baltimore Gas & Elec. Co. v. Nat'l Res. Defense Council*, 462 U.S. 87, 103 (1983) (a court must be "at its most deferential" when an agency is "making predictions within its area of special expertise, at the frontiers of science"). An agency has wide discretion to determine the best scientific and commercial data available for its decision-making. *See S.W. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 n.5 (9th Cir. 1998). A decision about jeopardy must be made based on the best science available at the time of the decision; the agency cannot wait for or promise future studies. *See Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1156 (D. Ariz. 2002).

### V. ANALYSIS

A. Likelihood of Success on the Merits.

1. NEPA Claim.

It has already been decided in this case that Reclamation, as the action agency, violated NEPA by failing to follow the prescriptions and requirements of NEPA in connection with the implementation of the RPAs prescribed by the 2008 Delta Smelt BiOp. *See* Doc. 399 ("Delta Smelt NEPA Decision").

The United States' failure to comply with NEPA has, at a

11

minimum, prevented a thorough evaluation, analysis, "hard look at," and disclosure of the costs of implementing the 2008 Smelt BiOp RPAs to human health and safety, the human environment, and other environments not inhabited by the smelt, all of which would have fostered development of the least damaging RPAs in light of catastrophic harm being inflicted on agricultural, municipal, and domestic water users.

However, the authority of the court to issue an injunction against implementation of the 2008 Smelt BiOp based on a NEPA violation is limited, as injunctive relief is precluded where "enjoining government action allegedly in violation of NEPA might actually jeopardize natural resources." *Save Our Ecosystems*, 747 F.2d 1240, 1250 n.16 (9th Cir. 1984). Nor may an injunction issue if it would cause violation of another law, here the ESA.

2. ESA Claims.

Plaintiffs argue that they are likely to succeed on the merits of their ESA claim that the 2008 Smelt BiOp is arbitrary, capricious, and contrary to law because: (a) FWS has failed to show that limiting entrainment is necessary to avoid jeopardy; and (b) the severe OMR flow restrictions in RPA Component 1, Action 2 are unsupported buy the data in the 2008 Smelt BiOp. Preliminary Injunction motions concerning these same issues are pending, but have not been heard or decided.

Action 2 has been triggered in this instance based on

12

entrainment concerns. Plaintiffs argue that the use of salvage/entrainment as a trigger for imposing pumping restrictions is unjustified because the BiOp is based upon a scientifically unsupportable finding of a relationship between reverse OMR flows and adult salvage. Plaintiffs' expert, Dr. Richard B. Deriso, declares that Component 1, Action 2 prescribes "OMR flow levels based on the BiOp's calculations of the relationship between OMR flows and adult salvage...[as] depicted in Figure B-13," which compares OMR flows to raw salvage numbers. Doc. 396 at ¶27; BiOp at 348). Dr. Deriso opines that because Figure B-13 is based upon <u>raw</u> salvage (i.e., how many individual smelt were salvaged), it fails to provide any information on "the proportion of the total population that is lost to salvage." *Id*. at ¶28. He concludes: "Figure B-13 does not show what effect OMR flows have on the total delta smelt population." *Id*. (emphasis added). Dr. Deriso opines that this failure is critical because "[o]nly by looking at population level effects can it be determined whether salvage is impacting the delta smelt population and its ability to recover." *Id*. at ¶69. Elsewhere in the BiOp, FWS concedes that, for purposes of "relating salvage data to population-level significance," the "total number salvaged at the facilities does not necessarily indicate a negative impact upon the overall delta smelt population." BiOp at 338.

13

To demonstrate the potential impact of the use of raw, as opposed to population-adjusted, salvage numbers, Dr. Deriso performed his own calculations to examine the relationship between OMR flows and the Cumulative Salvage Index, a measure that takes into account relative population size. He concluded, based on this analysis, that increased salvage of adult smelt is correlated to OMR flows only at levels more negative than -6100 cfs. *Id*. at ¶¶ 61-65. He also examined the data to determine whether negative OMR flows have any impact on the smelt's population growth rate, and found that "there is no statistical basis to conclude that cumulative salvage has a negative population level effect within the range of cumulative salvage index levels historically observed." *Id*. at ¶73.

However, contrary to Dr. Deriso's opinions, the BiOp concludes that entrainment has had significant population level effects in some years, even though entrainment may not be driving population dynamics every year. BiOp at 158-59 (citing, among other sources, a study by Manly and Chotkowski demonstrating that exports and OMR flows had statistically significant effects on smelt abundance). The BiOp reasoned that high entrainment of adult smelt in some years has played a role in the decline of the species. *Id*. at 173-74. The BiOp also considered evidence demonstrating that the CVP and SWP may disproportionately entrain the most fecund individuals in the population, which may affect

14

abundance levels more than overall entrainment numbers suggest. *Id*. at 147, 158. Finally, apart from the critiqued Figure B13, the BiOp performed other statistical analyses which indicate changes in salvage values at levels well below -5,000 cfs. *Id.* at 346-351 (discussing piecewise polynominal regression analyses showing a change in salvage values at -1,162 cfs).

DWR has acknowledged that population level effects may be difficult to detect statistically. *See* AR at 2275, 2277, 2287. In addition, an independent peer review of the BiOp found that the regression analysis FWS used to find a break point in the OMR-salvage relationship was reasonable. AR at 6523.

Plaintiffs emphasize the fact that pumping restrictions are being imposed on the basis of entrainment of six individual delta smelt. However, the BiOp found that entrainment at the pumps is a small fraction of delta smelt take caused by CVP and SWP operations, which include movement of the Smelt to the Central and South Delta, which is lethal to the species. *See* BO at 278-79; *see also NRDC v. Kempthorne*, 1:05-cv-1207, Doc. 561, Findings of Fact, ¶¶ 18-20, 51. The SWG recognized in 2007 that the delta smelt was "critically imperiled" and that the Projects should seek to achieve "no further entrainment" of delta smelt. *Id.*, Conclusions of Law, ¶11.

Finally, Plaintiffs assert that the most recent survey data shows that the majority of the smelt are in the Northern and

15

Western reaches of the Delta, far removed from any risk of entrainment. However, Federal Defendants rejoin that the Delta-wide survey upon which Plaintiffs rely is now approximately four weeks old, Doc. 578 at 5; and current salvage at the pumps "provides conclusive evidence of the presence of delta smelt in the South Delta." Doc. 470, Goude Decl. at ¶18.

These are significant scientific disputes regarding the relationship between OMR flows and entrainment and between entrainment and smelt population abundance. Federal Defendants and Defendant Intervenors have presented record evidence to dispute each of Plaintiffs' scientific critiques. What constitutes the "best" available science implicates core agency judgment and expertise to which Congress requires the courts to defer; a court should be especially wary of overturning such a determination on review. *Baltimore Gas & Elec. Co.*, 462 U.S. at 103 (1983) (a court must be "at its most deferential" when an agency is "making predictions within its area of special expertise, at the frontiers of science"). On the present motion, Plaintiffs have not shown they are likely to succeed on the merits of their ESA claim.

In this case, the action agency implementing the BiOp has violated NEPA, but no ESA violation has yet been found; FWS scientists opine that jeopardy to the species and/or adverse modification of its critical habitat is imminent and occurring;

16

Plaintiffs' experts have not discredited FWS's affirmative finding that implementation of Component 1, Action 2 is necessary to avoid jeopardy and/or adverse modification. The district court is without authority to balance the equities under the extant circumstances. The motion for TRO is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

DATED: February 12, 2010.

                                              /s/ Oliver W. Wanger
                                                 Oliver W. Wanger
                                      United States District Judge