**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE CONSOLIDATED DELTA SMELT CASES | Lead Case:<br>1:09-cv-00407 LJO BAM<br><br>Member Cases:<br>1:09-cv-00422 LJO GSA<br>1:09-cv-00480 LJO GSA<br>1:09-cv-00631 LJO DLB<br>1:09-cv-00892 LJO DLB<br><br>Partially Consolidated With:<br>1:09-cv-01201-LJO-DLB<br><br>MEMORANDUM DECISION AND ORDER RE MOTION TO EXTEND REMAND SCHEDULE (Doc. 1080) |
| THE CONSOLIDATED SALMONID CASES | Lead Case:<br>1:09-CV-01053 LJO BAM<br><br>Member Cases<br>1:09-CV-01090 LJO DLB<br>1:09-CV-01378 LJO SMS<br>1:09-CV-01520 LJO SMS<br>1:09-CV-01580 LJO DLB<br>1:09-CV-01625 LJO SMS<br><br>MEMORANDUM DECISION AND ORDER RE MOTION TO EXTEND REMAND SCHEDULE (Doc. 703). |

## I. INTRODUCTION

The final amended judgment in the *Consolidated Delta Smelt Cases* requires the U.S. Bureau of Reclamation ("Reclamation") and the U.S. Fish and Wildlife Service ("FWS") to complete a revised Biological Opinion ("BiOp") under the Endangered Species Act ("ESA") regarding the impact of proposed operation of the Central Valley Project ("CVP") and State Water Project ("SWP") on the threatened delta smelt, as well as to conduct certain related analyses under the National Environmental

1

Policy Act ("NEPA"), by December 1, 2013. 1:09-cv-00407 ("*Smelt*") Doc. 884. The final judgment in the *Consolidated Salmonid Cases* requires Reclamation and the National Marine Fisheries Service ("NMFS") to complete a BiOp analyzing the impact of CVP and SWP operations on five aquatic species, including three salmonid species, and a related NEPA analyses, in accordance with a schedule that calls for issuance of a Record of Decision by Reclamation by April 29, 2016. 1:09-cv-01053 ("*Salmonid*") Doc. 655. The schedules embodied in these judgments were modeled largely after schedules suggested by Federal Defendants, over numerous objections to the length of the remand period. *Smelt* Doc. 877-1; *Salmonid* Doc. 653.

Federal Defendants from these two sets of consolidated actions, as well as Plaintiff Intervenor in both cases, the California Department of Water Resources ("DWR"), (collectively, "Movants") jointly move to extend the respective remand schedules by three additional years. *Smelt* Doc. 1090; *Salmonid* Doc. 713. Defendant-Intervenors objected. *Smelt* Doc. 1092; *Salmonid* Doc. 722. After reviewing the initial pleadings, the Court concluded that Movants had not yet met their burden under Fed. R. Civ. P. 60(b), which governs amendment of the judgments in question. *Smelt* Doc. 1098; *Salmonid* Doc. 728.

Upon the Court's invitation and pursuant to a stipulated two-week continuance, Movants filed supplemental support for the requested extension on March 15, 2013. *Smelt* Doc. 1101; *Salmonid* Doc. 731. Various Plaintiffs filed statements of non-opposition, *Smelt* Doc. 1103 (Metropolitan Water District of Southern California, State Water Contractors, Kern County Water Agency, and Coalition for a Sustainable Delta), *Salmonid* Doc. 733 (same), or joinders, *Smelt* Doc. 1104 (San Luis & Delta Mendota Water Authority, Westlands Water District, Family Farm Alliance), *Salmonid* Docs. 734 (same) & 735 (Oakdale Irrigation District, South San Joaquin Irrigation District, Stockton East Water District). Defendant-Intervenors filed a supplemental opposition. *Smelt* Doc. 1105 (San Luis & Delta Mendota Water Authority, Westlands Water District, Family Farm Alliance), *Salmonid* Doc. 738.

Having considered all of the relevant submissions, the Court concludes that the issues are well defined and that oral argument is not necessary. The matter is therefore decided on the papers pursuant to Local Rule 230(g) and the following decision rendered.

2

## II. DISCUSSION

**A.     Legal Standard.**

Fed. R. Civ. P. 60(b) provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

In their initial pleadings, Movants relied on Rule 60(b)(5), asserting application of the respective judgment "prospectively is no longer equitable." *Smelt* Doc. 1095 at 9-10; *Salmonid* Doc. 726 at 7. A party invoking Rule 60(b)(5) must satisfy a two-prong standard. *United States v. Asarco, Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (citing *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992)). First, "[t]he moving party must satisfy an initial burden of showing a significant change either in factual conditions or in the law warranting modification of the [judgment]." *Id.* (citing *Rufo*, 502 U.S. at 384). Next, "the proposed modification [must be] suitably tailored to resolve the problems created by the changed factual or legal conditions." *Id.* (citing *Rufo*, 502 U.S. at 391). If the movant can point to "significantly changed factual conditions, … it must additionally show that the changed conditions make compliance with the [judgment] 'more onerous,' 'unworkable,' or 'detrimental to the public interest.'" *Id.* (citing *Small v. Hunt*, 98 F.3d 789, 795 (4th Cir. 1996) and quoting *Rufo*, 502 U.S. at 384).[1]

In their supplemental brief, Federal Defendants cite *Federal Power Commission v.*

---

[1] *Rufo* and *Asarco* concerned the modification of consent decrees entered in cases involving institutional reform. The Ninth Circuit has confirmed that the standards set forth in *Rufo* provide a "general, flexible standard for <u>all</u> petitions brought under the equity provision of Rule 60(b)(5)." *Bellevue Manor Associates v. United States*, 165 F.3d 1249, 1255 (9th Cir. 1999) (emphasis added); *see also Conservation Cong. v. U.S. Forest Serv.*, 2010 WL 3636142 (E.D. Cal. Sept. 14, 2010) aff'd, 489 F. App'x 151 (9th Cir. 2012) (applying *Rufo* in Administrative Procedure Act case).

3

*Transcontinental Gas Pipe Line Corporation*, 423 U.S. 326, 333 (1976), for the proposition that where a federal administrative agency seeks to define "the methods, procedures, and <u>time dimension</u> of the needed inquiry" on remand, the agency retains discretion to determine how it "may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops." The Supreme Court's reasoning in *Transcontinental* suggests that a reviewing court should not normally interfere with an agency's determination about how long remand would take to complete:

> At least in the absence of substantial justification for doing otherwise, a reviewing court may not, after determining that additional evidence is requisite for adequate review, proceed by dictating to the a the results to be reported to the court without opportunity for further consideration on the basis of the new evidence by the agency. Such a procedure clearly runs the risk of "propel(ling) the court into the domain which Congress has set aside exclusively for the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "The Court, it is true, has power 'to affirm, modify, or set aside' the order of the [agency] 'in whole or in part.' . . . But that authority is not power to exercise an essentially administrative function." *FPC v. Idaho Power Co.*, 344 U.S. 17, 21 (1952).

*Id*. (emphasis added).

Yet, recent Ninth Circuit precedent clearly permits imposition of deadlines upon the remand process. *See, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 937 (9th Cir. 2008) ("*NWF v. NMFS*" (finding a court has discretionary authority to impose deadlines on remand proceedings and that requiring regular status reports during remand is "clearly permissible"); *Nat'l Org. of Veterans' Advocates v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1381 (Fed. Cir. 2001) (setting 120–day deadline for rule-making, while permitting agency to move for a reasonable extension if rule-making could not be completed within this timeframe). The Ninth Circuit's precedent is not in conflict with *Transcontinental*. For example, although the district court in *NWF v. NMFS* acknowledged that *Transcontinental* prohibits a reviewing court from dictating to an administrative agency "the methods, procedures, and time dimension" of the remand in the absence of "substantial justification," the agency's history of failing to comply with the ESA in that case constituted "substantial justification for a process that is somewhat detailed and monitored by the court." *NWF v. NMFS*, 2005 WL 2488447 (D. Or. Oct. 7, 2005) *aff'd*, 481 F.3d 1224 (9th Cir. 2007) *opinion amended and superseded*, 524 F.3d 917 (9th Cir. 2008) and *aff'd*, 524 F.3d 917 (9th Cir. 2008).

4

**B.     Application of the *Asarco/Rufo* Standard.**

       **1.     Significant Change in Factual Conditions.**

To justify relief under Rule 60(b)(5) on the ground that a judgment "prospectively is no longer equitable," a party must first "satisfy [an] initial burden of showing a significant change either in factual conditions or in the law warranting modification of the [judgment]." *Asarco*, 430 F.3d at 979 (citing *Rufo*, 502 U.S. at 384). Here, Movants do not suggest that the law has changed. Rather, they argue that the process by which the relevant agencies and (at least some of the) interested stakeholders plan to develop scientific information relevant to the remand process has undergone a paradigm shift justifying the requested schedule modification.

       **a.     General Description of the CSAMP Process.**

Movants seek an extension from the remand schedules in both cases to allow staff from the relevant federal and state agencies to participate in a Collaborative Science and Adaptive Management Process ("CSAMP") described in a Proposal attached to the Supplemental Declaration of Ren Lohoefener. *Smelt* Doc. 1101-2, Att. 1.[2] The stated goal of the CSAMP is to "develop a robust science and adaptive management program, with collaboration of the scientists and experts from the Public Water Agencies (PWAs) and the NGO community, that will inform the development and implementation of the BiOps, [the Bay Delta Conservation Program ("BDCP")], and other programs." *Id*. at p. 11 of 15. Movants believe that implementation of CSAMP "will result in a halt to the counter-productive litigation cycle through the development of common understandings of the science, joint fact-finding, increased transparency through information sharing, and a commitment to work together so that parties develop trust and no longer use the courts to solve disputed scientific and technical issues." *Id*. With respect to the disputed BiOps, CSAMP's specific goals are to:

> (a) Identify and evaluate management actions, including but not limited to actions set forth in the [BiOps' Reasonable and Prudent Alternatives ("RPAs")], to protect one or more of the listed species;

---

[2] The remainder of this memorandum decision and order largely cites documents for which identical copies have been filed in both the *Smelt* and *Salmonid* cases. In such cases, only the *Smelt* citation is provided.

      (b) Develop a monitoring program to allow for the evaluation of costs and benefits and of alternative management actions; and

      (c) Support the development and adoption of an annual operational plan by no later than December 15 of each year.

*Id.*

Movants do not provide a great deal of detail about what the CSAMP will undertake and what it is likely to achieve. Movants explain that because it is intended to be a "collaborative" process, the details must be worked out in a collaborative manner after the process has begun. Supp. Lohoefener Decl. ¶ 20; Decl. of Maria Rea, Doc. 1101-3, ¶ 11. However, Movants do explain that CSAMP will follow standardized and generally-accepted protocols for a collaborative science process, *id.*, which will likely involve a nine-step protocol developed by the Delta Stewardship Council, *see* Rea Decl. ¶ 11 (explaining that these nine steps fall into the three broader categories of "plan," "do," and "evaluate and respond") & Ex. 1.

### b. Foreseeability of Changed Factual Conditions.

"Ordinarily … modification should not be granted where a party relies upon events that actually were anticipated" at the time judgment was entered. *See Rufo*, 502 U.S. at 385; *see also Labor/Community Strategy Ctr. v. Los Angeles Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120 (9th Cir. 2009) (noting that moving party must demonstrate the change was not anticipated at the time judgment was entered). "[W]here a party relies upon events that actually were anticipated at the time" judgment was entered, "modification should be granted only if the party satisfies the heavy burden of convincing the court that it agreed to the [judgment] in good faith, made a reasonable effort to comply, and should be relieved of the undertaking under Rule 60(b)." *Rufo*, 502 U.S. at 385.

Declarations filed in support of the pending motion to modify the judgment have universally indicated that circumstances related to collaborative scientific action have changed significantly since entry of judgment:

- Ren Lohoefener, Regional Director of FWS's Pacific Southwest Region, declares that while FWS staff was focusing on the increasingly adversarial litigation concerning the 2008 Smelt BiOp, many parties were focusing on the BDCP as a way to develop more collaborative solutions. However, "negotiations were impacted by the adversarial and time-consuming nature of the litigation ... making collaborative solutions extremely difficult." Supp. Lohoefener Decl. ¶ 4. "Since the litigation has ended, many parties have focused their efforts on BDCP and on fostering communication between the formerly adversarial parties." *Id*. at ¶ 5. This has led to movement in the BDCP effort as well as increased communication between formerly adversarial parties concerning implementation of the 2008 Smelt BiOp's RPA this past winter. *Id*. In sum, "there is no way the Federal Defendants could have predicted that the agencies and stakeholders could have come to the table in the way described in the [CSAMP] Proposal at the time the Amended Judgment was issued. The current circumstance is the result of many hundreds of hours spent meeting with stakeholders and fostering communication." *Id*. at ¶ 6.

- Maria Rea, NMFS's Central Valley Area Office Supervisor, echoes these sentiments, explaining that "the years of litigation on NMFS's 2009 salmonid [BiOp] created a very polarized atmosphere between NMFS and the litigants, including [DWR], with very different perspectives on what constitutes best available science." Rea Decl. ¶ 3. When she submitted a previous declaration proposing a schedule for remand that eventually led to the current remand schedule, Ms. Rea "did not anticipate" that a new collaborative science process would be proposed, nor that DWR would take a co-leadership role in the new South Delta Salmonid Research Collaborative ("SDSRC"), a smaller scale collaborative science project that the parties view as a subgroup of the larger CSAMP. *Id.* at ¶¶ 3, 25.

- Eileen Sobeck, Deputy Assistant Secretary for Fish and Wildlife and parks for the U.S. Department of the Interior and the point person for negotiation of the CSAMP Proposal, concurs that there has been a "significant change" in the parties' entrenched litigation positions since summary judgment was entered. Sobeck Decl., Doc. 1101-5, at ¶¶ 1, 3, 7.
- Dale Hoffman-Floerke, Chief Deputy Director of DWR, agrees that there has been a "significant breakthrough" in development of the BDCP, which in turn triggered an intensive collaboration between the state and federal agencies. Hoffman-Floerke Decl., Doc. 1101-1 at ¶ 2. In "recent months," the increasingly collaborative nature of discussions in connection with the BDCP has "spilled over" into discussions of the implementation of the RPAs. *Id*. at ¶ 3. As a result, Hoffman-Floerke too believes there has been a "paradigm shift." *Id*.

Defendant Intervenors dispute that the development of the CSAMP is a "new fact," pointing out that expanded stakeholder input was explicitly contemplated by earlier filings with this Court. *Smelt* Doc. 1092 at 6. For example, a September 20, 2011 stipulation regarding deadlines for submission of a revised draft smelt BiOp stated: "Federal Defendants and some of the parties have discussed greater participation in the consultation process for a new delta smelt BiOp." *Smelt* Doc. 1060 at ¶ 5. While this indicates that some collaboration might have been contemplated prior to the entry of judgment, the record amply demonstrates that the level of collaboration contemplated by the CSAMP is much more intense and potentially far-reaching than any previously-described collaborative efforts. The Court is satisfied that Movants have met their burden to demonstrate there has been a change in circumstances that was not anticipated at the time judgment was entered. Therefore, the additional "heavy burden" standard set forth in *Rufo* does not apply here.[3]

---

[3] For the same reason, there is no merit to Defendant Intervenors' objection that the motion to extend the remand schedule is untimely. *See Smelt* Doc. 1092 at 4-5. Fed. R. of Civ. P. 60(c)(1) provides that "[a] motion under Rule 60(b) must be made within a reasonable time." "What constitutes a reasonable time depends upon the facts of each case, taking into consideration the interest in finality, the reason for the delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to the other parties." *Lemoge v. United States*, 587 F.3d 1188, 1196 (9th Cir. 2009) (internal quotations and citations omitted). Here, Movants' evidence demonstrates a fairly recent, marked increase in collaboration between previously adversarial parties. The present motions, initially filed in late December 2012, were made within a "reasonable

8

### 2. Public Interest.

Movants must also "show that the changed conditions make compliance with the [judgment] 'more onerous,' 'unworkable,' or 'detrimental to the public interest.'" *Asarco*, 430 F.3d at 979 (citing *Small,* 98 F.3d at 795 and quoting *Rufo*, 502 U.S. at 384). Movants do not suggest that the changed factual conditions render compliance with the existing deadline "more onerous" or "unworkable." In fact, they acknowledge that staff is on target to meet the existing deadlines. *See* Supp. Lohoefner Decl. ¶ 14; Rea Decl. ¶ 8. Rather, Movants maintain that it will be detrimental to the public interest to continue on the current schedule because the CSAMP has the potential to break the cycle of litigation and to make the scientific underpinnings of both BiOps more robust. However, Movants explain that these advantages cannot be realized without an extension, as the respective agencies cannot dedicate staff to both efforts (i.e., the remand and the CSAMP) simultaneously.

#### a. Breaking the Litigation Cycle.

The Court takes judicial notice of the undisputed and undisputable fact that efforts to protect listed fish species in the Delta have been embroiled in nearly constant litigation for more than a decade. Movants' declarants emphasize the counterproductive effects of this state of affairs. Supp. Lohoefener Decl. ¶ 8 ("[E]ffective collaboration and litigation are fundamentally incompatible. Continued litigation stalls constructive efforts to improve the health of the Delta and its species."); Rea Decl. ¶ 7 ("Breaking this litigation cycle is in the public interest, as we will be able to focus our limited resources in ways that are most effective for the short and long-term protection of [ESA] listed species."). Movants believe that greater collaboration in the development of scientific information related to these species will reduce the likelihood of further litigation in the future. There is some evidence to support this belief. For example, Mr. Lohoefener credits "increased communication between the formerly adversarial parties [that] occurred this winter" for the fact that "[d]espite the fact that exports have been constrained to low levels from mid-December 2012 through mid-February 2013, no litigation has ensued." Supp. Lohoefener Decl. ¶ 5.

---

time" after these new circumstances came about.

However, as Defendant-Intervenors point out, no party has committed to refraining from seeking interim injunctive relief against the implementation of the BiOps' RPAs during any extended remand period. *See Smelt* Doc. 1093 at 2; *Salmon* Doc. 734 at 2 (indicating that the CSAMP process allows any party to pursue injunctive relief during remand).[4] Therefore, according to Defendant Intervenors, "the relationship remains adversarial." *Smelt* Doc. 1105 at 2. The fact that Defendant Intervenors have not joined in this motion to extend the remand schedule is evidence that the relevant stakeholders have yet to resolve many fundamental issues.

Nevertheless, on balance, the Court believes Movants' interest in pursuing the CSAMP process represents a solid step away from the pattern of litigation that has burdened the parties in recent years. If successful in this respect, CSAMP would advance the public interest. The Court is loath to cut off such a possibility before it is given a chance to develop, especially given the universal and enthusiastic interest in this approach expressed by all declarants.

### b.  **Advancement of Relevant Science.**

One of Movants' primary arguments in favor of the extension is their belief that the CSAMP process will "advance[e] the state of scientific understanding," thereby allowing the BiOps to be "made more robust." Rea Decl. ¶ 9 (discussing NMFS's work on the salmonid BiOp); *see also* Supp. Lohoefener Decl. ¶ 14 (indicating that while FWS "could issue a new smelt BiOp that meets the ESA's best available science requirement according to the existing remand schedule....," CSAMP is a means to "advance the state of science regarding some of the more contentious fish protective actions").

Movants' supplemental filings discuss in general terms the types of issues CSAMP may endeavor to address in a collaborative manner. Several declarants mention that a particularly fertile area for collaborative science is model development. Both this Court and multiple peer review bodies have identified a lack of quantitative life cycle models as a major shortcoming in development of the 2008 Smelt BiOp. *San Luis & Delta-Mendota Water Auth. v. Salazar*, 760 F. Supp. 2d 855, 881-85 (E.D. Cal.

---

[4] Defendant Intervenors also point out that DWR continues to challenge the science underlying the remanded BiOps on appeal. *Smelt* Doc. 1105 at 2. The Court does not believe this is indicative of anything other than DWR's long-standing disagreement with some of the scientific methods used and conclusions reached in the previous BiOps.

2010); *In re Consol. Salmonid Cases*, 791 F. Supp. 2d 802, 834-45 (E.D. Cal. 2011); Supp. Lohoefener Decl. ¶ 16. Mr. Lohoefener indicates that CSAMP "offers the opportunity to work with the parties to use existing models that they have developed and to further develop those and other models." Supp. Lohoefener Decl. ¶ 16. Likewise, Dr. Michael Schiewe, a fish biologist formerly employed by NMFS and now retained as a consultant by the agency, believes that a three-year extension will permit NMFS a much better opportunity to take advantage of a salmonid life cycle model currently being developed by NFMS. Schiewe Decl., Doc. 1101-4, ¶ 22 ("[D]eveloping quantitative life cycle models is an iterative process that involves testing and validating ... over multiple generations and years. I would expect each additional year made available by the 3-year extension to significantly improve the utility of the [NMFS] model. This is especially the case in the first few years after a new model is released."). Dr. Schiewe believes that "[p]erhaps more relevant to the specific question of improving Delta survival of salmonids" is the development of a behavioral model that will help predict how migrating juvenile salmon will respond to Delta conditions. *Id*. at ¶ 23. This issue was litigated extensively in connection with the 2009 Salmonid BiOp. *See Consol. Salmonid Cases*, 791 F. Supp. 2d at 899-904. Dr. Schiewe states that a three-year extension will provide time to begin development of a suite of models designed to better predict the effects of Delta operations on salmon migration behavior and survival. *Id*. at ¶24.

      CSAMP is also anticipated to benefit the development of actions to protect spawning delta smelt and their progeny. Supp. Lohoefener Decl. ¶ 18. It is believed that smelt populations may move in response to changing turbidity conditions. *See San Luis*, 760 F. Supp. 2d at 923-24. Models of the movement of turbid zones and smelt responses to local hydrology may help to inform how the Delta should be operated to minimize smelt entrainment in the State and Federal pumping facilities. *See* Supp. Lohoefener Decl. ¶ 18.

      CSAMP does seem to offer a potential mechanism to advance collaboratively scientific understanding in areas that have previously been the subject of intense dispute. Defendant Intervenors do not refute this. Rather, they argue that it is unlawful to delay the remand process in order to seek additional studies or information. In support of this proposition, Defendant Intervenors cite a previous

11

decision in the Consolidated Delta Smelt Cases, *San Luis*, 760 F. Supp. 2d at 871, which in turn relied upon *Center for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1154-56 (D. Ariz. 2002), for the general rule that "[a] decision about jeopardy must be made based on the best science available at the time of the decision; the agency cannot wait for or promise future studies."

A close examination of *Rumsfeld* reveals that it should not serve as a bar to the requested extension. *Rumsfeld* concerned a biological opinion that concluded the Army's continued operations at Fort Huachuca, Arizona would not cause jeopardy to listed species that relied on flows from the Upper San Pedro River, even though rapid development in the area and uncontrolled groundwater pumping at the Fort posed threats to the species. *See generally id*. at 1143-44. The "no jeopardy" finding was premised on several required mitigation measures. First, the Army had to develop and implement an on-base plan to protect and maintain populations of listed species and habitats, *id*. at 1148, although the on-base plan was not designed to address the underlying problem of diminishing flows in the San Pedro River, *see id*. at 1153. Second, the Army was required to develop a regional water resources plan, sufficient to maintain flows in the San Pedro River to sustain the protected species and their habitats. *Id*. at 1148. The biological opinion acknowledged that the Army had no authority over the implementation of the regional plan and was only required to participate along with other stakeholders. *Id*. at 1153. Third, the Army had to monitor progress and report on the implementation of the various projects. *Id.* at 1149. Fourth, the biological opinion assumed the operation of a water recharge facility designed to temporarily delay the impact of groundwater overdraft, which the *Rumsfeld* court acknowledged was "subject to substantial uncertainty." *Id*. at 1145. *Rumsfeld* found it unlawful for FWS to "sidestep[] its obligation to make an accurate 'no jeopardy' decision based on the best available evidence" by seeking to assign this responsibility to other stakeholders through the requirement that they develop a regional water resources plan.

Movants' interest in further developing the relevant body of science in a collaborative manner during an extended remand is distinguishable from the situation in *Rumsfeld*. *Rumsfeld* concerned an unlawful "no jeopardy" determination that permitted development activities to proceed on the uncertain

12

promise of future corrective action. Here, in contrast, the agencies seek to delay making a decision as to the existence of jeopardy and/or any required mitigation measures in order to develop better scientific information. Movants are trying to make a more robust (and possibly less contentious) jeopardy determination. The Court is unaware of any authority that prohibits affording agency decision makers a reasonable amount of time to engage in such a process.

### c.      Inability to Pursue CSAMP and Current Remand Schedules Simultaneously.

The final piece of Movants' public interest argument is their assertion that the parties cannot pursue CSAMP while simultaneously working to complete new BiOps according to the existing remand schedule. This is because CSAMP and the remand processes would involve largely the same key staff members from the state and federal agencies. *See* Supp. Lohoefener Decl., ¶¶ 11-12; Rea Decl. at ¶ 8 ("If the Court does not grant the requested extension, NMFS will adhere to the schedule previously ordered ... but will be unable to commit to the CSAMP process), ¶ 31.[5]

Although Defendant Intervenors are correct that "insufficient" funding is generally not considered a valid justification for delaying compliance with the ESA, *see Ctr. for Biological Diversity v. Norton*, 304 F. Supp. 2d 1174, 1179-80 (D. Ariz. 2003), the situation here cannot be fixed by merely reallocating funds and/or staff.  As Deputy Assistant Secretary of the Interior Sobeck indicates: "Adding inexperienced or new staff will not significantly expand the agencies' capacity to undertake all of theses efforts at the same time." Sobeck Decl. at ¶ 8.

### d.      Implementation of the RPAs during the Remand Period.

The Court is mindful of Defendant Intervenors' concern that recent filings suggest intent to use CSAMP to modify and refine the BiOps' RPA actions. *See, e.g.*, Smelt Doc. 1080-1 at 3 ("The RPAs will be evaluated and refined through the collaborative science and adaptive management program and may be modified through administrative action or judicial approval as appropriate."). As all parties are

---

[5] Movants also note that the ongoing remand/consultation process is preventing agency staff from fully participating in other, ongoing collaborative efforts, including the BDCP. While this arguably is detrimental to the public interest, this has not been considered in the public interest calculus because, as was discussed in this Court's January 30, 2013 Order, *Smelt* Doc. 1098, the possibility of simultaneously pursuing reconsultation and the BDCP was at least partially anticipated by the relevant agencies prior to entry of the judgments in these cases.

undoubtedly aware, the existing BiOps have not been vacated. Any "modifications" to the RPAs must be made consistent with procedures required by law. Absent lawful modifications,[6] the CVP and SWP are required to operate in compliance with the existing RPAs. Defendant Intervenors' fears that the protections of the BiOps will be weakened will not come to pass. With this in mind, any delay engendered by pursuit of CSAMP process poses no additional, independent threat to the continued existence of the species covered by the BiOps.

In sum, allowing CSAMP to proceed has the potential to advance significantly the public interest, while proceeding on the current schedule appears likely to reverse recent moves designed to steer the parties away from endless litigation, which has been extraordinarily burdensome on the parties and the Court.

### 3. **Suitably Tailored.**

The remaining question is whether the proposed modification is "suitably tailored" to the changed factual conditions. *See Asarco*, 430 F.3d 979 (citing *Rufo*, 502 U.S. at 391). Movants have generally explained why the CSAMP needs three years to bear fruit, *see* Rea Decl. ¶¶ 18-24, and that "it makes sense to pursue that effort" before proceeding in earnest with the remand, Sobeck Decl. ¶ 8.

NFMS provides a somewhat more specific timeline describing target dates for CSAMP and incorporation of its results into the consultation process. Rea Decl. at Ex. 3. According to this timeline, it will take until January 1, 2014 for CSAMP to form and develop key questions and experimental designs. *Id*. This will be followed by two years during which scientific experiments will be performed and those experiments will be analyzed and written up. *Id*. The close of the first year of scientific research is targeted for June 30, 2015, with the second year closing on June 30, 2016. *Id*. Reclamation (the action agency) will integrate the results of this scientific work into the its "consultation package," which may take the form of a biological assessment, to be transmitted to NMFS by the end of 2015, after which NMFS anticipates it will take slightly more than three additional years to complete its own work on a biological opinion, which it anticipates will issue February 1, 2019. *See id*.

---

[6] The Court does not, at this time, express any opinion as to how such modifications might be accomplished.

14

The Court has not located an equivalent timeline for an adjusted *Smelt* remand, but presumes that the target dates Ms. Rea provides for the CSAMP are universally applicable. Obviously, the timing of integration of any research produced by CSAMP would differ in the smelt case, as the extension they are requesting will extend the current deadline of December 2013 to December 2016, rather than early 2019.[7]

Because the CSAMP process has not yet begun and its exact processes are to be developed in a collaborative manner, Movants are unable at this time to provide details of the CSAMP process, what it is likely to accomplish, and how those accomplishments will be brought to bear on the respective consultation processes. *See* Sobeck Decl. ¶ 14. This lack of detail provides the Court with little assurance that CSAMP will proceed as envisioned, let alone that CSAMP will actually result in scientific progress, as opposed to "collaborative" gridlock. Therefore, rather than granting Movants a three-year blank check, during which time CSAMP could stagnate or entirely fall apart, the Court will grant a staged extension as described below.

### III. CONCLUSION AND ORDER

Given that the CSAMP is targeted to form and develop key questions and experimental designs by January 1, 2014, approximately nine months from now, all deadlines in both the *Smelt* and *Salmonid* cases are extended by one year. On or before February 15, 2014, the parties shall submit a joint status report to the Court detailing progress that has been made in connection with the CSAMP as well as providing additional information about CSAMP's future activities and how any results will be incorporated into the consultation processes. As part of any such submission, the Court expects to see detailed schedules describing how CSAMP and the consultation processes in both cases will proceed. Concurrent with the filing of the joint status report, the Court will entertain a request to extend the remand schedule by an additional year, with the understanding that if substantial progress has been made

---

[7] It is notable that FWS already has completed and transmitted to Reclamation a draft revised Smelt BiOp, *see Smelt* Doc. 1069, and Reclamation has begun the related scoping process under NEPA, *see* 77 Fed. Reg. 18,858 (Mar. 28, 2012). Nevertheless, FWS's Mr. Lohoefener is concerned that issuing the BiOp according to the current schedule does not leave sufficient time to build consensus and "stakeholder buy-in" and therefore "will lead to further litigation." Supp. Lohoefener Decl. ¶ 9. According to Deputy Assistant Secretary Sobeck, this will "send all parties back to their litigation corners, which will severely limit further efforts at collaboration" and "will not help foster long-term solutions." Sobeck Decl. ¶ 6.

along the lines outlined by Movants, such an extension will be granted. The opposite is equally true. If substantial progress has not been made, further extensions will be nonexistent. Extension of the deadlines by a third year will require a similar showing at the end of the second year.

IT IS SO ORDERED.

Dated:   **April 9, 2013**                              **/s/ Lawrence J. O'Neill**
                                                                                    UNITED STATES DISTRICT JUDGE